DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARC F. MAHONEY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>FOUNDATION MEDICINE, INC., MICHAEL J. PELLINI, STEVEN KAFKA and JASON RYAN,<br><br>Defendants. | Civil Action No. 17-cv-11394<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Marc F. Mahoney ("Plaintiff"), on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Foundation Medicine, Inc. ("Foundation" or the "Company"), as well as conference call transcripts and media and analyst reports about the Company.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all purchasers of Foundation common stock between February 26, 2014 and November 3, 2015, inclusive (the "Class Period").  Plaintiff seeks to pursue remedies against Foundation and certain of its most senior executives under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule l0b-5 promulgated thereunder.

2.     Foundation provides expensive genetic tumor testing that costs upwards of $7,200 per test.

3.     At the start of the Class Period, there was no Medicare coverage for the Company's genomic testing and so almost no commercial insurance carriers offered coverage for it.

4.     During the Class Period, the Company made positive statements regarding the reimbursement process for its tumor tests by Medicare, claimed to be on track for obtaining Medicare coverage, and provided strong 2015 financial guidance, causing the price of its common stock to trade at fraud-inflated prices.

5.      On July 29, 2015, the Company finally disclosed that it was not making the strides obtaining coverage it had claimed to have been making during the Class Period and that in reality, Foundation would receive no Medicare payments in 2015 for its tumor profiling tests, due to a delay in receiving a local coverage determination ("LCD") from its regional Medicare Administrative Contractor ("MAC").  As a result of the delay, the Company slashed its 2015 financial guidance which, unbeknownst to investors, was based on an assumption that Medicare approval was going to be obtained in 2015.  Foundation had previously projected revenues of $105 million to $115 million for 2015, but lowered that forecast to a range of $85 million to $95 million, while revising its expectations for clinical test volumes downward to between 35,000 and 38,000 tests from a previous range of 43,000 to 47,000.

6.      During a conference call held that day to discuss its financial results and prospects, the Company's Chief Executive Officer ("CEO") Michael Pellini ("Pellini") disclosed that the original 2015 guidance had been based on Defendants' assumption that an LCD from Foundation's regional MAC would be in place in the first half of 2015 for at least some of Foundation's Medicare patients.  Pellini explained that lack of Medicare coverage impacted the number of clinical tests being ordered, not only for Medicare patients but also for non-Medicare patients, referring to a "spillover effect."

7.      On this news, the price of Foundation common stock plummeted, closing down $7 per share – a decline of ***approximately 24%*** – on July 30, 2015.

8.      Then, on November 3, 2015, the Company disclosed a further revision to the number of clinical tests it expected to report for 2015, now in the range of 32,000-33,000 clinical tests (a material reduction from its July 29, 2015 already-reduced expected number of 35,000-38,000 clinical tests for 2015).

9.    Following this disclosure, the price of Foundation common stock fell again, closing

down $6.62 per share to close at $17.31 per share on November 4, 2015, on unusually high trading

volume of more than 1.781 million shares trading.

## JURISDICTION AND VENUE

10.    Jurisdiction is conferred by §27 of the Exchange Act.  The claims asserted herein

arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  This

Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the

Exchange Act.

11.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C.

§1391(b) as many of the false and misleading statements alleged herein were disseminated from this

District.

12.    In connection with the acts alleged in this Complaint, Defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,

the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

13.    Plaintiff Marc F. Mahoney, as set forth in the accompanying Certification, which is

incorporated by reference herein, purchased Foundation common stock during the Class Period and

has been damaged thereby.

14.    Defendant Foundation, based in Cambridge, Massachusetts, develops, manufactures

and sells genomic analysis diagnostics for solid and circulating cancers.  As of May 6, 2015, the

Company had more than 34 million shares of common stock issued and outstanding, which trade in

an efficient market on the NASDAQ under the ticker symbol "FMI."

15.    Defendant Pellini was, throughout the Class Period, Foundation's CEO and a member

of its Board of Directors.  He is currently Chairman of the Company's Board of Directors.

16.     Defendant Steven Kafka ("Kafka") is, and was throughout the Class Period, Foundation's Chief Operating Officer ("COO").  He has also served as its President since March 23, 2015.

17.     Defendant Jason Ryan ("Ryan") is, and has been since March 23, 2015, Foundation's Chief Financial Officer ("CFO").  Prior to that he served as its Senior Vice President, Finance.

18.     Defendants Pellini, Kafka and Ryan are referred to herein as the "Individual Defendants."  Foundation and the Individual Defendants are referred to herein, collectively, as "Defendants."

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of Foundation during the Class Period (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

20.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Foundation common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Foundation and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

21.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

22.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

23.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by Defendants as alleged herein;

(b)     whether statements made by Defendants misrepresented material facts about the business, operations and prospects of Foundation; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

24.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## BACKGROUND

25.     Defendant Foundation develops, manufactures and sells genomic analysis diagnostic tests for solid and circulating cancers that are based on next-generation sequencing technology.

26.     The Company's flagship products are the FoundationOne tumor profiling test, and the FoundationOne Heme diagnostic test for blood cancers.   The price for the FoundationOne test is $5,800 and the price for the FoundationOne Heme test is $7,200.

27.     Reimbursement has been a major hurdle in the clinical sequencing and molecular diagnostic space as a whole, and neither Medicare nor almost any commercial insurance carrier has agreed to provide coverage for the Company's tests, significantly diminishing demand for them.  If Foundation obtained coverage approval from its regional MAC, and Medicare began to cover the tests, it was expected that commercial insurers would cover as well.

28.     In October 2013, the Company undertook an initial public stock offering and listed its shares on the NASDAQ.

### DEFENDANTS' MATERIALLY FALSE AND
### MISLEADING STATEMENTS DURING THE CLASS PERIOD

29.     The Class Period begins on February 26, 2014.  The prior evening, after the close of regular trading, Foundation hosted a conference call with investors to discuss its 2013 fiscal year-end results. During the call, Defendant Ryan, then Senior Vice President of Finance, announced that the Company had begun submitting reimbursement claims to Medicare using a different product coverage code. Defendant Ryan emphasized how Foundation was strategically planning to have codes for FoundationOne and FoundationOne Heme recognized, as these types of codes had already been adopted by Medicare administrative contractor Palmetto GBA ("Palmetto"). Defendant Ryan stated, in relevant part:

> ***Regarding Medicare we are now submitting claims.***  As a reminder, we made a decision to begin submitting these claims primarily because the volume of our Medicare claims has grown substantially given our commercial growth.  We expect that this will be a process that plays out over time.  ***We also want to give some additional color on our initial approach to billing Medicare.  We submitted these claims using a miscellaneous code, not start code as we have originally done with the non-governmental commercial payers.***  In addition, because current coding the current coding landscape is not content code specific enough for test or as comprehensive and precise as FoundationOne and FoundationOne Heme, we've submitted an application on the McKesson diagnostic exchange to establish to unique Z-Code identifiers for these two asset.  In its current form the system will map the Z-Code identifiers to FoundationOne and FoundationOne Heme.  ***The Z-Code identifiers have already been adopted by Palmetto as part of the MolDX program that determines coverage and payment from Medicare in 17 states.  While***

- 6 -

> **Massachusetts is not yet one of the state, the MolDX program is expected by many to be adopted broadly by other Medicare administrated contractors and by U.S. commercial payers.**[1]

30.     On March 7, 2014, Foundation filed its 2013 Annual Financial Report on Form 10-K with the SEC which was signed and certified as to compliance with the Sarbanes Oxley Act of 2002 by Defendants Pellini and Ryan. In the 10-K, Foundation stated that it had changed its MAC to National Government Services and reaffirmed its strategy to achieve better coverage through the "leading role" of Palmetto in coverage determination, stating in relevant part:

> Palmetto GBA, **a Medicare administrative contractor that currently plays a leading role in discussions about coverage determinations for complex molecular tests**, has established the Molecular Diagnostic Services program, or MolDX. MolDX is currently used to help determine coverage and payment for Medicare in 17 states. Z-Codes have been adopted by Palmetto as part of MolDX.  While Massachusetts is not one of those states, **MolDX is expected by many to be adopted broadly by other Medicare administrative contractors and US commercial payors, including potentially, National Government Services, our Medicare administrative contractor in Massachusetts**.

31.     On November 5, 2014, Foundation issued a press release announcing its 3Q 2014 financial results for the period ended September 30, 2014, along with the announcement of a "Secured broad reimbursement coverage for FoundationOne® and FoundationOne® Heme from Priority Health." During the conference call that followed, Defendant Ryan then emphasized how it "represents tangible evidence of the progress that [they are] continuing to make with certain payers."

32.     On January 12, 2015, in addition to announcing Roche's purchase of a 56.3% stake in the Company through a US$780 million purchase of newly issued shares, Foundation issued a press release preliminarily announcing its unaudited full-year 2014 financial results for the period ended December 31, 2014.  One of "several commercial and operational accomplishments in 2014" the release highlighted was that Foundation had "[s]ecured first broad payor coverage of FoundationOne

---

[1]     All emphasis is added, unless otherwise noted.

and FoundationOne Heme by Priority Health." The release also quoted defendant Pellini, stating, in pertinent part, as follows:

> The rapid revenue growth in 2014 was driven by progress across the three key pillars of our business, specifically, the continued adoption of comprehensive genomic profiling by oncologists in both the academic and community setting, ***an increase in demand from our pharmaceutical partners for clinical trial support***, and expanded access to our molecular information platform. . . . Once again, the team at Foundation Medicine executed well on our business and delivered real value to our clients and their patients, as we exceeded our total revenue guidance for the year.

33.    That same morning, Foundation held a conference call with investors conducted by the Individual Defendants, wherein additional positive statements were made about the strength of the Company's ongoing business metrics and financial prospects. During the call, Defendant Pellini emphasized that "on [the reimbursement] front, we do believe we are – ***we continue to make progress with*** several of the key national players, ***as well as a couple of the [MACs] which are so important to our approach on the Medicare front***. So we feel good about the direction that everything is heading, and we think this only complements the work that we've been doing for the past several years."

34.    The market responded positively to Defendants' false and misleading statements about the status of the Company's business metrics and financial prospects and the price of Foundation common stock surged, opening above $54 per share, an increase of more than $30 per share – up 125% from the prior night's close – and a Class Period high – and closing up approximately $22 per share on January 12, 2015, on unusually high trading volume of more than nine million shares traded, an increase of more than 35x the average daily volume during the preceding ten trading sessions.

35.    On January 23, 2015, *Bloomberg's* Cristin Flanagan reported that stock analyst Leerink Partners's Dan Leonard had issued a client note entitled "Foundation Medicine Gets 'Big Win' on Coverage Decision," which stated, in pertinent part, that Foundation's "tumor test,

FoundationOne [got] draft coverage determination from Medicare Administrative Contractor (MAC), Palmetto, GBA, in non-small lung cancer." Citing the *Leerink* client note, the *Bloomberg* report emphasized that "[o]ther MACs, commercial payers may follow with coverage" and that Foundation could "see added rev[enue] in the [second half of 2015]."

36.     Though stock analyst Leerink nominally issued the announcement, based on the facts that Foundation was then in the process of scheduling an appearance by defendant Kafka at the Leerink Global Healthcare Conference on in early February 2015, and that the draft policy issued by Palmetto that day did not mention the FoundationOne test name and so Foundation would have had to have brought the draft coverage determination to Leerink's attention, more likely than not it was Foundation that alerted Leerink to the issuance of Palmetto's draft coverage determination, claimed that the determination applied to FoundationOne and caused Leerink to issue its client note.

37.     On this news, the price of Foundation stock increased another $1.68 per share on high trading volume on January 23, 2015.

38.     On February 24, 2015, the Company issued a press release announcing its 4Q and 2014 financial results for the period ended December 31, 2014, along with "Recent Highlights and 2015 Outlook." The release quoted defendant Pellini emphasizing that "[c]ommercial execution and growth rates were strong across both [of the Company's] clinical and pharma customers in the fourth quarter, *highlighting the broad adoption of [its] comprehensive genomic profiling approach,"* and again highlighted that "[i]n November, broad reimbursement coverage for FoundationOne and FoundationOne Heme was announced by Priority Health." As to "2015 Outlook," the release stated, in pertinent part, as follows:

- *The company expects to report between 43,000 and 47,000 clinical tests in 2015*.

- *The company anticipates 2015 revenue will be in the range of $105 - $115 million* assuming completion of the Roche transaction in the second quarter of 2015.

- ***The company expects operating expenses in the range of $128 to $138 million***.

39.   Foundation held a conference call with investors that morning as well, further elaborating on the status of business metrics and financial prospects.   During his introductory comments, defendant Pellini announced that the Company had received a positive coverage decision from Palmetto, which was not Foundation's regional MAC, but one that Defendants claimed was very influential as to other MACs, stating, in pertinent part, as follows:

> . . . . we crossed an important milestone in the reimbursement landscape with Palmetto's Draft Local Coverage Determination for comprehensive genomic profiling in its specific clinical indication.  ***This activity combined with a broad coverage decision for FoundationOne and FoundationOne Heme from Priority Health, represents meaningful progress in our efforts towards broad-based reimbursement, setting the stage for continued progress in 2015***.

40.   Defendant Ryan too discussed the purportedly positive momentum then underway in the Company's efforts to obtain coverage, stating, in pertinent part, as follows:

> The average reimbursement per clinical test recognized in revenue in Q4 was approximately $3,600, again, consistent with the prior quarters.  ***As Mike mentioned, we were encouraged by signs of forward progress in reimbursement landscape, headlined by Palmetto's Draft Local Coverage Determination published in January.***
>
> ***This Draft LCD was a very important step forward, because it specifically relates to comprehensive genomic profiling in certain patients with non-small cell lung cancer, and because it sets a standard for the rigorous analytic validation that's required with this type of testing***.
>
> Although Palmetto was not our MAC, ***they are considered a thought leader and an influential voice in molecular diagnostics.  We look forward to building on this important momentum and hopefully establishing a similar LCD with our own MAC, National Government Services***.

41.   On March 13, 2015, the Company filed its 2014 Annual Financial Report on Form 10-K with the SEC which was signed and certified as to compliance with the Sarbanes Oxley Act of 2002 by Individual Defendants Pellini and Ryan.  Concerning momentum being made on obtaining wider reimbursement for its tumor tests, the Form 10-K stated, in pertinent part, as follows:

- 10 -

In January 2015, a draft LCD was published by Palmetto *and includes proposed reimbursement for comprehensive genomic profiles for highly validated testing in an initial subset of patients diagnosed with non-small cell lung cancer. We believe this is an important first step towards broader coverage, and we believe Palmetto is considered a key thought leader among the other MACs*. We will continue to work with our regional MAC, National Government Services, to pursue similar progress within our own Medicare jurisdiction. The Priority Health agreement and the *Palmetto LCD are important initial milestones that we believe can lay the groundwork for broader commercial third-party and government payor coverage of FoundationOne and FoundationOne Heme*.

*        *        *

Palmetto, *which currently plays a leading role in discussions about coverage determinations for complex molecular tests*, has established the Molecular Diagnostic Services program, or MolDX, which is currently used to help determine coverage and payment for Medicare in 17 states. Z-Codes have been adopted by Palmetto as part of MolDX. While Massachusetts is not one of the 17 states, *MolDX is expected by many to be adopted broadly by other MACs and commercial payors, including potentially National Government Services*.

42.     On May 11, 2015, the Company issued a press release announcing its first quarter 2015 financial results for the period ended March 31, 2015. The release quoted defendant Pellini, stating, in pertinent part, that Foundation was "continuing to build a transformational business for the long-term, and [had] made significant progress in that direction during the first quarter." As to "2015 Outlook," the release reaffirmed the Company was still on track to achieve "between 43,000 and 47,000 clinical tests in 2015," "2015 revenue … in the range of $105 - $115 million," and "operating expenses in the range of $128 to $138 million."

43.     Foundation held a call with investors that morning as well, further elaborating on the status of business metrics and financial prospects. During his introductory comments, defendant Ryan discussed the current status of the Company's coverage momentum, stating, in pertinent part, as follows:

*During the first quarter, we saw meaningful progress in the reimbursement landscape with Palmetto's Draft Local Coverage Determination published in January. The draft LCD is an important step because it specifically relates to*

- 11 -

*comprehensive genomic profiling and because it sets a high standard for the rigorous, analytic validation required for this type of approach*.

*We expect the Draft LCD to be finalized in the near-time and we're hopeful that our MAC, National Government Services will follow in that direction.  We anticipate that this first coverage determination will lead to broader coverage over time, both in lung cancer and in additional clinical indications.  And we're also engaged in a productive dialogue at the national CMS level which may be impactful to our reimbursement efforts over the longer term*.  We continue to submit claims to Medicare using the miscellaneous code and consistent with our expectations we haven't yet received payment on those submissions.

44.    Reiterating the Company's 2015 financial guidance, defendant Ryan assured investors that Foundation "continue[d] to have very conservative expectations with respect to any backlog revenue," and that it was still on track to achieve the outsized financial guidance provided in February, stating, in pertinent part, as follows:

Looking out at the reminder of 2015, we are maintaining our current annual guidance.  First, we expect to perform between *43,000 and 47,000 clinical tests* for the year.  *At the midpoint, this represents approximately 85% year-over-year growth.*  Second, we anticipate that 2015 total revenue will be in the range of $105 million to $115 million….

And third we anticipate total OpEx in the range of $128 to $138 million….

45.    On May 27, 2015, the staff of the SEC's Division of Corporate Finance wrote defendant Ryan a letter asking for additional detail addressing "whether the FoundationOne Heme test had a significant impact on the fiscal 2014 increase in total revenue or average revenue per test" and asked him to "confirm that [Foundation would] disclose such information in future filings, to the extent significant," expressly referencing "Item 303(a)(3)(iii) of Regulation S-K," which directs issuers to discuss all known trends expected to affect financial performance.

46.    The statements referenced above in ¶¶29-33, 35 and 38-44 were each materially false and misleading when made as they failed to disclose and misrepresented the following adverse facts which were known to Defendants or recklessly disregarded by them as follows:

(a)     Palmetto was having little influence over the coverage determination of Foundation's MAC, National Government Service;

(b)     Based on its ongoing conversations with its MAC, National Government Service, Foundation lacked a reasonable basis to predict that Palmetto was exerting sufficient influence over National Government Service's coverage determination, and as such had no basis to include the additional testing that local Medicaid coverage approval would entail in its 2015 guidance; and

(c)     As a result of the foregoing, the Company was not on track to achieve the financial results and performance Defendants claimed the Company was on track to achieve during the Class Period.

47.     Suddenly, on July 29, 2015, before the opening of trading, Foundation issued a press release announcing its second quarter 2015 financial results and downgrading its financial guidance. The release quoted defendant Pellini disclosing that Foundation's "clinical volume growth was affected by slower than anticipated progress towards obtaining a local coverage determination from [its] regional Medicare Administrative Contractor (MAC)," and that "[a]s a result, [the Company was] adjusting guidance for clinical volume and annual revenues." The Company reduced its 2015 clinical test guidance to "between 35,000 and 38,000 clinical tests," down significantly from "between 43,000 and 47,000 clinical tests in 2015," and its 2015 revenue guidance to "the range of $85 to $95 million," also down significantly from "the range of $105 - $115 million," without concomitantly reducing its operating expense target, and thus significantly reducing its 2015 profitability forecast.

48.     During the conference call held with investors that morning, defendant Pellini discussed the reversal in the prior momentum claimed to be underway in obtaining broader coverage,

acknowledging that Foundation was "*no longer assuming any Medicare payment for the rest of 2015*," and stating in pertinent part as follows:

> *Another impact on our commercial velocity this quarter was slower than expected progress with Medicare and certain national commercial payers. Because of this we aren't seeing the commonly observed carryover effect from a coverage decision that we would typically expect to see in the field. Our 2015 annual guidance for clinical volume testing was developed based on certain assumptions, including having a local coverage determination or LCD for a portion of Medicare cases in place starting in the first half 2015.*
>
> As guided by Medicare to local and national levels, we worked closely with Palmetto GBA, even though they are not the specific Medicare Administrative Contractor, or MAC for our region. *While there is no direct precedent for this approach,* Palmetto was the only MAC with expertise in assessing cutting edge molecular testing and it was strongly suggested that other MACs, including [indiscernible], National Government Services, or NGS, would look to Palmetto for guidance on this important area. The first part of the effort took shape. Palmetto's LCD for comprehensive genomic profiling in a subset of patients with non-small cell lung cancer became final as of July 6th. We expect Palmetto to establish in Q3 a reasonable payment approach that reflects a clear need to maintain very high standards for analytic validation of comprehensive genomic profiling. We anticipated NGS to be more proactive based on the Palmetto decision, *but we now realize this next phase is going to take more time to play out.*

49.    On this news, the price of Foundation common stock plummeted, closing down $7 per share – approximately 24% – on July 30, 2015, on unusually high trading volume of more than 1.677 million shares traded.

50.    Then, on November 3, 2015, the Company disclosed a further revision to the number of clinical tests it expects to report for 2015, now in the range of 32,000-33,000 clinical tests (a material reduction from its July 29, 2015 already-reduced expected number of 35,000-38,000 clinical tests for 2015).

51.    Following this disclosure, the price of Foundation common stock fell further, closing down $6.62 per share to close at $17.31 per share on November 4, 2015, on unusually high trading volume of more than 1.781 million shares trading.

52.     The market for Foundation common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and omissions as set forth above, Foundation common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Foundation common stock relying upon the integrity of the market price of Foundation common stock and market information relating to Foundation, and have been damaged thereby.

53.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Foundation common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

54.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Foundation's business, prospects, and operations.  These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of Foundation and its business, prospects, and operations, thus causing the Company's stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing Foundation common stock at artificially inflated prices, thus causing the damages complained of herein.  When the true facts about the Company were revealed to the market, the

- 15 -

inflation in the price of Foundation common stock was removed and the price of Foundation common stock declined dramatically, causing losses to Plaintiff and the other members of the Class.

## ADDITIONAL SCIENTER ALLEGATIONS

55.     As alleged herein, Foundation and the Individual Defendants acted with scienter in that they: knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding Foundation, their control over, and/or receipt and/or modification of Foundation's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Foundation, participated in the fraudulent scheme alleged herein.

## NO SAFE HARBOR

56.     The "Safe Harbor" warnings accompanying Foundation's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  *See* 15 U.S.C. §78u-5(b)(2)(A).

57.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Foundation who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or

relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICATION OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET

58.     Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     Foundation common stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Foundation common stock; and

(e)     Plaintiff and other members of the Class purchased Foundation common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

59.     At all relevant times, the market for Foundation common stock was efficient for the following reasons, among others:

(a)     As a regulated issuer, Foundation filed periodic public reports with the SEC; and

(b)     Foundation regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on

the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## LOSS CAUSATION/ECONOMIC LOSS

60.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Foundation common stock and operated as a fraud or deceit on Class Period purchasers of Foundation common stock by misrepresenting the value of the Company's business and prospects.  As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Foundation common stock fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of Foundation common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

61.     Plaintiff incorporates ¶¶1-60 by reference.

62.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

63.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a

course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Foundation common stock during the Class Period.

64.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Foundation common stock.  Plaintiff and the Class would not have purchased Foundation common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against All Defendants

65.     Plaintiff incorporates ¶¶1-64 by reference.

66.     The Individual Defendants acted as controlling persons of Foundation within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, and their ownership of Foundation common stock, the Individual Defendants had the power and authority to cause Foundation to engage in the wrongful conduct complained of herein.  Foundation controlled the Individual Defendants and all of the Company's employees.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  July 28, 2017                    **HUTCHINGS BARSAMIAN**
                                         **MANDELCORN, LLP**
                                         THEODORE M. HESS-MAHAN, BBO #557109


                                         */s/Theodore M. Hess-Mahan*
                                         THEODORE M. HESS-MAHAN

                                         110 Cedar Street, Suite 250
                                         Wellesley Hills, MA 02481
                                         Telephone:  781/431-2231
                                         781/431-8726 (fax)
                                         thess-mahan@hutchingsbarsamian

                                         ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                         Samuel H. Rudman
                                         David A. Rosenfeld
                                         58 S. Service Road, Suite 200
                                         Melville, NY 11747
                                         Telephone:  631/367-7100
                                         631/367-1173 (fax)

LEVI & KORSINSKY LLP
Nicholas I. Porritt
Adam M. Apton
Adam C. McCall
1101 30th Street NW, Suite 115
Washington, DC 20007
Telephone:  202/524-4290
202/333-2121 (fax)

*Counsel for Plaintiff*