UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MARC F. MAHONEY, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 1:17-cv-11394-LTS |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | |
| | ) | AMENDED CLASS ACTION COMPLAINT |
| vs. | ) ) | FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| FOUNDATION MEDICINE, INC., MICHAEL J. PELLINI, STEVEN KAFKA and JASON RYAN, VINCENT MILLER, M.D. and DAVID DALY, | ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

## TABLE OF CONTENTS

Page

I.    NATURE OF THE ACTION ........................................................................1

II.   JURISDICTION AND VENUE ...................................................................5

III.  PARTIES .....................................................................................................6

      A.    Plaintiff............................................................................................6

      B.    Defendants .......................................................................................6

IV.   SUBSTANTIVE ALLEGATIONS ...........................................................11

      A.    Overview of Foundation's Business ..............................................11

      B.    Foundation Tried to Differentiate Its Tests from Other Molecular
            Diagnostic Tests on the Market .....................................................15

      C.    Throughout 2014, Foundation Reports Steadily Increasing Clinical Test
            Volumes While Concealing Fundamental Problems with the Company's
            Business .........................................................................................17

      D.    Obtaining Medicare Coverage and Reimbursement Was Critical to
            Foundation Commercial Success and Saving Defendants from a
            Revelation of Their Fraud ..............................................................23

      E.    During the Class Period, Defendants Led Investors to Believe that the
            Company Would Obtain Broad Medicare Coverage and Reimbursement
            for FoundationOne and FoundationOne Heme ..............................27

      F.    Defendants Knew, or Recklessly Disregarded, that Foundation Would Not
            Achieve Broad Medicare Coverage and Reimbursement in 2014 or 2015 ..........31

      G.    Defendants Issued 2015 Guidance that They Knew Was Not Achievable ...........33

      H.    The Truth About the Negative Effects of Competition from Other
            Molecular Diagnostic Tests and Medicare Reimbursement Challenges
            Was Slowly Revealed to the Market Beginning on May 11, 2015 ........................33

      I.    In October 2015, Foundation's Local MAC Finally Issues a Narrow Draft
            Local Coverage Determination for One Clinical Indication ...............................37

      J.    The Full Truth About the Negative Effects of Competition and
            Reimbursement Challenges Is Finally Fully Revealed ...........................................38

# TABLE OF CONTENTS

**Page**

K.    Post-Class Period Events Confirm that Defendants Knew, or Recklessly Disregarded, that Foundation Would Not Obtain Broad Medicare Coverage and Reimbursement ...................................................................40

V.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ................................................41

    A.    Fourth Quarter and Full Year 2013 Financial Results ...........................43

    B.    First Quarter 2014 Financial Results .....................................................52

    C.    Second Quarter 2014 Financial Results ..................................................59

    D.    Third Quarter 2014 Financial Results ....................................................66

    E.    Fourth Quarter 2014 Financial Results ..................................................73

VI.    THE TRUTH BEGINS TO EMERGE ..............................................................80

    A.    First Quarter 2015 Financial Results .....................................................80

    B.    Second Quarter 2015 Financial Results ..................................................88

    C.    Third Quarter 2015 Financial Results ....................................................97

VII.    POST-CLASS PERIOD REVELATIONS .......................................................101

VIII.    LOSS CAUSATION/ECONOMIC LOSS ......................................................101

    A.    May 11, 2015 Revelations ....................................................................102

    B.    July 29, 2015 Revelations .....................................................................103

    C.    November 3, 2015 Revelations .............................................................104

IX.    ADDITIONAL ALLEGATIONS REGARDING SCIENTER .......................106

X.    PRESUMPTION OF RELIANCE .................................................................114

XI.    NO SAFE HARBOR ......................................................................................116

XII.    CLASS ACTION ALLEGATIONS ..............................................................117

Lead Plaintiff John A. Blair ("Plaintiff"),[1] on behalf of all others similarly situated, alleges the following against Defendants Foundation Medicine, Inc. ("Foundation" or "Company"), Michael J. Pellini, M.D. ("Pellini"), Steven Kafka, Ph.D. ("Kafka"), Jason Ryan ("Ryan"), Vincent Miller, M.D. ("Miller"), and David Daly ("Daly") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included: (a) review and analysis of public filings made by Foundation with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications by other related non-parties concerning Foundation; (c) review of news articles, securities analyst reports, and shareholder communications; (d) review of other publicly available information concerning Foundation; (e) consultation with experts; and (f) interviews with former employees of Foundation.   Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and control.   Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.   This is a federal securities fraud class action against Foundation and certain of its officers for violations of the federal securities laws.   Plaintiff brings this action on behalf of himself and all other similarly situated persons or entities, who purchased the publicly traded common stock of Foundation between February 26, 2014 and November 3, 2015 ("Class Period") and who were damaged thereby ("Class").   This action seeks remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation

---

[1]   Lead Plaintiff, Marc F. Mahoney, due to personal circumstances, is no longer able to serve as a lead plaintiff.   A separate notice indicating his formal withdrawal from the litigation will be filed.

Reform Act of 1995, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

2.      Foundation billed itself as a "commercial-stage company focused on fundamentally changing the way patients with cancer are treated."  Recent advancements in science and medicine have led to the recognition that cancer is a disease of the genome, not a disease defined solely by the anatomical organ or tissue where it began.  Foundation sought to capitalize on the paradigm shift that has occurred over the last decade in the understanding of how cancer is diagnosed and treated through the development of its two flagship products, FoundationOne and FoundationOne Heme, which Defendants described as "the first commercially available comprehensive molecular information products for analysis of routine cancer specimens in a clinical setting."  Put simply, FoundationOne and FoundationOne Heme are diagnostic tests that identify genomic mutations associated with cancer.

3.      Critical to the commercial success of Foundation and it tests were:  (1) adoption of Foundation's tests by community-based physicians, which comprised 85% of the approximately 10,000 oncologists in the United States and, therefore, treated the vast majority of patients with cancer; and (2) obtaining Medicare coverage and reimbursement for the FoundationOne and FoundationOne Heme tests, as patients covered by Medicare represented approximately 30%-31% of total tests reported to physicians in the United States and without Medicare coverage, private insurance companies were less likely to cover the tests and physicians were less likely to order them for patients.

4.      Throughout 2014, Foundation reported sequential growth in clinical test volumes, a key metric Defendants, analysts and investors closely followed.  Defendants made numerous materially false and misleading statements and omissions which were designed to and gave the false

impression that Foundation was making inroads with the critically important community-based physician market.  As Defendants knew, or recklessly disregarded, Foundation was boosting clinical test volumes and revenue through physician incentives and other practices.  Further, contrary to Defendants' Class Period statements, Foundation's tests were not gaining traction with community-based physicians due to competition from other molecular diagnostic tests and because physicians did not find Foundation's tests to be useful, among other reasons.

5.      Despite knowledge of the foregoing, Defendants raised clinical test volume and revenue guidance for 2015 which, at the midpoint, represented approximately 85% year-over-year growth in clinical test volumes.  Unbeknownst to investors, however, Defendants had pinned their hopes for commercial success in 2015 on their continued fraudulent activities and on obtaining broad Medicare coverage and reimbursement, which Defendants knew, or recklessly disregarded, were not attainable.

6.      Specifically, during the Class Period, Foundation was focused on obtaining coverage and reimbursement for FoundationOne and FoundationOne Heme for six clinical indications.  Defendants sought to convince analysts and investors that broad Medicare coverage and reimbursement was likely by issuing a steady and misleading stream of positive news regarding reimbursement.  As Defendants knew, or recklessly disregarded, Foundation could not and would not obtain broad Medicare coverage and, at most, would only be able to obtain coverage for a single, narrow clinical indication reimbursable at a fraction of the approximately $3,400 to $3,600 average reimbursement the Company reported.

7.      Faced with declining clinical test volumes, the truth about Foundation's increasing competitive pressure and reimbursement challenges was slowly revealed to the market in a series of disclosures beginning on May 11, 2015.  On that day, the Company announced weak 1Q15 results

- 3 -

which missed analysts' estimates. Defendants revealed that the disappointing clinical test volumes were due in part to "increased confusion in the marketplace." But Foundation downplayed the true extent to which competitive noise was adversely impacting clinical test volumes and concealed continuing challenges with obtaining broad Medicare coverage and reimbursement. The price of Foundation stock fell 9.8%, but would have fallen further had the true extent of Defendants' fraud been revealed.

8.     On July 29, 2015, the Company posted another quarter of disappointing results, which Defendants attributed to "slower than anticipated progress towards obtaining a local coverage determination from our regional Medicare Administrative Contractor (MAC)" and "some competitive noise in the market." Defendants shocked investors by slashing 2015 guidance, revealing that the Company expected to report revenue in the range of $85 million to $95 million, down from $105 million to $115 million, and between 35,000 and 38,000 clinical tests, down from 43,000 to 47,000 tests. Defendants then revealed what had previously been concealed: "Our 2015 annual guidance for clinical volume testing was developed based on certain assumptions, including having a local coverage determination, or LCD, for a portion of Medicare cases in place, starting in the first half of 2015." Following Defendants' announcement, the price of Foundation stock dropped 24% on July 30, 2015, and another 9% on July 31, 2015.

9.     Finally, on November 3, 2015, the Company reported yet another quarter of lower-than-expected revenues and the third straight quarter in which clinical volumes missed analysts' estimates. Defendants attributed the disappointing results to a slowdown in reorder rates, oncologists reserving Foundation's tests for patients with the most difficult medical conditions and difficulty in using all molecular information uncovered during the testing process. In light of these lackluster results, Foundation again reduced clinical testing volume guidance to between 32,000 and

33,000 for FY15, down from July's expected range of 35,000 to 38,000. In reaction to Defendants' announcement, the price of Foundation stock tumbled 28%. To date, Foundation has not obtained the broad Medicare reimbursement it led investors to believe it would achieve. Meanwhile, Defendants profited handsomely from their fraud, as they collectively sold ***more than 544,000 shares*** of stock for profits of ***over $21 million***.

## II.   JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

11.     This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331, because this is a civil action arising under the laws of the United States.

12.     Venue is proper in this District under Section 27(c) of the Exchange Act, 15 U.S.C. §78aa(c), and 28 U.S.C. §1391(b)-(d). Many of the acts and transactions that constitute the alleged violations of law occurred in this District. In addition, Foundation maintained its principal executive offices in this District during the Class Period.

13.     In connection with the acts and transactions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the United States mail, interstate telephone and other electronic communications, and the facilities of the NASDAQ Global Select Market ("NASDAQ"), a national securities exchange.

### III.    PARTIES

#### A.    Plaintiff

14.    Plaintiff John A. Blair, as set forth in his certification previously filed with this Court [ECF No. 13-3] and incorporated by reference herein, purchased Foundation common stock during the Class Period and suffered damages.

#### B.    Defendants

15.    Defendant Foundation Medicine, Inc., based in Cambridge, Massachusetts, develops, manufactures, and sells genomic analysis diagnostics for solid and circulating cancers.  Foundation was founded in 2009 by members of some of the leading cancer institutes, including the Broad Institute, the Dana-Faber Cancer Institute, Harvard Medical School, and the Massachusetts Institute of Technology.  On September 30, 2013, the Company closed its initial public offering of common stock wherein it sold 6,772,221 shares of common stock at a public offering price of $18.00 per share, which totaled net proceeds of approximately $110.4 million.  As of May 6, 2015, the Company had more than 34 million shares of common stock issued and outstanding, which trade on the NASDAQ exchange under the ticker symbol "FMI."

16.    Defendant Michael J. Pellini, M.D. joined the Company in May 2011 and served, at all relevant times, as Chief Executive Officer ("CEO") of Foundation.  Defendant Pellini joined Foundation from Clarient, Inc. ("Clarient"), a General Electric Healthcare Company ("GE Healthcare"), where he held the positions of President and Chief Operating Officer ("COO") from April 2008 to April 2011 and served on its board of directors from May 2007 to April 2009.  Defendant Pellini served as Vice President, Life Sciences at Safeguard Scientifics, Inc., a private equity and venture capital firm specializing in expansion financings, growth capital, management buyouts, recapitalizations, industry consolidations, corporate spinouts, growth stage, and early stage financings, from March 2007 to April 2008 and, as part of this role, was detailed to Clarient

beginning in July 2007.   Defendant Pellini received a B.A. from Boston College, an M.B.A. from Drexel University, and an M.D. from Jefferson Medical College, now the Sidney Kimmel Medical College, of Thomas Jefferson University.   He resigned from Foundation on February 6, 2017. During the Class Period, Defendant Pellini sold 318,300 shares of Foundation common stock for total proceeds of $13,005,807.

17.     Defendant Jason Ryan has served as Foundation's Chief Financial Officer ("CFO") since March 2015; as the Senior Vice President, Finance from January 2014 to March 2015; and as the Vice President, Finance from March 2012 to January 2014.   He previously served as Foundation's Senior Director, Finance from May 2011 to March 2012.   Prior to joining Foundation, Defendant Ryan led the finance and strategic planning functions of Taligen Therapeutics, Inc., which was acquired by Alexion Pharmaceuticals, Inc., from May 2009 to April 2011; Codon Devices Inc. from May 2007 to May 2009; and Genomics Collaborative, Inc., which was acquired by SeraCare Life Sciences Inc., from September 1998 to September 2004.   Defendant Ryan began his career at Deloitte & Touche LLP.   Defendant Ryan holds a B.S. in economics from Bates College, an M.B.A. from Babson College, and earned a C.P.A. in Massachusetts.   During the Class Period, Defendant Ryan sold 65,689 shares of Foundation common stock for total proceeds of $2,168,643.

18.     Defendant Steven Kafka, Ph.D. joined the Company in January 2013 and has served as Foundation's President and COO since March 2015, was the COO from May 2013 to March 2015, and was the Chief Business Officer from January 2013 to May 2013.   Defendant Kafka was previously COO and CFO at Aileron Therapeutics Inc. ("Aileron"), a biopharmaceutical company based in Cambridge, Massachusetts from September 2009 to October 2012.   Before Aileron, from September 2006 to September 2009, Defendant Kafka was Vice President of Finance at Infinity Pharmaceuticals, Inc., a drug discovery and development company.   Defendant Kafka earned his

B.A. from Stanford University and his Ph.D. from Harvard University. During the Class Period, Defendant Kafka sold 91,265 shares of Foundation common stock for proceeds of $3,618,282.

19.     Defendant Vincent Miller, M.D. was appointed to serve as Foundation's Chief Medical Officer ("CMO") on July 2013. He joined the Company in October 2011 and served as the Senior Vice President, Clinical Development between then and July 2013. Defendant Miller served between July 1991 and October 2011 as an attending physician, and Defendant Miller has served since November 2011 to the present as a consulting physician at Memorial Sloan-Kettering Cancer Center. Defendant Miller earned his B.A. from the University of Pennsylvania and his M.D. from the University of Medicine and Dentistry of New Jersey in Newark. During the Class Period, Defendant Miller sold 68,977 shares of Foundation common stock for total proceeds of $2,280,826.

20.     Defendant David Daly joined Foundation in December 2014 and serves as the Company's Chief Commercial Officer ("CCO"). Prior to joining Foundation, from March 2014 to December 2014, Defendant Daly served as Vice President, Commercial Operations for the Anatomic Pathology Division at Thermo Fisher Scientific Inc. ("Thermo Fisher"). Prior to its acquisition by Thermo Fisher, from June 2012 to March 2014, Defendant Daly served as head of oncology, medical sciences at Life Technologies Corporation ("Life Technologies"), a commercial clinical diagnostics company. Prior to Life Technologies, from May 2009 to June 2012, Defendant Daly served as CCO for Clarient, an anatomic pathology company that was later acquired by GE Healthcare. Defendant Daly also served as Vice President of Commercial Operations at Clarient from February 2008 to May 2009. Defendant Daly was also Vice President of Sales and Marketing from February 2006 to February 2008 and Vice President of Sales from February 2005 to February 2006 at Clarient. In addition, Defendant Daly also served in various sales and marketing leadership roles in molecular diagnostics, hematology, and laboratory automation with Roche Diagnostics and Abbott

Laboratories.  Defendant Daly holds B.A. and M.A. degrees in economics from the University of California, Irvine and Santa Barbara, respectively.

21.     The Defendants referenced above in ¶¶16-20 are sometimes referred to herein as the "Individual Defendants."

22.     Because of the Individual Defendants' positions with the Company, they each had access to the adverse, undisclosed information about Foundation's business, operations, products, operational trends, financial statements, markets, and present and future business prospects via internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, and attendance at management and/or Board meetings and committees.

23.     It is appropriate to treat Defendants as a group for pleading purposes and to presume that the materially false, misleading, and incomplete information conveyed in the Company's public filings, press releases, and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above.  Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

24.     As officers and controlling persons of a publicly held company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, which is

governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects.   In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded stock would be based upon truthful and accurate information.   Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

25.   The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.   Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

26.   Each Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Foundation common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme:   (a) deceived the investing public regarding Foundation's financial performance, business, products, operations, management, and the intrinsic value of Foundation common stock; (b) enabled the Individual Defendants to sell over $18.8 million of their personally held Foundation

common stock to the unsuspecting public at artificially inflated prices; and (c) caused Plaintiff and the Class to purchase Foundation publicly traded stock at artificially inflated prices.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Overview of Foundation's Business

27.   During the Class Period, Foundation billed itself as a "commercial-stage company focused on fundamentally changing the way patients with cancer are treated." Cancer is not a single disease, but a complex disease driven by a series of changes within cells at the genetic level, which leads to uncontrolled cell division and growth. In the U.S. alone, according to the National Cancer Institute, there are approximately 13 million people living with cancer.

28.   For decades, cancers have been classified by the organ or tissue where they begin, such as the breast, skin, bone marrow, digestive system, and prostate gland, typically followed by treatment with surgery, broad-cytotoxic chemotherapy and/or radiation. or drugs approved for specific tumor location. However, advancements in both science and medicine have led to the recognition that cancer is a disease of the genome,[2] not a disease defined solely by the anatomical organ or tissue where it began. For example, research has shown that certain lung cancers share some of the same abnormal, or mutated, genes as some brain cancers and that gene mutations that show up in breast and ovarian cancers also sometimes appear in prostate cancers. This knowledge has led to the realization that each person's cancer or tumor is unique and that understanding the genetic changes that occur in cancer cells can help improve the efficacy of treatment(s).

29.   "Precision medicine" is the phrase used to describe how a patient's specific genetic information can be used to more effectively diagnose and treat their disease. Physicians increasingly

---

[2]   "A genome is an organism's complete set of DNA, including all of its genes. Each genome contains all of the information needed to build and maintain that organism." U.S. National Library of Medicine, https://ghr.nlm.nih.gov/primer/hgp/genome (last visited Dec. 21, 2017).

use precision medicine to target cancers based on the specific genomic alterations driving their growth.  To determine the optimal course of treatment, physicians need molecular information about their patient's unique cancer.  Foundation sought to capitalize on the growing understanding of the molecular underpinnings in cancer, and the need to define treatment around the genetic fingerprint of the tumor as opposed to its anatomical location.  Foundation claimed that other molecular diagnostic tests available during the Class Period captured only a limited number of the most common and known genomic alterations, which, according to Foundation, often failed to identify relevant targeted treatment options.

30.     To that end, Foundation developed its two flagship tests, FoundationOne and FoundationOne Heme, which the Company marketed and sold during the Class Period.  Foundation billed the FoundationOne and FoundationOne Heme tests as "the first commercially available comprehensive molecular information products for analysis of routine cancer specimens in a clinical setting."

31.     The Company's first test, FoundationOne, was launched in June 2012 for use with solid tumors.  FoundationOne detects genomic alterations in the tumor and provides actionable treatment information to clinicians dealing with late stage, rare, aggressive, and/or treatment resistant cancer.  The test is designed to interrogate 236 genes (representing 3,769 exons) and 47 introns (from 19 genes commonly involved in genetic rearrangements) from collected tumor tissue. FoundationOne utilizes next generation sequencing to identify all four major classes of alteration, which include base pair substitutions (*i.e.*, single letter changes), insertions and deletions (missing or extra short stretches of DNA in the genome), copy number variations (*i.e.*, extra copies or missing genes), and translocations (rearrangement of chromosomes fusing genes together).  In July 2014, the Company launched a second generation of FoundationOne, which interrogates the entire coding

sequence of 315 cancer-related genes across multiple classes of genomic alterations, as well as certain intronic regions (DNA sequences that do not encode for proteins) of 28 genes commonly involved in rearrangements.  During the Class Period, the list price for FoundationOne was $5,800.

32.     In December 2013, the Company launched FoundationOne Heme, which is geared toward hematologic cancers (leukemia, lymphoma, and myeloma plus many sarcomas and pediatric cancers).     FoundationOne Heme detects all classes of genomic alterations, including base substitutions, insertions and deletions, copy number alterations, and select gene rearrangements in 405 cancer-related genes (as well as certain intronic regions of 31 commonly rearranged genes). Additionally, the test employs RNA sequencing across 265 genes to capture a range of gene fusions, which are considered a common driver of hematological cancers and sarcomas.  During the Class Period, the list price for FoundationOne Heme was $7,200.

33.     In 2014 and 2015, Foundation performed all of its FoundationOne and FoundationOne Heme testing at its Cambridge, Massachusetts laboratory.  The testing process consists of four steps.  First, a physician orders a FoundationOne or FoundationOne Heme test via an order form (by hand, electronically, or via electronic medical records).  Second, the specimen that has been collected via standard surgical technique is packaged in a kit provided by Foundation and shipped via an overnight carrier.    Third, once the specimen is received, it is entered into Foundation's clinical laboratory information management system ("LIMS") and prepared for testing. Fourth, the specimen is analyzed using (a) specimen preparation; (b) sequencing; and (c) data analysis.  The results and data are then synthesized by a team of trained scientists that produce and review each patient result report.

34.     The FoundationOne and FoundationOne Heme results include a report that: (a) describes a tumor's or hematologic cancer's genomic alterations; and (b) matches the genomic

alterations with an FDA-approved therapy or therapies and/or open clinical trials for therapies that are targeting the cancers driven by discovered alterations. Each report is reviewed and signed by Foundation's medical staff before being sent to the ordering physician. Reports are typically provided to the ordering physician within 11-14 days and 15-18 days after the specimen is received for FoundationOne and FoundationOne Heme, respectively. In addition to the paper report, the physician receives access to Foundation's Interactive Cancer Explorer ("ICE"), which the Company billed as an easy-to-use online portal for clinicians. ICE provides current information about reported genomic alterations, associated therapies and clinical trials and is linked to publicly available databases, such as PubMed and clinicaltrials.gov to provide clinicians with additional information relevant to a patient's identified genomic alterations.

35. During the Class Period, Foundation derived revenue from the sale of its branded FoundationOne and FoundationOne Heme tests, sold through a direct sales force, to clinical customers comprised of academic centers and community-based physicians. Increasing sales of its tests to community-based oncologists was of particular importance to Foundation's financial performance and future growth prospects, because approximately 85% of patients with cancer in the United States are treated in community practice settings.

36. Foundation also sold unbranded versions of its tests to biopharmaceutical customers for the analysis of tumor samples collected from current and historical clinical trials. Genetic profiling of tumors can be extremely valuable to pharmaceutical and biotech companies developing new targeted treatments, as genetic information can help optimize and speed up drug discovery and development. Customers may use the service to identify within specific patient populations genetic variations that confer better response to treatment. During the Class Period, Foundation had relationships with more than 20 biopharmaceutical partners.

37.     Prior to and during the Class Period, Foundation's tests had limited reimbursement coverage, as the tests were not covered by government payors (*i.e.*, Medicare) and only covered by a few private payors in a limited way.   Foundation recognized revenue on a cash basis and, during the Class Period, the principal groups from whom Foundation received payment for its tests included: (a) commercial third party payors; (b) patients making co-payments, deductibles, or other amounts that the Company was unable to collect from their insurance companies (private payors); (c) biopharmaceutical customers, with whom the Company had individual agreements; and (d) academic medical centers, certain hospitals, cancer centers, and other institutions that paid Foundation directly at negotiated rates for their physicians' test orders.

**B.     Foundation Tried to Differentiate Its Tests from Other Molecular Diagnostic Tests on the Market**

38.     During the Class Period, Defendants billed Foundation's tests as the "only commercially available comprehensive molecular information products designed for use in routine care of patients with cancer."   The Company described three categories of molecular tests: (a) routine, single-gene marker tests such as IHC, PCR, and FISH;[3] (b) targeted "next gen sequencing panels" or "hotspot" tests that assess specific mutations within multiple genes; and (c) comprehensive genomic profiling tests like FoundationOne and FoundationOne Heme.

39.     The first category of molecular tests, routine, single-gene marker tests like IHC, PCR, and FISH, is the "gold standard,"[4] the most common type of molecular testing performed, and has been used for decades.   Foundation referred to the tests as the "bread-and-butter" of pathologists.

---

[3]     IHC, or immunohistochemical, is a process used to diagnose abnormal cells.   Polymerase chain reaction, or PCR, is a technology used for amplifying DNA sequences.   FISH-based DNA, or FISH, is a mechanism for detecting DNA sequences through the use of fluorescent technology.

[4]     "Gold standard" is a term of art in the molecular diagnostics world and means that there are accompanying national guidelines for the testing.

The tests play an important role in the treatment of cancer, as they allow pathologists to deliver information that often helps oncologists make important decisions about surgical and/or other treatment options.

40.     The second category of molecular tests, targeted "next gen sequencing" panels, also called "hotspot" tests, are a step up from, and are more advanced than, the category one tests. Single-marker or "hotspot" tests employ hot spot analyses and capture one or a limited number of the most common, well-known gene alterations that the tests are designed to target.  There are four classes of genomic alterations that are clinically relevant to the treatment of cancer: (a) base pair substitutions; (b) copy number alterations; (c) short insertions and deletions; and (d) gene rearrangements and fusions.   Defendants claimed that the single-marker or "hotspot" tests, were inferior to Foundation tests for a number of reasons.  According to Defendants, hotspot panel tests generally are only able to identify base pair substitutions and specific gene rearrangements, cannot detect copy number alterations, and sometime lack the sensitivity to identify short insertions and deletions.  In other words, hotspot tests focus on a narrow subset of genes and tend not to analyze the entire coding regions or detect all known alterations or classes of alterations.   As Defendants claimed, because hotspot panel tests may fail to identify some genomic alterations, physicians using the tests may fail to identify actionable information about their patients' cancers that could inform a preferable treatment approach.

41.     Category three tests are comprehensive genomic tests like those offered by Foundation and several leading academic medical centers.   The tests sequence across the entire coding region of all genes known to be altered in human cancer, not just high probability hotspot regions,  and  detect all classes of genomic alterations in a single assay.  FoundationOne and FoundationOne Heme were category three tests designed to test for a broad array of clinical

indications, including one through six, described in more detail below. This differentiated Foundation's tests from the hotspot tests that were designed to test for one or two indications.

42.    During the Class Period, Defendants went to great lengths to distinguish Foundation's tests from the category one and two tests. Defendants continually exalted FoundationOne and FoundationOne Heme as being far superior than the "hotspot" tests or the existing gold standard tests, telling investors that they did not see any "comparable commercial offering in the marketplace" or "any validated comprehensive approach that is competing with us in the market today."

**C.    Throughout 2014, Foundation Reports Steadily Increasing Clinical Test Volumes While Concealing Fundamental Problems with the Company's Business**

43.    Throughout 2014, Foundation reported steadily increasing revenue and clinical test volumes, a metric analysts and investors closely watched, which the Company attributed to "the value that ordering physicians see in our approach," "strong sales and volume increases," and a "robust" business. The Company also reported that the commercial mix between community-based practices and academic centers demonstrated an "uptake in community practices" and "robust integration into community practices," as the Company reported increasing community-based growth, which was critical to the Company's, FoundationOne's, and FoundationOne Heme's commercial viability.

44.    As an example, on February 25, 2014, Foundation reported 3,752 clinical tests for 4Q13 and revenue from clinical tests of $5.3 million. In a press release announcing the Company's 4Q13 and FY13 results and 2014 outlook, Defendant Pellini stated that "[c]linical adoption of FoundationOne steadily increased during 2013 and accelerated through the fourth quarter demonstrating the value of the molecular information we are delivering to oncologists and pathologists." The press release also announced guidance for 2014, disclosing that the Company

expected to report between 22,000 and 25,000 clinical tests and revenue in the range of $52 million to $58 million. During the Company's 4Q13 earnings call, Defendants disclosed that "55% of our reported tests came from community-based practices." Analysts commented that Foundation offered the "only commercially available pan-cancer panel that delivers concise, comprehensive, actionable, and patient-specific treatment options" and noted that the Company's revenue beat for the quarter was "led by solid test volumes in both Clinical and Pharma."

45.    The next quarter, on May 7, 2014, Foundation reported 4,702 clinical tests for 1Q14, revenue from clinical testing of $7.1 million, and total revenue of $11.5 million, largely in line to slightly above analysts' consensus of approximately $11.4 million. In a press release announcing the Company's 1Q14 results, Defendant Pellini stated, "The first quarter was a strong start to 2014 for Foundation Medicine, as we drove 25 percent quarter over quarter growth in the number of clinical tests reported to physicians, and in particular, saw early success with the adoption of our second clinical product, FoundationOne Heme." The Company reiterated 2014 guidance of 22,000 to 25,000 clinical tests and revenue of $52 million to $58 million. During the Company's 1Q14 earnings call, Defendants highlighted that 54% of the quarter's reported clinical tests came from community practices, demonstrating "tremendous consistency over the past several quarters with growth" in both the academic medical center and community-based practice areas.

46.    On August 12, 2014, the Company reported stronger-than-expected 2Q14 financial results, reporting 5,908 clinical tests, revenue from clinical testing of $9.4 million, and total revenue of $14.5 million, which beat analysts' consensus. In a press release announcing the Company's 2Q14 results, Defendant Pellini commented on the Company's "strong growth in clinical test volumes." The Company again confirmed its prior guidance for 2014 of 22,000 to 25,000 clinical tests and revenue in the range of $52 million to $58 million. During the Company's 2Q14 earnings

call, Defendants reported that 60% of tests were from community-based physicians, up from 54% the prior quarter, as the Company was continuing to "make strong inroads in the community practices."

47.    On November 5, 2014, Foundation reported 3Q14 revenue of $16.4 million which, once again, beat analysts' estimates.   Although the Company's 3Q14 clinical test volume of 6,428 tests came in slightly below analysts' estimates, Defendants attributed the lower-than-expected growth in clinical test volumes to a "modest slowdown" in the summer months, but assured investors that the "commercial uptake for FoundationOne and FoundationOne Heme remains strong." Foundation also *raised* 2014 guidance, disclosing that the Company expected 2014 revenue in the range of $58 million to $60 million and clinical tests at the upper end of the Company's initial guidance range of 22,000 to 25,000.   During the Company's 3Q14 earnings call, Defendants reported that the Company "continue[d] to demonstrate robust integration into community practices, with 60% of test[s] reported to physicians in the community."

48.    On February 24, 2015, Foundation reported its financial results for 4Q14 and FY14. For 4Q14, the Company reported 7,233 clinical tests and revenue from clinical testing of $10.3 million for the quarter.  The Company reported total revenue for FY14 of $61.1 million, beating its prior revenue guidance.  The Company also reported 24,271 clinical tests in 2014, which came in at the high end of Foundation's guidance range, as previously forecasted.  During the Company's 4Q14 earnings call, Defendants again reported that 60% of tests were reported from community-based physicians.

49.    Throughout 2014, therefore, Foundation repeatedly reaffirmed the Company was transitioning sales from academic medical centers to community-based physicians where the majority of patients and associated revenue were located.  Defendants told investors that the early

adoption of the FoundationOne and FoundationOne Heme tests "was from the major academic medical centers, the key opinion leaders," which was a "really important customer base" for the Company.  Then, "[a]s the testing became a little bit more well known, it started to leak out into the community, often in a regional way around some of the leading academic medical centers where you have the initial uptake in testing."  Defendants then described "[t]he next phase," which was "to migrate [the tests] into the community setting."

50.     Defendants, and investors, viewed adoption of Foundation's tests by community-based physicians as critical to the Company's commercial success, as it is estimated that 85% of the 10,000 practicing oncologists in the United States work in community-based hospitals, and these physicians will increasingly leverage patients' molecular information to guide treatment decisions as precision medicine becomes more ubiquitous.  Explaining the importance of the community-based physician market, one analyst commented that "[p]enetrating these domestic community-based centers remains a major source of untapped incremental growth for Foundation Medicine."  Defendants also emphasized that "[t]he growth driver is on the community side."

51.     Given the importance of the community-based physician market to Foundation's commercial success, during 2014, Defendants sought to give the appearance that Foundation was making inroads with that critically important market.  As an example, Defendants repeatedly touted "continued expansion" into community practices, reported that community practices were "outpacing" academic centers in the number of tests ordered, disclosed that the Company was making "strong inroads in the community practices," and described "robust integration into community practices."

52.     Analysts viewed the Company's progress with the community physician market, which increased from 54% to 60% in 2014, as promising, commenting that "[t]est adoption in the

community setting continues to increase," which reflects that Foundation "continues to gain awareness among community-based oncologists." Analysts further commented that Foundation was experiencing "meaningful uptake" with community-based oncologists. Contrary to Defendants' statements, however, the Company was not actually making a transition to the lucrative community-based physician market.

53.     Although Foundation was able to report steadily increasing clinical test volumes and revenue throughout 2014, in reality, the Company was boosting community clinical test volumes through steep incentives and other discounts. As an example, the Company induced community-based physicians to order the FoundationOne and FoundationOne Heme tests – which were substantially more expensive than category one and two tests and not covered by government or private payors – by assuring physicians that their patients would not be billed for the tests. Foundation also told physicians the Company would "take on the primary responsibility for obtaining third-party reimbursement on behalf of patients." The Company also engaged in other practices to give the appearance that Foundation was generating reimbursements from the sale of its tests, like cobbling together stacked current procedural terminology ("CPT") codes in order to obtain reimbursements and heavily relying on unsustainable academic medical center "philanthropy," like grants, which covered the cost of tests.

54.     Indeed, in 2014, the Company received, on average, approximately $1,400-1,500 per test, materially less than the publicly disclosed average reimbursement rate of approximately $3,400 to $3,600 per test. For example, in 1Q15, the true average per test was $1,413 and in 2Q15, it decreased to $1,401, which represented an increasing negative trend that Defendants actively concealed from investors.

55.     Foundation's increasing clinical test volumes and positive statements about the Company's expansion into community-based practices in 2014 masked fundamental problems with the Company's business; namely, that its flagship tests, FoundationOne and FoundationOne Heme, were not gaining traction with community-based physicians.  As investors would later learn, Defendants knew, or recklessly disregarded, that the Company was suffering from "competitive noise" from other molecular diagnostic tests, such as the traditional "gold standard" IHC, PCR, and FISH tests and next gen sequencing hotspot tests.  In addition to the existing category one and two tests, new entrants to the market, such as liquid biopsies and the development of comprehensive genomic profiling tests by academic medical centers, began exerting additional competitive pressure on Foundation's business.

56.     Fundamentally, Foundation's tests were of limited utility to physicians, as there were limited to no drug treatments associated with nearly all of the genes FoundationOne and FoundationOne Heme identified.  Defendants actively concealed this from investors and increasingly extolled the expanding community-based physician adoption of the Company's tests, along with its unique market-dominant position, which gave investors a false sense of the Company's operations, successes, and financial potential.

57.     Reorder rates from community oncologists were also low because of a lack of clinical utility and because doctors did not know how to interpret the FoundationOne and FoundationOne Heme test results.  Defendants knew, or recklessly disregarded, that physicians were not reordering the FoundationOne and FoundationOne Heme tests.  In fact, although the Company initially reported the specific number of physicians that ordered Foundation's tests, the Company subsequently ceased that practice.  Thus, the Company went from reporting the "[m]ore than 2,100 physicians from large academic centers and community-based practices" that have "ordered FoundationOne since its

formal commercial launch in June 2012," to vaguely referring to the "several thousand physicians from large academic centers and community-based practices" that have ordered Foundation tests. When directly questioned by analysts why the Company ceased reporting on the specific number of oncologists that have ordered its tests, Defendants misleadingly claimed that the Company "elected not to continue to just state . . . the number of overall physicians ordering the tests" because the Company was purportedly continuing to "refine the metrics that we will give the investor community."

58.     Although Defendants knew, or recklessly disregarded, that the Company was not successfully penetrating the community-based physician market and, therefore, would not be able to continue reporting increased clinical test volumes, Defendants nevertheless prognosticated even better results for 2015, telling investors that the Company expected to report between 43,000 and 47,000 clinical tests for the year, which, "[a]t the midpoint," represented approximately "*85% year-over-year growth*."   Unbeknownst to investors, Defendants had pinned their hopes for commercial success in 2015 on their continued fraudulent activities and on obtaining broad Medicare coverage and reimbursement for six clinical indications, which Defendants knew, or recklessly disregarded, was not attainable.

**D.     Obtaining Medicare Coverage and Reimbursement Was Critical to Foundation's Commercial Success and Saving Defendants from a Revelation of Their Fraud**

59.     Prior to and at the beginning of the Class Period, Foundation did not have specific coverage decisions for FoundationOne or FoundationOne Heme from private or government payors. Obtaining positive coverage decisions and favorable reimbursement rates from the Centers for Medicare & Medicaid Services ("CMS")[5] and private payors, however, was critically important to

---

[5]     Medicare is the federal health insurance program for people who are 65 or older, certain younger people with disabilities, and people with End-Stage Renal Disease.   Medicaid is a jointly funded,

the commercial success of Foundation and its tests for a number of reasons.[6]   First, gaining widespread reimbursement – Foundation's ultimate goal – typically starts with obtaining CMS coverage.  Second, CMS covers a large percentage of the patients who would be eligible to receive Foundation's tests (approximately 30%-40%).  Third, many private payors (*i.e.*, private insurance companies) follow the actions of CMS and/or a Medicare Administrative Contractor ("MAC(s)") and may not issue a positive coverage decision until either CMS or a company's local MAC does.  Fourth, physicians and patients are reluctant to order certain diagnostic tests, like those offered by Foundation, until CMS and private payors decide to cover the tests, for fear of burdening themselves or their patients with the hefty price tag of the tests.

60.    According to Medicare guidelines, Medicare coverage is contingent upon the services meeting certain requirements to determine medical necessity.  In order to be considered a covered service, Medicare requires that the service in question: (a) falls within a defined Medicare benefit category; (b) not be excluded from coverage by statute, regulation, or coverage decisions; (c) be considered reasonable and necessary in the diagnosis or treatment of an illness or injury, or to rule out or confirm a suspected diagnosis; (d) be ordered by a physician who is treating the beneficiary; and (e) provides data that would be directly used in the management of a beneficiary's specific medical program.

---

Federal-State health insurance program for low-income and needy people, including children, the aged, blind, and/or disabled, and other people who are eligible to receive federally assisted income maintenance payments.  Medicare and Medicaid are administered by the CMS, a federal agency within the United States Department of Health and Human Services.

[6]   Medicare reimbursement refers to the payments that hospitals and physicians receive in return for services rendered to Medicare beneficiaries.  The reimbursement rate for these services are set by Medicare, and are typically less than the amount billed or the amount that a private insurance company would pay.

61.     Diagnostic providers like Foundation also need to demonstrate analytical and clinical validity as well as clinical utility in order to obtain Medicare coverage and reimbursement.  Analytic validation demonstrates the accuracy, precision, and reproducibility of a test, *i.e.*, how well the test measures what it claims to measure, while clinical validation demonstrates the effectiveness of a test. Clinical utility is defined as the usefulness of a test for clinical practice.  Demonstrating clinical utility is arguably the most significant hurdle in obtaining Medicare coverage and reimbursement. As payors have become increasingly reluctant to cover costly tests, which, in the past, did not have to demonstrate clinical utility, the inability to demonstrate clinical utility is one of the most cited reasons for diagnostic tests failing to obtain coverage.  Defendants were well aware that demonstrating clinical utility was "a key factor in the reimbursement equation for payors."

62.     CMS is responsible for issuing national coverage determinations ("NCDs"), which describe the circumstances for Medicare coverage nationwide for a specific medical service, procedure, or device.  NCDs are made through an evidence-based process, with opportunities for public participation.  In the absence of a national coverage policy, an item or service may be covered at the discretion of the MACs based on a local coverage determination ("LCD").[7]  During the Class Period, Foundation's MAC was National Government Services, Inc. ("NGS").

63.     Despite rapid advancements in molecular diagnostic testing fueled by the paradigm shift in the understanding that cancer is a disease of the genome, molecular diagnostic tests like those offered by Foundation did not conveniently fit into the existing Medicare coverage and

---

[7]     A MAC is a private health care insurer that has been awarded a geographic jurisdiction to process Medicare Part A and Part B ("A/B") medical claims or Durable Medical Equipment claims for Medicare Fee-For-Service ("FFS") beneficiaries.  CMS relies on a network of MACs to serve as the primary operational contact between the Medicare FFS program and the health care providers enrolled in the program.  MACs are multi-state, regional contractors responsible for administering both A/B medical claims.

- 25 -

reimbursement system.[8]   The lack of specificity of molecular diagnostic CPT codes makes it difficult

for payors to make informed coverage decisions and manage the cost of care.   Thus, as molecular

diagnostic testing has become more common over the last decade, companies have created programs

to catalog commercially available tests that are molecular in nature in order to assist commercial and

government payors by identifying unique tests across systems by labs, providers, payors, and policy

makers.     As an example, in 2011, McKesson created the McKesson Diagnostics Exchange

("McKesson DEX"), a molecular diagnostic test identification assessment program used to help

connect payors and laboratories in an effort to drive appropriate coverage and payment for molecular

diagnostic tests.   When tests are registered with the McKesson DEX, they are assigned a McKesson

Z-Code Identifier ("McKesson Z-Code(s)"), a unique, five-character, alpha-numeric code.   These

McKesson Z-Codes serve as "tracking codes" and enable the identification of tests across labs,

providers, payors, and policy makers, helping each stakeholder make more educated decisions on the

clinical and financial impact of specific tests.

      64.     Also in 2011, Palmetto GBA, LLC ("Palmetto") developed the MolDX program,

which is used to help determine Medicare coverage and payment of molecular diagnostic tests in

---

[8]   Medicare coverage and reimbursement has been described as an opaque process that, in general, requires: (1) appropriate coding of the service provided by utilizing CPT codes, a uniform coding system used by the American Medical Association ("AMA"); (2) appropriate coding of the diagnosis using ICD-9 code; and (3) the CMS determination of the appropriate fee.   CPT undergoes periodic updates based on changes in medical and surgical procedures and the development of new technology.   For a new procedure to receive a code, it must meet certain criteria, such as: it must be done by a reasonable number of the specialty that presents the code, be performed at reasonable frequency, be done throughout the country, and have peer-reviewed literature supporting its efficacy. In 2013, the AMA entered into a licensing relationship with McKesson under which the AMA began mapping McKesson Z-Codes in the McKesson DEX to CPT codes.   In 2014, new codes for sequencing-based panel tests were approved by the AMA and, while the new codes were intended to more appropriately classify molecular tests that rely on next generation sequencing, they do not necessarily differentiate comprehensive genomic profiles (like Foundation's tests) from other hotspot tests.

multiple MAC jurisdictions.[9]  The McKesson Z-Codes have been adopted by Palmetto as part of the MolDX program.  Though CMS has not officially determined how the MolDX program will be expanded, some believe that the MolDX program has set a "gold standard" for how molecular diagnostic tests should be evaluated by payors and expect similar criteria to be adopted more broadly by other MACs, as well as commercial payors, over time.  Thus, further adoption of the program by other MACs, including Foundation's MAC, was viewed as being advantageous to Foundation.

65.    For these reasons, during the Class Period, analysts and investors viewed positive Medicare reimbursement decisions as vital to the Company's ability to meet analyst estimates of clinical test volumes, revenue and other important financial metrics.  Defendants also acknowledged that "[a]dequate reimbursement is an important factor in achieving broad clinical adoption of FoundationOne and FoundationOne Heme" and that obtaining a "positive national coverage decision and favorable reimbursement rate from CMS, for FoundationOne and FoundationOne Heme" tests was a "necessary element in achieving material commercial success."

**E.    During the Class Period, Defendants Led Investors to Believe that the Company Would Obtain Broad Medicare Coverage and Reimbursement for FoundationOne and FoundationOne Heme**

66.    During the Class Period, Foundation was focused on obtaining broad reimbursement coverage from government and private payors for FoundationOne and FoundationOne Heme for six clinical indications: (a) newly diagnosed stage IV non-small lung cancer; (b) newly diagnosed cancer of unknown origin or unknown primary anatomic site; (c) newly diagnosed stage IV rare or uncommon solid tumors for whom very limited or no systemic treatment options exist in clinical care guidelines or pathways; (d) newly diagnosed stage IV solid tumors who have received limited to

---

[9]    Palmetto is a MAC based in South Carolina.  In addition to processing Medicare claims, Palmetto also performs other critical Medicare functions, such as enrolling and auditing Medicare providers and educating providers on Medicare coverage requirements.  Palmetto is considered by many to be a thought leader in molecular diagnostic testing.

no benefit from standard chemotherapy; (e) patients with solid tumors whose available biopsy sample proves insufficient for traditional molecular diagnostic testing; and (f) patients with stage IV solid tumors who have exhausted the established guideline-driven systemic therapy or therapies, but who maintain adequate functional status as deemed by their treating physician.

67.     Although Defendants admitted that there was no "direct precedent" for reimbursement of its tests by government and private commercial payors, Defendants sought to convince analysts and investors that broad Medicare coverage and reimbursement for FoundationOne and FoundationOne Heme was likely by issuing a steady and misleading stream of positive news concerning reimbursement during the Class Period.

68.     As an example, on February 25, 2014, Foundation announced that it had submitted an application on the McKesson DEX to establish unique McKesson Z-Codes for FoundationOne and FoundationOne Heme, which Defendants claimed would "further distinguish these tests and allow [the Company] to move more quickly towards value-based payment." Analysts reacted positively to the Company's announcement, calling Foundation's application to establish unique McKesson Z-Codes on the McKesson DEX a "positive on the reimbursement front," as it "view[ed] this application for z-code identifiers as an incremental positive in obtaining reimbursement."

69.     On May 7, 2014, Defendants announced that Foundation had received "unique Z-Code identifiers from the McKesson DEX for both FoundationOne and FoundationOne Heme," which it categorized as "another step" toward differentiating our assets and "providing greater transparency and reimbursement in billing practices." Analysts and investors again viewed Foundation's receipt of unique McKesson Z-Codes "as an incremental positive, which could prove advantageous should the Z-coding program go national."

70.     On July 17, 2014, the Company announced that it had received final approval from the New York Department of Health ("NYS Dept. of Health"), enabling New York physicians to utilize FoundationOne and FoundationHeme, which the Company touted as a "significant regulatory milestone" and "confirmation of the high standard for validation established with FoundationOne and FoundationOne Heme," as New York "is the only U.S. state that requires an independent regulatory review process" and "represents one of the most rigorous levels [of both technical and clinical] validation required for laboratory developed tests." Once again, analysts commented that the Company was "making major strides towards a positive national coverage decision" and "view[ed] the New York State Department of Health approvals of FoundationOne and FoundationOne Heme as important milestones for FMI." Analysts also viewed the announcement of New York State approval as a "major milestone" for Foundation.

71.     On August 12, 2014, Defendants reported additional progress toward Medicare reimbursement announcing that "[a]s a sign of steady progress, . . . we've moved beyond what we refer to as the educational phase and on to providing validation ***and clinical utility*** data as part of our ongoing dialogue." Defendant Kafka also misleadingly spoke about the NYS Dept. of Health decision, telling investors that "this approval confirms the high standard of validation established by our assays and, furthermore, we expect this approval to have a positive impact as we continue our reimbursement dialogue with payors."

72.     On October 16, 2014, Foundation announced an agreement with Priority Health, a small regional commercial payor in Michigan, for coverage of FoundationOne and FoundationOne Heme. With the agreement, Priority Health became the first health plan in the country to cover Foundation's tests. The next month, on November 5, 2014, Foundation announced that, effective January 1, 2015, Google employees and their families would have covered access to FoundationOne

and FoundationOne Heme testing. Defendants told investors that the Priority Health agreement was "an important milestone in our ongoing reimbursement efforts" and an "important step forward in recognizing the value of comprehensive genomic profiling in oncology that also represents tangible evidence of the progress that we're continuing to make with certain payers." Defendants also encouraged investors to look at the Google decision "as another piece and as part of a multipronged focus on the payer world."[10] Analysts viewed the Priority Health agreement "as a first in what we believe will be a string of positive coverage announcements over the next 24 months" which "could catalyze additional positive payer discussions."

73. On January 23, 2015, Palmetto issued a draft LCD providing coverage for comprehensive somatic genomic profiling in non-small cell lung cancer ("NSCLC") patients. The scope of the Palmetto LCD was limited in that it only covered genomic profiling for non-smokers with stage IIIB or IV NSCLC who have also already tested negative for EGFR and EML4-ALK translocations; in other words, only one of FoundationOne's and FoundationOne Heme's six clinical uses. Though the Palmetto draft LCD did not specifically mention Foundation's tests by name, it endorsed the use of "comprehensive genomic profiling."

74. During the Class Period, although Palmetto was not the MAC that oversees Massachusetts, where Foundation is based, many believed Palmetto's decisions set the tone for the entire country. Given Palmetto's position as the "trend setter" in molecular diagnostics coverage and reimbursement, analysts and investors expected that Foundation's own MAC, NGS, would follow Palmetto's lead. Thus, analysts and investors viewed the Palmetto draft LCD as a "big win" for both Foundation and the molecular diagnostic testing space in general "given it represents the beginnings

---

[10] Notably, Google Ventures was, during the Class Period, a majority shareholder of Foundation.

of payer coverage" and "suggests early stages of acceptance by payers of more comprehensive [next-generation sequencing]-based cancer panels."

75.     Defendants emphasized the importance of the Palmetto draft LCD, announcing that Foundation had "crossed an important milestone in the reimbursement landscape" with the issuance of the draft LCD, which represented "signs of forward progress on the reimbursement landscape." Although Foundation acknowledged that "Palmetto is not our MAC," the Company stated it looked "forward to building on this important momentum, and hopefully establishing a similar LCD with our own MAC National Government Services." Defendants told investors that the Priority Health decision and Palmetto draft LCD, collectively, represented "meaningful progress in our efforts towards broad-based reimbursement, setting the stage for continued progress in 2015."

76.     Defendants' announcements during the Class Period were designed to, and did, give analysts and investors the false impression that Foundation was on track to receive broad Medicare coverage and reimbursement as early as 2015. Unbeknownst to investors, however, Defendants knew, or recklessly disregarded, that Foundation could not reasonably expect to receive broad Medicare coverage and reimbursement, as opposed to coverage for a single and more narrow indication for which other hotspot tests were specifically designed and reimbursed for a fraction of the price (approximately $500) of FoundationOne and FoundationOne Heme.

F.     **Defendants Knew, or Recklessly Disregarded, that Foundation Would Not Achieve Broad Medicare Coverage and Reimbursement in 2014 or 2015**

77.     As discussed above, Defendants sought to achieve broad reimbursement coverage from private and government payors, including Medicare and Medicaid, for six clinical indications. In order to do so, however, Foundation was required to demonstrate analytical and clinical validity, *as well as clinical utility*, for all six indications. Defendants knew, or recklessly disregarded, that Foundation could not demonstrate clinical utility for all six indications and, as a result, would and

could not achieve comprehensive Medicare coverage reimbursement.  At most, Foundation would only be eligible to obtain reimbursement for a single indication and, even then, for materially less than the Company's reported average reimbursement rate of $3,400 to $3,600.

78.  Company executives, including Defendant Pellini, were informed that Foundation would never achieve comprehensive Medicare coverage because that is not how the coverage and reimbursement process actually works in practice.  Specifically, Medicare looks at "disease-specific" applications, in addition to other criteria, when it comes to providing coverage for a particular test, including clinical studies to support the use of the tests.  Government and private payors will not cover or reimburse a diagnostic test, like those offered by Foundation, without specific clinical study results, for a specific application, that demonstrate the clinic utility of the tests.  Indeed, at the time Defendants told investors that they were attempting to achieve "broad reimbursement coverage with commercial third-party and government payors, including Medicare and Medicaid," there were no guidelines, *i.e.*, nothing in clinical studies, to support the broad coverage and reimbursement Foundation sought.

79.  For example, Foundation's tests covered approximately 300 genes for non-small lung cancer alone, but even as of the present day, there are only drug guidelines available for five of these 300 genes and, in the 2014-2015 timeframe, only two gold standard tests had clinical utility, EGFR (PCR) and EMLU ALK (FISH).[11]  While Foundation's tests were high quality, they simply provided test results and lacked the necessary clinical data.  Accordingly, Foundation's testing for the additional 295 genes provided limited utility since there were no drugs or clinically demonstrated treatments associated with these genes.  Thus, community physicians did not want and could not use the FoundationOne and FoundationOne Heme tests.  Additionally, physicians receiving the

---

[11]  There are now five available tests with clinical utility on the market:  EGFR (PCR), EMLU ALK (FISH), ROS1, KRAS, and MEK.

FoundationOne and FoundationOne Heme reports would not know what to do with the information contained therein, as the reports did not provide enough information for a physician to safely select a treatment based on the test results because there was not enough patient data to support what a treatment should be.  Indeed, as Defendants would later admit, it was not easy for oncologists to routinely use all the information uncovered by the Foundation tests.  Thus, although Foundation was able to demonstrate clinical and analytic validity for its tests, the Company's inability to demonstrate clinical utility for all six indications would prove fatal to Foundation's ability to obtain broad reimbursement coverage, which Defendants knew, or recklessly disregarded, but concealed from investors.

**G.    Defendants Issued 2015 Guidance that They Knew Was Not Achievable**

80.    On February 24, 2015, Foundation announced that it expected to report 2015 revenue in the range of $105 million to $115 million and between 43,000 and 47,000 clinical tests in 2015. As investors would later learn, however, Defendants' reported 2015 guidance was false and misleading and lacked a reasonable basis because, among other reasons: (a) it assumed Medicare payment, which Defendants knew the Company would not obtain in 2015; and (b) the Company was suffering from "competitive noise," which was having a negative impact on Foundation's clinical test volumes and associated revenue.

**H.    The Truth About the Negative Effects of Competition from Other Molecular Diagnostic Tests and Medicare Reimbursement Challenges Was Slowly Revealed to the Market Beginning on May 11, 2015**

81.    Despite the myriad positive and encouraging statements made throughout 2014 and into the beginning of 2015 regarding FoundationOne and FoundationOne Heme, the Company's competitive advantage, growth prospects, and the anticipated Medicare coverage and reimbursement for Foundation's tests, Defendants failed to disclose that Foundation's tests were not commercially successful, as: (a) the existence of "competitive noise" from other genomic tests on the market was

negatively impacting the Company's clinical test volumes; (b) doctors opted for "gold standard" and hotspot tests that were less expensive and covered by both Medicare and private payors; (c) although Foundation's tests provided detailed information about various gene mutations they were not accompanied by available or recommended treatment options and, as a result, had little to no clinical utility; and (d) neither FoundationOne nor FoundationOne Heme qualified for or would actually receive, the broad Medicare coverage and reimbursement the Company led the market to believe it would.

82.    The truth was slowly revealed to the market in a series of disclosures, beginning on May 11, 2015.  On that day, the Company announced weak 1Q15 financial results, reporting total revenue of  $19.3 million and 7,854 clinical tests.  The Company also reported $11.1 million in revenue from clinical testing, up only slightly from $10.3 million the prior quarter.  Foundation's 1Q15 results came in well below analysts' consensus, which had projected revenue of approximately $21 million and approximately 8,600 clinical tests.

83.    During the Company's 1Q15 earnings call, Defendants revealed that the disappointing clinical test volumes were due in part to "increased confusion in the marketplace," which made it "difficult for some oncologists and pathologist to differentiate today between the various tumor profiling assays and to determine which test is most appropriate for a particular patient."  However, Defendants continued to conceal the true extent to which competitive noise was negatively impacting the Company's clinical test volumes, instead telling investors that they were re-doubling their efforts to "continue to differentiate our platform and our business and to rapidly evolve into a more mature commercial and customer-oriented business."

84.    With regard to reimbursement, the Company admitted a "slight decrease" in the average reimbursement per clinical test down to $3,400.  Notwithstanding the decline, the Company

continued to remain positive about the likelihood of receiving reimbursement from government and private payors, especially in light of the draft LCD issued by Palmetto the prior quarter, stating, "The draft LCD is an important step because it specifically relates to comprehensive genomic profiling, and because it sets a high standard for the rigorous analytic validation required for this type of approach."

85.     The Company maintained its false and misleading 2015 guidance, reiterating that it expected revenue in the range of $105 million to $115 million and 43,000 to 47,000 tests and confirming that the guidance for clinical tests was limited to "clinical market tests," meaning it did not include tests ordered by the Company's biopharmaceutical partners.

86.     Despite Defendants' efforts to downplay the negative impact from competitive noise and the purported progress the Company was making toward achieving Medicare coverage and reimbursement, analysts and the market were underwhelmed by the Company's results and the price of Foundation stock fell 9.8% on May 12, 2015.  Following the news of Foundation's 1Q15 results, analysts commented that the lower clinical test volumes were a sign that the Company was "unable to penetrate mainstream clinics" and an indication that, despite Foundation's "first mover" advantage, competitive dynamics were real, and their existence would "continue to soften overall growth."

87.     On July 29, 2015, the Company announced its financial results for 2Q15, reporting disappointing quarterly revenue of $22.5 million and only 8,846 clinical tests, compared to analysts' consensus of 9,770.  In a press release, the Company attributed the low clinical test growth to "slower than anticipated progress towards obtaining a local coverage determination from our regional Medicare Administrative Contractor (MAC) and by some competitive noise in the market." The Company further disclosed that, as a result, it would be materially adjusting guidance for

clinical volume and annual revenues downward, revealing that Foundation now expected to report 2015 revenue in the range of $85 million to $95 million. The Company also lowered its 2015 guidance for clinical tests to 35,000 and 38,000 tests, but, as discussed below, even the lowered clinical test guidance was false and misleading and lacked a reasonable basis.

88.     During the 2Q15 earnings call held later that day, Defendants disclosed that the poor results were due in part to "slower than expected progress with Medicare and certain national commercial payers." Specifically, following the issuance of the Palmetto LCD, the Company was not seeing "the commonly observed carryover effect from a coverage decision that we would typically expect to see in the field," despite also admitting "there was no direct precedent for this approach." Defendant Pellini told investors the Company was "*no longer assuming any Medicare payment for the rest of 2015*." Defendant Pellini also disclosed, for the first time, that "[o]ur 2015 annual guidance for clinical volume testing was developed based on certain assumptions, including having a local coverage determination, or LCD, for a portion of Medicare cases in place, starting in the first half of 2015."

89.     Expanding on the quarter's results, Defendant Ryan admitted that "the lack of an LCD in our region began to impact the growth curve of clinical revenue and testing volume. We believe that more consistent utilization of comprehensive genomic profiling will ultimately require a positive step by NGS," the Company's MAC. With respect to the Company's reduced 2015 guidance, Defendant Ryan confirmed that the "changes to guidance are driven by a shift in our assumptions around the timing of Medicare payments, the associated affect that an LCD can have on non-Medicare volumes, and some of that competitive noise [in] the marketplace related to hot spot based testing."

90.     While the Company had finally revealed that its expectation for reimbursements was misguided and that it no longer anticipated *any* Medicare coverage for 2015, it was not as forthcoming with the truth regarding competition.  Defendants attempted to maintain an upbeat tone about the Company's 2Q15 results, stating that the year-over-year growth in clinical volume and revenue "provide evidence that the business remains strong, and that our principal customers, oncologists and pathologists, continue to utilize our products to gain additional insight into treatment options for their patients battling cancer" and that the Company was "maintaining our leadership position in the industry."  Defendants also continued to conceal the true effects of competition from other molecular diagnostic tests, reassuring investors that, while the reduce guidance was attributed in part to "competitive noise," "our commercial organization continues to build stronger messaging around the need for comprehensive testing in the appropriate clinical indications."

91.     Analysts and investors reacted negatively to the Company's news, as the price of Foundation stock fell 24% on July 30, and another 9% on July 31, 2015, on abnormally high volume.

I.      **In October 2015, Foundation's Local MAC Finally Issues a Narrow Draft Local Coverage Determination for One Clinical Indication**

92.     On October 1, 2015, Foundation's MAC, NGS, finally published a draft LCD for Genomic Sequence Analysis Panels in the Treatment of Non-Small Cell Lung Cancer.  The draft NGS LCD covered a broader set of indications than the Palmetto LCD, including stage IIIB and IV NSCLC patients and did not limit candidates based on a patient's prior smoking history or previous testing.  Specifically, the draft LCD covered:

- Newly diagnosed NSCLC patients with advanced (stage IIIB or IV) NSCLC who are not treatable by resection or radiation with curative intent and who are suitable candidates for therapy at the time of testing;

- Previously diagnosed NSCLC patients with advanced (stage IIIB or IV) NSCLC who have not responded to at least one systemic therapy or who

have progressed following resection.   The patient must be a candidate for treatment at the time of testing;  and

- Previously diagnosed NSCLC patients with advanced (stage IIIB or IV) NSCLC who have been resistant to at least one targeted therapy, are able to undergo tumor tissue biopsy for testing, and who are suitable candidates for additional treatment at the time of testing.

93.   However, the NGS policy failed to distinguish hotspot testing from comprehensive genomic profiling tests like those offered by Foundation, as the NGS LCD considered CPT code 81445 (solid tumor profiling 5-50 genes) a useful representation of the aggregate of appropriate gene tests for patients with NSCLC.  The NGS LCD specified that a genomic sequence analysis panel represented by code 81445 would be considered reasonable and necessary for tumor tissue evaluation.  The national pricing proposed by Medicare the previous month for CPT code 81445 was approximately $600, substantially below the list price of $5,800 and $7,200 for the FoundationOne and FoundationOne Heme tests, respectively, and the approximately $3,400 average reimbursement price the Company received for its tests.   In other words, as written, the NGS LCD would only reimburse Foundation approximately $600 for its tests and did not distinguish Foundation's tests from "hotspot" tests.   Analysts commented that the draft NGS LCD was "mixed but on balance negative" for Foundation and "disappointing on a number of fronts."  As an example, the lack of clear differentiation between hotspot panels and Foundation's tests was a "worrying issue" the Company would need to address.  Although Defendants attempted to spin the NGS draft LCD as "one step in the right direction," they admitted that if finalized as is, the NGS LCD would "mean limited access for Medicare patients."

**J.     The Full Truth About the Negative Effects of Competition and Reimbursement Challenges Is Finally Fully Revealed**

94.   On November 3, 2015, the Company announced its 3Q15 financial results, reporting lower-than-expected revenues and  the  third  straight  quarter  in  which  clinical  volumes  missed

analysts' estimates.    Specifically, the Company revealed that it had delivered only 8,102 FoundationOne and FoundationOne Heme tests, "which certainly fell short of our expectations." Defendants attributed the disappointing results to a slowdown in reorder rates, oncologists reserving Foundation's tests for patients with the most difficult medical conditions, and difficulty in using all molecular information uncovered during the testing process.   In light of these lackluster results, the Company again **reduced** its clinical testing volume guidance to between 32,000 and 33,000 for FY15, down from the previously forecasted range of 35,000 to 38,000.

95.     After multiple quarters of positive and encouraging announcements, the Company finally admitted "we still have work to do," but provided its alleged solution for stemming the tide. For example, the Company reported "the number of oncologists ordering our tests in the third quarter did not materially change [and] the reorder rate for our tests slowed," but the Company assured "we are accelerating . . . activities that address clinical volumes," including educating physicians, improving access to targeted therapy and clinical trials, and broadening reimbursement efforts.   To address the fact that many oncologists "are reserving the use of our tests for their patients with the most difficult medical conditions" and the Company was challenged with "convert[ing] more of our clients to repeat, consistent customers, including the use of our tests earlier in the course of treatment," Foundation also announced its plan to "continue to educate" physicians through its sales and marketing efforts.

96.     In reaction to Defendants' announcement, the price of Foundation stock tumbled 28%.  Analysts commented that the Company's 3Q15 results demonstrated that the "incremental clinical utility of FoundationOne above more simplistic hotspot assays" remained "uncertain."

**K.**  **Post-Class Period Events Confirm that Defendants Knew, or Recklessly Disregarded, that Foundation Would Not Obtain Broad Medicare Coverage and Reimbursement**

97.     On December 21, 2015, the Company announced that it had signed a national agreement with UnitedHealthcare for FoundationOne. The agreement, which became effective December 15, 2015, covered FoundationOne for patients with metastatic stage IV NSCLC[12] and was viewed by Foundation as "an important step towards broader reimbursement for Foundation Medicine, and importantly, it's a significant advance for patients with metastatic NSCLC."

98.     Despite the agreement, and the Company's characterization of it as a "step towards broader reimbursement," the fact remained that the decision covered only one clinical indication and Foundation had yet to receive the type of coverage it had promoted (and hoped to achieve) during the Class Period.

99.     That hope was further shattered in February 2016, when NGS issued its final LCD for genomic sequencing panels in advanced NSCLC, which failed to address the requests outlined in Foundation's comments in response to the draft LCD issued in October 2015.

100.     For example, despite Foundation's requests that the LCD include molecular profiling assays of more than 50 genes, the final LCD deemed only genomic sequencing panels gauging between 5 and 50 genes "reasonable and necessary" for advanced NSCLC patients who are newly diagnosed but do not qualify for surgery or radiation, or have been previously diagnosed but are not responding to systemic therapy or are resistant to targeted therapy. Moreover, according to the final LCD, patients must be able to receive targeted treatment at the time of genomic testing.

---

[12]   In the United States, approximately 50% of patients with NSCLC have metastatic disease at the time of diagnosis, which, as of September 2015, amounted to nearly 0.25 million U.S. patients. According to Defendant Ryan, "[a]bout 20% of FoundationOne tests are being run for patients with non-small cell lung cancer."

101.    Also contrary to Foundation's specific request, the final LCD did *not* distinguish between hotspot genomic tests and broader tests that pick up base pair substitutions, insertions/deletions, copy number variations, and translocations, which were included in Palmetto's policy and would include the FoundationOne test.

102.    Finally, in perhaps the most devastating blow, NGS' final LCD only covered tests identified by a specific CPT code that would be reimbursed for *up to* $600 – a nominal rate as compared to the average reimbursement of $3,200 per test the Company had been reporting at the close of the Class Period.

103.    Then, on May 3, 2016, Foundation announced that it was expanding its "U.S. laboratory footprint to include a second site at Research Triangle Park in North Carolina." Importantly, Palmetto is also based in North Carolina and, with the move, Foundation would fall under Palmetto's coverage.  Under Palmetto's coverage, Foundation's tests would be billed under a different CPT codes, which is not priced nationally, but, instead, by Palmetto.

104.    Almost two years after the end of the Class Period, on March 2, 2017, Foundation announced that it had finally received payment from Palmetto, the Company's MAC in North Carolina, for its FoundationOne comprehensive genomic profiling assay when used in the clinical course for care of individuals in the U.S. with stage IIIB or IV NSCLC who meet the eligibility requirements under Palmetto's LCD.   Foundation began submitting an initial set of claims to Palmetto in January 2017 for FoundationOne and received its first payments for claims under this LCD on March 1, 2017.

## V.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

105.    Throughout the Class Period as detailed herein, Defendants made numerous positive and encouraging statements about FoundationOne and FoundationOne Heme, in addition to

statements about the Company's competitive advantage, growth prospects, and the anticipated Medicare coverage and reimbursement for its tests. Defendants, however, failed to disclose that Foundation's tests were not commercially successful due to several factors, including, the existence of "competitive noise" from other tests, which negatively impacted testing volumes, doctors selecting traditional gold standard and hotspot tests that were less expensive and covered by Medicare and private payors, and the lack of clinical utility of FoundationOne and FoundationOne Heme, which was a prerequisite to obtaining Medicare coverage and reimbursement.

106. Defendants also omitted material information from the Company's SEC filings required by Item 303 of Regulation S-K, 17 C.F.R. §229.303 ("Item 303"). Item 303 requires the disclosure of all "known trends . . . that have had or that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues." In addition to the identification of such "known trends," Item 303 specifically requires disclosure of: (a) whether those trends have had or are reasonably expected to have a material negative impact on revenues; and (b) the extent of any such impact on revenues.

107. Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 require disclosure of forward-looking information." Indeed, the SEC has stated that Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company … with particular emphasis on the registrant's prospects for the future." *See* Management's Discussion and Analysis of Financial Condition and Results of Operation, S.E.C. Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989). Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See* Commission Guidance Regarding

Management's Discussion and Analysis of Financial Condition and Results of Operation, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (Dec. 29, 2003).

108.    Disclosure of forward-looking information concerning the registrant's revenue is required by Item 303 "where a trend, demand, commitment, event or uncertainty is both [a] presently known to management and [b] reasonably likely to have material effects on the registrant's financial condition or results of operation."   *See* Management's Discussion, 1989 WL 1092885, at *4.

109.    Accordingly, Defendants' failure to disclose the Company's true operational practices, results, and prospects and the actual impact being experienced due to community-based oncologists' rejection of FoundationOne and FoundationOne Heme, competition from academic medical centers and other molecular diagnostic tests, an increasing refusal to order tests absent reimbursement, and the inability to achieve Medicare reimbursement for anything more than one of the tests' six clinical indications constitutes a violation of Item 303 and renders Defendants' Class Period SEC filings materially false and misleading.

A.    **Fourth Quarter and Full Year 2013 Financial Results**

110.    The Class Period begins on February 26, 2014.  The prior evening, after the market closed, Foundation issued a press release announcing its 4Q13 and FY13 financial results.  The press release quoted Defendant Pellini as stating, "Clinical adoption of FoundationOne steadily increased during 2013 and accelerated through the fourth quarter demonstrating the value of the molecular information we are delivering to oncologists and pathologists."   Defendant Pellini further stated, "We are also encouraged by the initial uptake of FoundationOne Heme . . . .  The response from hematologists and oncologists indicates this product will be important in providing comprehensive genomic profiling for patients with hematologic malignancies, sarcomas and pediatric cancers."

- 43 -

111.    For FY14, the press release stated that Foundation "expects to report between 22,000 and 25,000 clinical tests in 2014, driven by FoundationOne and FoundationOne Heme," and "anticipates 2014 revenue will be in the range of $52 to $58 million."

112.    Also on February 25, 2014, after the market closed, Foundation hosted a conference call with analysts and investors to discuss the Company's earnings release and business operations. During the call, Defendant Pellini spoke positively about Foundation's tests, stating, "We believe that [the] single test philosophy and comprehensive information based approach is enabling a paradigm shift in the treatment of virtually all types of solid and liquid tumors." Defendant Pellini boasted, "Our fourth quarter was very strong in terms of the commercial ramp with tests and revenue again growing at accelerated rates as compared to prior periods."

113.    With regard to the Company's commercial mix, Defendant Pellini reported an increase in test volumes with community physicians, indicating "progress and rapid growth." Specifically, for 4Q13, Defendant Pellini stated, "our commercial mix continues to demonstrate uptake in community practices as well in the academic medical centers as those categories grew in tandem, with community groups slightly outpacing the academic centers." He continued, "55% of our reported tests came from community-based practices in the fourth quarter." Defendant Pellini emphasized that the "fundamental driver" of this growth was "the value that ordering physicians see in our approach."

114.    Whether and when Foundation would receive reimbursement coverage was also a topic of discussion on the conference call. During his prepared remarks, Defendant Ryan provided an update on the Company's progress toward Medicare reimbursements and the efforts it was undergoing to achieve coverage, stating, "we are now submitting claims" and "we made the decision to begin submitting these claims primarily because the volume of our Medicare claims has grown

substantially given our commercial growth."   Defendant Ryan said, "We expect that this will be a process that plays out over time."

115.    With respect to Foundation's approach to billing Medicare, Defendant Ryan explained the various steps the Company had undergone to date to achieve the "broad" reimbursement it was seeking:

> We submitted these claims using a miscellaneous code, non-stacked code, as we had originally done with the non-governmental commercial payers.  In addition, because current coding -- the current coding landscape does not contain codes specific enough for tests that are as comprehensive and precise as FoundationOne and FoundationOne Heme, we have submitted an application on the McKesson diagnostics exchange to establish unique [z-code] identifiers for these two assays.  In it's current form, this system will map z-code identifiers to FoundationOne and FoundationOne Heme.

> The z-code identifiers have already been adopted by Palmetto as part of the MolDX program that determines coverage in payment for Medicare in 17 states.  While Massachusetts is not yet one of those states, the MolDX program is expected by many to be adopted broadly by other medicare administrative contractors and by US commercial payers.  While it is possible that other CPT coding options may become available for generic NGS type tests, it would be unusual that a CPT code would be released initially that adequately represents either FoundationOne or FoundationOne Heme.  Therefore, proactively, it seems z-codes will further distinguish these tests and allow us to move more quickly towards value-based payment.

> As we previously noted, we are approaching reimbursement across a broad platform of activities, and we continue to be as transparent as possible as we move forward.

116.    Overall, Defendant Ryan reported, "the Company is in a strong financial position" and "[w]e're pleased with our growth, and we do believe the business has compelling leverage as we gain momentum."

117.    Defendant Kafka discussed the Company's operations and outlined Foundation's "priority initiatives" in 4Q13: "Supporting the volume ramp in the commercial business and growing our sales force, continuing to extend our work supporting pharma clinical trials and launching FoundationOne Heme."

118.    In touting the "great fourth quarter," Defendant Kafka expressed the Company's contentment with "the mix of our business," and reported that "[g]rowth is being bolstered by the addition . . . of sales professionals in new territories across the United States," which totaled 26 as of December 31, 2013 and which the Company expected to "grow to approximately 45 to 50" by the end of the 2014 calendar year.

119.    During the question and answer portion of the call, Defendants were asked for additional details about Medicare reimbursement, including the use of McKesson Z-Codes and Foundation's strategy for obtaining coverage.    In response, Defendant Pellini claimed that the Company wanted to "maintain as much transparency as possible" about the reimbursement process.

120.    In discussing Foundation's tests, Defendant Pellini stated, "We have been pleased with the execution on the tests, we have been pleased with the demand for FoundationOne and frankly, even the early demand FoundationOne Heme since its recent launch. . . .    [W]e feel confident in the yearly guidance that we have provided."

121.    Also during the call, an analyst from Leerink Partners ("Leerink") requested an "update" on the number of physicians ordering FoundationOne in 4Q13.    Defendant Pellini responded that "we did not provide an update on the specific number of oncologists that have ordered the test" which was a surprise given that the Company had previously disclosed the number of doctors ordering FoundationOne.    Instead, Defendant Pellini responded that "both oncologists in the academic medical centers, as well as in the community settings continue to grow in number," and that "we certainly like the progress [and] the evolving ratio between community-based oncologists and academic-based oncologists."

122.    In order to quell any additional curiosity, the Company provided an additional explanation for why it would no longer be reporting that metric, falsely stating:

One of the reasons why we elected not to continue to just state that there's a -- state the number of overall physicians ordering the tests is because we want to -- we aim to continue to refine the metrics that we will give the investor community.  And I think over the course of this year, we anticipate providing additional information that really helps you think about our commercial ramp.  And so we don't want to provide numbers for the sake of it, we want to provide numbers that really give you the appropriate insight into the growth of our business.

We are seeing growth in both categories.  We are seeing new customers each week, and as I said, both in the academic and as well as in the community setting.  But one of the things that we have always measured is the percentage of the tests that are, in fact, from repeat customers.

123.    Toward the end of the call, an analyst sought additional information about "competitive dynamics" and expressed concern over prior statements that a majority of tests were ordered by repeat customers.  The analyst questioned why there was not "more traction from new customers."  Defendant Pellini responded, "[w]e are seeing growth in both categories," with "new customers each week . . . in the academic and as well as in the community setting."  Defendant Pellini continued, "one of the things that we have always measured is the percentage of the tests that are, in fact, from repeat customers . . . that's the way that you build a business."

124.    Defendant Pellini further discussed "overall competitive dynamic[s]," stating, "we just really don't see any comprehensive approach that is competing with us in the market."  He continued, "We have seen other tests that are entering the market, but they are not FoundationOne-like."  He further stated, the "other tests that are much more narrow in breadth, they don't have the same accuracy, they don't have the same completeness."

125.    Analysts reacted positively to Defendants' statements on February 25, 2014 and it was clear that they were buying into Foundation's representations that its tests were one-of-a-kind.  For example:

(a)      In a report dated February 26, 2014, JMP Securities ("JMP") commented that the Company's FoundationOne test is "currently the only commercially available pan-cancer panel that delivers concise, comprehensive, actionable, and patient-specific treatment options."

(b)      J.P. Morgan also commented on the "[r]evenue beat led by solid test volumes in both Clinical and Pharma."  The report called Foundation's announced submission of claims to Medicare and an application to establish unique McKesson Z-Codes on the McKesson DEX a "positive on the reimbursement front," as it "view[ed] this application for z-code identifiers as an incremental positive in obtaining reimbursement."   J.P. Morgan increased its price target from $28.00 to $30.00.

(c)      Additionally, in a report dated February 26, 2014, Leerink increased its sales estimates to reflect the 4Q13 beat and FY14 guidance above its prior estimates and increased its price target from $35.00 to $36.00.  Leerink observed that "[t]est adoption in the community setting continues to increase," noting that the FoundationOne test "continues to gain awareness among community-based oncologists, who comprised 55% of clinical tests in the quarter."

126.    On March 7, 2014, the Company filed its annual report for the year ended December 31, 2013 with the SEC on Form 10-K ("2013 10-K"), which was signed by Defendants Pellini and Ryan and reiterated the Company's previously announced financial results.  The 2013 10-K stated that the Company had changed its MAC to NGS and reaffirmed its strategy to achieve better coverage through the "leading role" of Palmetto on coverage determination, stating, in relevant part:

> Palmetto GBA, a Medicare administrative contractor that currently plays a leading role in discussions about coverage determinations for complex molecular tests, has established the Molecular Diagnostic Services program, or MolDX. MolDX is currently used to help determine coverage and payment for Medicare in 17 states. Z-Codes have been adopted by Palmetto as part of MolDX. While Massachusetts is not one of those states, MolDX is expected by many to be adopted broadly by other Medicare administrative contractors and US commercial payors, including

potentially, National Government Services, our Medicare administrative contractor in Massachusetts.

127.   The 2013 10-K also contained materially false and misleading statements about

Foundation's tests and the tests' "rapid adoption," stating:

> We believe we have built the only molecular information platform that comprehensively assesses cancer tissue simultaneously for all four classes of genomic alterations across all cancer-related genes with the sensitivity and specificity required for routine medical practice. . . .
>
> We have experienced rapid adoption of FoundationOne. More than 2,100 physicians from large academic centers and community-based practices across more than 25 countries have ordered FoundationOne since its formal commercial launch in June 2012. We believe this rapid adoption of FoundationOne, which has been accomplished with a nascent sales team, demonstrates the demand for and utility of a single, comprehensive product that helps oncologists effectively implement the promise of precision medicine.
>
> \*        \*        \*
>
> Based on our actual experience with patient cases since its launch, we believe FoundationOne's ability to identify actionable genomic alterations far exceeds that of other commercially available molecular diagnostic tests. We define an actionable alteration as an identified genomic alteration in an analyzed cancer cell associated with an FDA-approved targeted therapy in the tumor type, an FDA-approved targeted therapy in another tumor type or an open clinical trial for which the alteration confers eligibility. Our comparative quantitative analysis demonstrated that running four commercially available tests that also utilize next-generation sequencing, or NGS, plus two relevant and commonly-used hotspot tests together would collectively identify only a maximum of 31% of the actionable genomic alterations that can be identified by FoundationOne.

128.   The 2013 10-K was signed by Defendants Pellini and Ryan and contained materially

similar certifications by Defendants Pellini and Ryan pursuant to the Sarbanes-Oxley Act of 2002

("SOX"), which stated in relevant part:

> 1.       I have reviewed this Annual Report on Form 10-K of Foundation Medicine, Inc. for the year ended December 31, 2013;
>
> 2.       Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

\*      \*      \*

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

129.    For the reasons stated above in Section IV, and as further detailed herein, Defendants' statements concerning demand, competition, adoption and reimbursement coverage made in the Company's fourth quarter ("4Q13") and full year December 31, 2013 ("FY13") earnings release dated February 25, 2014, the conference call with analysts held the same day, and the 2013 10-K, filed on March 7, 2014, were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because, for example:

(a)    FoundationOne and FoundationOne Heme did not have commercial demand;

(b)    FoundationOne and FoundationOne Heme lacked the clinical utility for community-based oncologists that existed with category one (the "gold standard") and/or category two ("hotspot") tests, which were a fraction of the cost and readily reimbursable by non-governmental third party payors and Medicare;

(c)    FoundationOne and FoundationOne Heme did not have validated clinical utility thereby providing community-based oncologists with less valuable and informative information for the treatment of their patients;

(d)    Defendants were artificially boosting the Company's clinical test volumes to create the appearance of widespread adoption, market penetration, and growth by providing

community-based oncologists, or their patients, with various undisclosed incentives, discounts, or inducements;

(e)     Defendants were overstating the average revenue per clinical test that, in reality, was approximately $1,400-$1,500 per test, substantially below the reported $3,400-$3,600;

(f)     Defendants could not obtain "broad" Medicare reimbursement approval for each of the six clinical indications for which FoundationOne and FoundationOne Heme were designed absent validated clinical utility, which did not exist.  The most the Company could hope to achieve, if at all, was Medicare reimbursement approval for one of the six clinical indications pertaining to non-small cell lung cancer at a market price commensurate with that of competing hotspot tests, which would have indicated to investors the limited commercial viability of FoundationOne and FoundationOne Heme;

(g)     Defendants gave investors the false impression of the widespread adoption of FoundationOne and FoundationOne Heme by ceasing to report the actual number of ordering community-based physicians – maintaining throughout 2014 that it was simply "more than 2,100" – and, in 2015, continuing to lead the market to believe that there was an increasing number of "thousands" of community-based oncologists ordering the tests;

(h)     the Company's 2013 10-K was materially false and misleading because it failed to disclose (in violation of Item 303)  materially adverse trends and conditions to investors; and

(i)     the SOX certifications executed by the Defendants included the misleading representation that the 2013 10-K did not contain untrue statements or material omissions, when in reality, Defendants knew but failed to disclose, or recklessly disregarded, that the Company's reported success and future prospects were predicated on artificially inflated clinical test volumes,

growth, and associated revenue and a false impression of the adoption of FoundationOne and FoundationOne Heme by an increasing number of community-based oncologists.

### B.     First Quarter 2014 Financial Results

130.     On May 7, 2014, after the close of the market, Foundation issued a press release announcing its 1Q14 financial results.   Specifically, the press release reported 4,702 clinical tests and $7.1 million in revenue from clinical testing in the first quarter.   The press release quoted Defendant Pellini as stating, "The first quarter was a strong start to 2014 for Foundation, as we drove 25 percent quarter over quarter growth in the number of clinical tests reported to physicians, and in particular, saw early success with the adoption of our second clinical product, FoundationOne Heme." Defendant Pellini further stated, "To meet the increasing demand in the clinical and pharmaceutical business areas, we are continuing to invest in our commercial and business development infrastructure and expanding our experienced sales force."   The press release also confirmed the Company's FY14 guidance of between 22,000-25,000 reported clinical tests and between $52 to $58 million in revenue.

131.     Also on May 7, 2014, after the market closed, Foundation hosted a conference call with investors to discuss the Company's earnings release and business.   During the call, Defendant Pellini touted the Company's growth and highlighted the additional efforts it had undergone to strengthen its sales force in order to ensure continued meaningful traction with community physicians, stating:

> Foundation Medicine's commercial momentum continued through the first quarter resulting in strong sales and volume increases and a range of positive operational success.   The team executed well against our goals and our financial results speak to that fact.   Externally, we continue to feel encouraged by the sustained enthusiasm around our products in the oncology community as evidenced by continued growth in tests reported, overall revenue, and continued expansion into academic and community practices.

We again expanded our commercial infrastructure with the addition of talented and experienced sales professionals who continue to rapidly gain meaningful traction with oncologists and pathologists.

132.    In his prepared remarks, Defendant Ryan reiterated 1Q14 financial results and provided an update on the status of reimbursement, stating, "The average reimbursement for clinical tests that was recognized in revenue during the first quarter was approximately $3,400, which is consistent with our experience in the prior quarter."   With respect to the Company's progress on obtaining Medicare reimbursement, Defendant Ryan told investors that Foundation was "headed in the right direction with our overall approach to reimbursement" and had "received unique Z-Code identifiers from the McKesson DEX for both FoundationOne and FoundationOne Heme," which was "another step towards adequately differentiating our assets and providing greater transparency and reimbursement in billing practices."

133.    Defendant Ryan commented that "we continue to be encouraged by our test volume and revenue growth and we believe the Company is well positioned to leverage its current investments as volumes continue to expand."

134.    In discussing FoundationOne Heme, Defendant Kafka stated, "These efforts all speak to Foundation Medicine's commitment to maintaining our leading position through our commercial expansion as well as our commitment to innovation."

135.    In discussing the competitive landscape, Defendant Pellini stated, "I would like to reiterate, as I discussed on our last earnings call, that we do not yet see any validated comprehensive approach that is competing with us in the market today."   He continued, "There has been a good deal of discussion among investors and others in the oncology community about the commercial environment in cancer diagnostics, and it can be confusing."   Defendant Pellini discussed the "three categories of molecular tests:"  (1) routine single-gene marker tests such as IHC, PCR, and FISH, the "bread-and-butter" of local pathologists; (2) targeted "next gen sequencing panels," or "hot spot"

tests that assess specific mutations within multiple genes; and (3) "the comprehensive genomic profile that represents Foundation Medicine's segment today."  With respect to the third category, Defendant Pellini then stated, "[c]ollectively we believe this category represents an important approach in identifying potentially important treatment options for patients with many types of cancer" and "[w]e are convinced that we have gained early and growing traction in the marketplace due to our unique approach of testing all the known, relevant cancer genes for all classes of alterations in DNA in a way that makes it easy for the oncologist or pathologist to utilize this information in everyday patient care."

136.    Later in the call, Defendants Pellini and Ryan responded to a request for an update about the current status of the Company's reimbursement conversations with private payors. Defendant Ryan responded, "we are continuing to work with really all of the national payors as well as some of the regional payors, continuing to educate, working with them on the clinical validity as well as utility data that continues to come out and we feel good about the direction we are headed in."

137.    Defendant Pellini added:

Even though FoundationOne and FoundationOne Heme are Foundation Medicine tests and we are working for coverage decisions, this approach is something that is supported by a significant number of academic medical centers in particular whether they are bringing up their own tests in a handful of cases or whether they are simply working through Foundation Medicine.  Collectively we can make an even stronger argument to the payors as we generate the data and I think have a voice to ultimately obtain those coverage policy decisions.  So we are not in this alone and I think that is another important piece to realize.

138.    Defendants were also asked to address sequential growth in solid tumor volume which an analyst noted was lower than the prior quarter.  Defendant Pellini stated, "we have been really pleased with execution and the demand for our tests."  He explained that "[o]ur total volumes grew 25% over Q4 and that is robust growth" and that "the bigger picture volumes grew more than

threefold over Q1 of last year." Defendant Pellini continued, "we saw growth in both the academic medical centers as well as community oncologist areas which is all -- which is very positive."

139.   Defendant Pellini provided an update on what sales representatives were hearing in the field regarding Foundation's tests, stating, "It is again, very consistent, though it's not only in the academic medical center arena, but also with some of the larger laboratories." He continued, "[t]hey tend to be bringing up the targeted panels" and "[t]hat is one of the reasons we carved out these different categories of testing." Defendant Pellini stated, "[w]e are seeing are a number of laboratories bringing up targeted panels." Defendant Pellini commented that "there might be 10% or 15%" overlap in categories two and three, but that "we do see that as being very differentiated from Foundation Medicine's marketplace."

140.   Defendants took questions from analysts following opening remarks, which included inquiries regarding various competitive dynamics, the average reimbursement rate for the tests, the Company's customer base, and a status update with regard to Medicare coverage.

141.   In responding to a question on the average reimbursement rate for FoundationOne Heme, Defendant Ryan explained, "[w]e don't have enough experience in full to be able to answer," but provided that "[t]he average revenue per test that was recorded in revenue that I mentioned was $3,400 which was consistent with Q4."

142.   In discussing the growth of Foundation's customer base, Defendant Pellini stated, "Out of the gates we saw the majority of the adoption -- of the early adoption was from the major academic medical centers, the key opinion leaders, they still represent a really important customer base for us." He continued, "As the testing became a little bit more well known, it started to leak out into the community, often in a regional way around some of the leading academic medical centers where you have the initial uptake in testing."

143.    Defendant Pellini then explained the transition to community physicians and the sales force's efforts to reach those doctors:

> Now as we build the sales force they continue to reach out into the community.  They are giving additional cover to the communities doing a lot of the education.  And as you know, the second half of last year is where we first saw the transition from the majority of tests coming from academic centers to the majority of tests coming from the community practices.

144.    Defendant Pellini further reported that "54% . . . [of the] tests [performed] were from community practices versus 46% from academic medical centers" – results that were consistent with prior quarters.  He attributed the percentage of community physicians to the "early impact of the sales team."

145.    At the end of the call, a J.P. Morgan analyst sought additional information on competitive dynamics in the marketplace, specifically asking if physicians and payors understood the difference between category two and three tests or whether the categories caused a "hindrance to adoption."  Defendant Pellini's answer was nonresponsive, as he stated:

> The most, I think, important competitive dynamic relates to education. What we described in the one past, again, one of the reasons we had the early and significant uptake in the academic medical centers is that I think intuitively many of the key opinion leaders had a sense this was an important tool. We made that relatively easy for them.

> The next phase was then to migrate this into the community setting and also to educate not only the payors but also work with the FDA as part of the education process. Those are ongoing activities. There are a couple of academic medical centers out there that are either working with Foundation Medicine or they have pioneered their own approaches. Frankly it is helpful to have those academic medical centers talking about their approach, talking about the relationship with Foundation Medicine and publishing data in parallel with Foundation Medicine. Again, I would say most important thing that we are -- one of the most important things that we are focused on in 2014 is educating the community, the oncology community on how to think about FoundationOne and FoundationOne Heme within the context of these key clinical indications.

146.    In response to Defendants' statements on May 8, 2014, William Blair & Company, L.L.C. ("William Blair") issued an analyst report commenting on the Company's reported 4,702 clinical tests, which "suggest[ed] the company continues to get meaningful traction."

147.    On May 13, 2014, Foundation filed its Form 10-Q ("1Q14 10-Q") with the SEC, which was signed by Defendants Pellini and Ryan and confirmed the Company's previously announced financial results and financial position.  The 1Q14 10-Q also contained materially false and misleading statements about FoundationOne, stating:

> We have experienced rapid adoption of FoundationOne. More than 2,100 physicians from large academic centers and community-based practices have ordered FoundationOne since its formal commercial launch in June 2012. We believe this rapid adoption of FoundationOne, accomplished with a nascent sales team, demonstrates the demand for and utility of a single comprehensive product that helps oncologists effectively implement the promise of precision medicine.

148.    The 1Q14 10-Q was signed by Defendants Pellini and Ryan and contained materially similar certifications by Defendants Pellini and Ryan pursuant to the SOX, as stated in ¶128, *supra*.

149.    For the reasons stated above in Section IV, and as further detailed herein, Defendants' statements made concerning demand, competition, adoption, and reimbursement coverage, made in the Company's first quarter 2014 ("1Q14") earnings release dated May 7, 2014, the conference call with analysts held the same day, and the 1Q14 10-Q, filed on May 13, 2014, were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because, for example:

(a)    FoundationOne and FoundationOne Heme did not have commercial demand;

(b)    FoundationOne and FoundationOne Heme lacked the clinical utility for community-based oncologists that existed with category one (the "gold standard") and/or category two ("hotspot") tests, which were a fraction of the cost and readily reimbursable by non-governmental third party payors and Medicare;

(c)     FoundationOne and FoundationOne Heme did not have validated clinical utility thereby providing community-based oncologists with less valuable and informative information for the treatment of their patients;

(d)     Defendants were artificially boosting the Company's clinical testing volumes to create the appearance of widespread adoption, market penetration, and growth by providing community-based oncologists, or their patients, with various undisclosed incentives, discounts, or inducements;

(e)     Defendants were overstating the average revenue per clinical test that, in reality, was approximately $1,400-$1,500 per test, substantially below the reported $3,400-$3,600;

(f)     Defendants could not obtain "broad" Medicare reimbursement approval for each of the six clinical indications for which FoundationOne and FoundationOne Heme were designed absent validated clinical utility, which did not exist. The most the Company could hope to achieve, if at all, was Medicare reimbursement approval for one of the six clinical indications pertaining to non-small cell lung cancer at a market price commensurate with that of competing hotspot tests, which would have indicated to investors the limited commercial viability of FoundationOne and FoundationOne Heme;

(g)     Defendants gave investors the false impression of the widespread adoption of FoundationOne and FoundationOne Heme by ceasing to report the actual number of ordering community-based physicians – maintaining throughout 2014 that it was simply "more than 2,100" – and, in 2015, continuing to lead the market to believe that there was an increasing number of "thousands" of community-based oncologists ordering the tests;

(h)     the Company's 1Q14 10-Q was materially false and misleading because it failed to disclose (in violation of Item 303) materially adverse trends and conditions to investors; and

(i)     the SOX certifications executed by the Defendants included the misleading representation that the 1Q14 10-Q did not contain untrue statements or material omissions, when in reality, Defendants knew but failed to disclose, or recklessly disregarded, that the Company's reported success and future prospects were predicated on artificially inflated clinical test volumes, growth, and associated revenue and a false impression of the adoption of FoundationOne and FoundationOne Heme by an increasing number of community-based oncologists.

150.    On July 17, 2014, Foundation issued a press release announcing that it received final approval from the New York Department of Health for FoundationOne and FoundationOne Heme. The press release stated, in relevant part:

> "This approval marks a significant regulatory milestone for Foundation Medicine and serves as a confirmation of the high standard for validation established with FoundationOne and FoundationOne Heme," said Jeffrey Ross, M.D., medical director, Foundation Medicine. "The approval enables New York physicians to utilize our tests, which are designed to identify the molecular growth drivers of each individual's unique cancer, to select relevant targeted therapy options or clinical trials that may be appropriate for their patients."
>
> *       *       *
>
> The state of New York is the only U.S. state that requires an independent regulatory review process, including technical and clinical validation, for laboratory developed tests. FoundationOne and FoundationOne Heme are the only fully informative genomic profiles to be approved by New York State for the detection of all classes of genomic alterations, including base pair substitutions, insertions and deletions, copy number alterations and gene rearrangements, within the full coding region of all genes known to be somatically altered in human cancers. The standard set by New York State represents one of the most rigorous levels of validation required for laboratory developed tests.

**C.     Second Quarter 2014 Financial Results**

151.    On August 12, 2014, after the market closed, Foundation issued a press release announcing its financial results for 2Q14. The press release reported that the Company had recorded revenue for 5,908 clinical tests for a total of $9.4 million in revenue from clinical testing. The press release quoted Defendant Pellini as stating, "We continued to gain commercial momentum in the

second quarter, with strong growth in clinical test volumes and in the revenue contribution from our pharmaceutical industry partnerships." He further stated, "It was especially encouraging to see a large number of new abstracts and publications coming from our partnerships and from independent research efforts. These data further validate our comprehensive approach to clinical testing and also represent a growing base of evidence supporting the clinical utility of our tests, a key factor in the reimbursement equation for payors." The press release also confirmed prior FY14 guidance of 22,000-25,000 reported clinical tests and between $52-$58 million in revenue.

152.    That same day, after the market closed, Foundation hosted a conference call with analysts and investors to discuss the Company's earnings release and business operations. During the call, Defendant Pellini stated, "our second quarter, it was a very strong one with positive momentum across virtually all commercial metrics."

153.    In particular, Defendant Pellini reported an updated commercial mix between community physicians and academic centers, reporting that the number of tests being ordered by community physicians had jumped to 60% from 54% the prior quarter.

154.    Despite the shift toward community doctors, the Company nevertheless touted growth in the academic medical centers as well:

> We still have a very strong client base around -- within the academic medical centers around the United States. And I think the most positive thing is that we still see growth in both of those areas, both at the academic medical center setting as well as in the community practice, where the community practice is. But, as Jason mentioned in the earlier comments, we're learning about how the community oncologist will really ultimately incorporate this into their community -- into their daily practice

155.    The rate at which physicians and academic centers reordered the test was also an important factor impacting growth. With respect to the reorder rate, Defendant Pellini extolled the positive rate of reorder, highlighting that "the majority of cases that we see each week are in fact coming from accounts and clients who have ordered the test before, so we like the trending on the

reorder rate as well." In fact, he pointed out that the 60% of tests that were reported to community oncologists, were "driven largely by repeat ordering physicians." Defendant Pellini attributed the volume growth, at least in part, to the "growth of [the] sales team," and commented that "over time we will continue to see further growth into community practices around the United States."

156.    Implying the results were indicative of a successful sales team, Defendant Pellini continued, "[a]s the numbers indicate, our business remains robust, resulting in strong sales and volume growth in a range of positive operational successes."

157.    Defendant Ryan commented on the 2Q14 financial results, stating, "we had a strong second quarter in terms of our commercial acceleration and revenue growth." He also provided a status update on the Company's average reimbursement for clinical tests, which rose to $3,600 (an increase of about $200 per test from the first quarter), attributable to "the impact of the higher priced FoundationOne Heme test," as "there was no material change in the average reimbursement per FoundationOne test."

158.    With regard to Medicare coverage, specifically, Defendant Ryan provided an update on the Company's strategy and efforts to date, falsely leading the market to believe that its efforts would eventually be rewarded. Although he reported that the Company had yet to receive any payments for the claims it submitted using a miscellaneous code – which it was in the process of appealing – Defendant Ryan falsely added:

> As a sign of steady progress, both Medicare and a number of regional and national commercial payors, we've moved beyond what we refer to as the educational phase and on to providing validation and clinical utility data as part of our ongoing dialogue. Of course, we're engaged in various phases of discussion at any given time, but we continue to make progress as payors become increasingly familiar with our tests, the value they're delivering to physicians and their patients, and the impact that they can have in overall cancer treatment. Nonetheless, despite this progress, we still can't predict the timing of any potential coverage decisions.

159.    Defendant Pellini added some additional color later in response to an analyst's question about whether there were "any new themes or trends developing around how physicians are using the test in practice," reiterating:

> [W]e continue to stay focused . . . on those six key clinical indications I think that is important to realize.  That's where the studies are focused as we interact with it with a clinician.  We're really focused on those six core clinical indications that we've been talking about for the past year and a half or so.

160.    Defendant Kafka also provided remarks on the call.  At the top of his list was the Company's announcement that it had received approval by the NYS Dept. of Health for FoundationOne and FoundationOne Heme.   According to Defendant Kafka, this was quite a milestone, because, as he explained, "New York . . . is the only US state that requires an independent regulatory review process and represents one of the most rigorous levels of both technical and clinical validation required for lab developed tests."  In addition to reporting the news to analysts and investors, Defendant Kafka signaled, falsely, not only that the "approval confirms the high standard of validation established by our assays," but also that the approval would have "a positive impact as we continue our reimbursement dialogue with payors."

161.    Defendant Miller reiterated Defendant Kafka's enthusiasm and provided more detail on the metrics the NYS Dept. of Health focused on and the impact of approval on the Company's overall reimbursement strategy.    Specifically, Defendant Miller stated, "the New York State regulatory process is quite rigorous as was alluded to in Steve's [Kafka's] comments."   He continued, "there are very detailed metrics around analytic validation components that were embodied in that document and we felt that was a very real and meaningful process and approval."

162.    Defendant Pellini added, "I think the most important takeaway is that both the New York State approval coupled with the Nature Biotech analytic validation paper last fall should in fact help check the box or should in fact check the box for analytic validation."  Defendant Pellini also

added, "I think it's just another piece in the process as we continue to build evidence that starts with analytic validation runs all the way to the clinic utility for the payors. . . . I would just look at it in totality of the information that we are developing for and presenting to the payors."

163.    Defendant Kafka continued his glowing remarks, calling Foundation's tests "best-in-class," and touting that "Foundation Medicine has established and is positioned to maintain our leadership position in comprehensive molecular testing for cancer patients."   In fact, Defendant Kafka emphasized that point, announcing "[w]e do not yet see a comparable commercial offering in the marketplace."

164.    Analysts reacted positively to Defendants' statements on August 12, 2014 regarding Foundation's 2Q14 financial results and clinical test volumes.   For example:

(a)    On August 12, 2014, J.P. Morgan issued a report noting the "solid growth in clinical test volumes" and an "incremental positive on the regulatory/reimbursement front" with the Company's announcement that it had recently received approval for the FoundationOne and FoundationOne Heme tests from the NYS Dept. of Health, which "should help in the ongoing dialog with payors."

(b)    In a report also dated August 12, 2014, William Blair commented that clinical testing revenue growth was driven by strong volume growth and repeat orders from community oncologists.

(c)    In a report dated August 13, 2014, Janney Capital Markets ("Janney") acknowledged that the Company was "making major strides towards a positive national coverage decision" and "view[ed] the New York State Department of Health approvals of the FoundationOne and FoundationOne Heme as important milestones for FMI."

(d)     Also on August 13, 2014, Wedbush issued a report in which it stated it "continue[d] to be encouraged on the reimbursement trend as a result of greater market awareness, increasing publications plus more frequent and deeper payor discussions."

165.    On August 13, 2014, Foundation filed its Form 10-Q ("2Q14 10-Q") with the SEC, which was signed by Defendants Pellini and Ryan and confirmed the Company's previously announced financial results and financial position.  The 2Q14 10-Q also contained materially false and misleading statements about FoundationOne, stating:

> We have experienced rapid adoption of FoundationOne. More than 2,100 physicians from large academic centers and community-based practices have ordered FoundationOne since its formal commercial launch in June 2012. We believe this rapid adoption of FoundationOne demonstrates the demand for and utility of a single comprehensive product that helps oncologists effectively implement the promise of precision medicine.

166.    The 2Q14 10-Q was signed by Defendants Pellini and Ryan and contained materially similar certifications by Defendants Pellini and Ryan pursuant to the SOX, as stated in ¶128, *supra*.

167.    For the reasons stated in Section IV, and as further detailed herein, Defendants' statements concerning demand, competition, adoption and reimbursement coverage, made in the Company's second quarter 2014 ("2Q14") earnings release dated August 12, 2014, the conference call with analysts held the same day, and the 2Q14 10-Q, filed on August 13, 2014, were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because, for example:

(a)     FoundationOne and FoundationOne Heme did not have commercial demand;

(b)     FoundationOne and FoundationOne Heme lacked the clinical utility for community-based oncologists that existed with category one (the "gold standard") and/or category two ("hotspot") tests, which were a fraction of the cost and readily reimbursable by non-governmental third party payors and Medicare;

(c)     FoundationOne and FoundationOne Heme did not have validated clinical utility thereby providing community-based oncologists with less valuable and informative information for the treatment of their patients;

(d)     Defendants were artificially boosting the Company's clinical testing volumes to create the appearance of widespread adoption, market penetration, and growth by providing community-based oncologists, or their patients, with various undisclosed incentives, discounts, or inducements;

(e)     Defendants were overstating the average revenue per clinical test that, in reality, was approximately $1,400-$1,500 per test, substantially below the reported $3,400-$3,600;

(f)     Defendants could not obtain "broad" Medicare reimbursement approval for each of the six clinical indications for which FoundationOne and FoundationOne Heme were designed absent validated clinical utility, which did not exist.  The most the Company could hope to achieve, if at all, was Medicare reimbursement approval for one of the six clinical indications pertaining to non-small cell lung cancer at a market price commensurate with that of competing hotspot tests, which would have indicated to investors the limited commercial viability of FoundationOne and FoundationOne Heme;

(g)     Defendants gave investors the false impression of the widespread adoption of FoundationOne and FoundationOne Heme by ceasing to report the actual number of ordering community-based physicians – maintaining throughout 2014 that it was simply "more than 2,100" – and, in 2015, continuing to lead the market to believe that there was an increasing number of "thousands" of community-based oncologists ordering the tests;

(h)     the Company's 2Q14 10-Q was materially false and misleading because it failed to disclose (in violation of Item 303) materially adverse trends and conditions to investors; and

(i)     the SOX certifications executed by the Defendants included the misleading representation that the 2Q14 10-Q did not contain untrue statements or material omissions, when in reality, Defendants knew but failed to disclose, or recklessly disregarded, that the Company's reported success and future prospects were predicated on artificially inflated clinical test volumes, growth, and associated revenue and a false impression of the adoption of FoundationOne and FoundationOne Heme by an increasing number of community-based oncologists.

168.    On September 12, 2014, J.P. Morgan issued an analyst report following a meeting with management, including Defendants Pellini and Ryan.   The report commented that "[m]anagement's tone was upbeat" and, as a result, J.P. Morgan "came away incrementally positive on the longer-term outlook (including FMI's differentiated offering with a non-trivial first-mover advantage in an area of rapidly growing medical need)."   According to the report, "Management noted that conversations with payors continue to evolve in the right direction and having a seat at the table early in the process is critical to shaping payor thinking on both validation and standards, thereby creating a barrier to entry for later entrants."

169.    Also on October 16, 2014, after the Company announced that Priority Health would cover both FoundationOne and FoundationOne Heme for members with advanced cancers, William Blair issued a report calling the positive coverage decision "encouraging" and upgraded Foundation's shares from Market Perform to Outperform.

**D.     Third Quarter 2014 Financial Results**

170.    On November 5, 2014, after the market closed, Foundation issued a press release announcing its financial results for 3Q14.   The press release reported that the Company had conducted 6,428 clinical tests and reported $9.8 million in revenue from clinical testing in 3Q14.

171.    The press release announced "continued commercial execution," reimbursement progress, and updated guidance.   The press release quoted Defendant Pellini as stating, "We

continued to execute operationally and commercially in the third quarter, with further growth in revenue and clinical test volumes." The press release also updated FY14 guidance, narrowing its expected reported clinical tests to within the upper end of the Company's initial guidance range of 22,000-25,000 and raising its revenue projection to be between $58 to $60 million, updated from the Company's previous 2014 guidance of $52 to $58 million.

172.    Also on November 5, 2014, after the market closed, Foundation hosted a conference call with investors to discuss the Company's earnings release and business operations. During the call, Defendant Pellini discussed 3Q14 financial results and made two important announcements regarding the Company's progress toward reimbursement.

173.    First, Defendant Pellini announced that Priority Health had agreed to cover FoundationOne and FoundationOne Heme – the first health plan in the country to do so. The Company characterized this decision as an "important milestone" in the Company's ongoing efforts to achieve Medicare reimbursement. Specifically, Defendant Pellini announced, "As for our third quarter, our commercial momentum continued across the organization, and we also reached an important milestone in our active and ongoing reimbursement efforts" with Priority Health becoming the first health plan to broadly cover FoundationOne and FoundationOne Heme.

174.    Second, Defendant Pellini also reported that, "beginning in 2015, Google employees and their families who are navigating cancer treatment will have covered access to FoundationOne and FoundationOne Heme testing."

175.    Commenting next on the Company's revised revenue and clinical test volume projections, Defendant Pellini extolled, "[a]s our results indicate our business remains robust, resulting in continued sales and test volume growth coupled with a number of positive operational successes" and stated that "[t]he team has continued to execute well against our goals and our

financial results speak to that fact." Defendant Pellini also stated that "[t]he commercial uptake for FoundationOne and FoundationOne Heme remains strong, as does the clinical data supporting each test."

176.    Defendant Ryan also provided additional color on the Company's commercial advancements in community practices:

> [W]e ended the quarter with a US sales team of 47 account executives and sales managers, consistent with our plan and the prior quarter. We continue to demonstrate robust integration into community practices, with 60% of test reported to physicians in the community, which is consistent with the prior quarter. Clinical tests reported to physicians in both the community setting and academic medical centers increased over the prior quarter. We are in the early days of learning about ordering patterns in the community and we're actively investing in our commercial infrastructure to increase reordering trends among our physician clients.

177.    Defendant Ryan next provided an update on reimbursement, stating:

> The average reimbursement for clinical tests recognized in revenue in Q3 was approximately $3,600, consistent with the prior quarters. We were encouraged by some of our reimbursement momentum headlined by the coverage decision by Priority Health for both FoundationOne and FoundationOne Heme. This was an important step forward in recognizing the value of comprehensive genomic profiling in oncology that also represents tangible evidence of the progress that we're continuing to make with certain payers.

178.    Defendant Ryan recapped the quarter, stating, "the third quarter was another very strong period for FMI with meaningful revenue growth, positive news from Priority Health and continued investments on the commercial, research and technology fronts." He continued,

> We believe those investments will drive future top line growth and yield significant leverage as we scale. But most importantly, we still fundamentally believe that we're at the very front edge of what is a tremendous market opportunity for comprehensive genomic profiling and molecular information in the field of oncology.

179.    Following prepared remarks, the Company fielded questions from analysts who inquired about the Company's revised guidance projections and the status of the Company's reimbursement efforts, as well as color on the competitive landscape.

180.    When asked for more detail on the Company's revised FY14 guidance and the recognition that it "implies a pretty significant sequential pick up," Defendant Pellini explained:

[T]he overall fundamentals of our clinical business do remain strong. . . . And the way that we look at it is, we started off by gaining tremendous traction within the academic medical centers. That was our first market. We then made a deliberate commercial push into the community setting and that push has been quite successful based on the number of ordering oncologists and the percentage of tests that are ordered from this segment.

181.    In response to a request for "more color on clinical test volumes in terms of repeat orders versus physician's ordering," and whether there is any evidence of physicians ordering the test for the same patient multiple times as the cancer evolves, Defendant Pellini explained:

With respect to the reorder rates, one of the things that we touched on in last quarter's call is that, we do see a difference in reorder rates between the oncologists in the academic medical center setting and the community oncologists. And I think the migration into the community is something that has really taken place over the course at least in earnest taken place over the course of the past year or so, and I think what we've recognized is, we have to focus more on the community docs, that's where our commercial team is now aligned. And again, that's the type of additional support, we are putting this additional support in place to really assist the barriers that those community oncologists sometimes face in clinical practice.

182.    Defendant Ryan also responded to questions regarding the reimbursement rates, to which he reiterated that "the average reimbursement per test that was recognized in revenue held steady at that $3,600."

183.    Defendant Pellini further commented on the overall market and commercial competitors, including from the academic medical centers.   In response, he attempted to quell investor concerns, stating, "[o]ver the course of the past year, we thought we saw a couple of companies that were perhaps moving in this direction, which is really this category 3 comprehensive genomic profiling"; however, he stated, "[t]o be frank, we just haven't seen them emerge in our space at this point in time."   Defendant Pellini continued, "from a commercial standpoint, we

continue to believe that we are the only company out there with a validated comprehensive genomic profile."

184.    As it relates specifically to academic medical centers, Defendant Pellini further assuaged investors, stating:

> [W]e're seeing the exact same thing that we've seen for the past year and a half, I think we have a clear sense of all the major academic medical centers, the large handful of them that are either have brought up or working to bring up a comprehensive genomic profile type test and I think even in the past several of days another major cancer center that we're aware of, said that they have their own test.
>
> And to be frank, that supports us. That supports us as we -- in terms of as we have conversation with payers. But what most of the centers will be doing if they bring up any type of next-generation sequencing, if they bring it up, it will be panel-based testing that category 2. And as we've described multiple times in the past, we just don't see that as being competitive with what we're doing with comprehensive genomic profiling.

185.    Analysts reacted positively to Defendants' statements on November 5, 2014 regarding Foundation's 3Q14 financial results.  For example:

(a)    In a report dated November 6, 2014, Janney commented on Foundation's accomplishments in 3Q14, including the positive coverage decision by Priority Health and the collaboration with WuXi to offer genomic profiling services for biopharma companies conducting China-based clinical trials.

(b)    In a report dated November 6, 2014, William Blair commented that "management's commentary on the call about progress made with some MACs seemed more positive than we have heard in the past."

186.    On November 13, 2014, Foundation filed its Form 10-Q ("3Q14 10-Q") with the SEC, which was signed by Defendants Pellini and Ryan and confirmed the Company's previously announced financial results and financial position.  The 3Q14 10-Q provided:

> We have experienced rapid adoption of FoundationOne.  More than 2,100 physicians from large academic centers and community-based practices have ordered

- 70 -

FoundationOne since its formal commercial launch in June 2012. We believe this rapid adoption of FoundationOne demonstrates the demand for and utility of a single comprehensive product that helps oncologists effectively implement the promise of precision medicine.

187.    The 3Q14 10-Q was signed by Defendants Pellini and Ryan and contained materially similar certifications by Defendants Pellini and Ryan pursuant to the SOX, as stated in ¶128, *supra*.

188.    For the reasons stated above in Section IV, and as further detailed herein, Defendants' statements concerning demand, competition, adoption and reimbursement coverage, made in the Company's third quarter 2014 ("3Q14") earnings release dated November 5, 2014, the conference call with analysts held the same day, and the 3Q14 10-Q filed on November 13, 2014, were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because, for example:

(a)    FoundationOne and FoundationOne Heme did not have commercial demand;

(b)    FoundationOne and FoundationOne Heme lacked the clinical utility for community-based oncologists that existed with category one (the "gold standard") and/or category two ("hotspot") tests, which were a fraction of the cost and readily reimbursable by non-governmental third party payors and Medicare;

(c)    FoundationOne and FoundationOne Heme did not have validated clinical utility thereby providing community-based oncologists with less valuable and informative information for the treatment of their patients;

(d)    Defendants were artificially boosting the Company's clinical testing volumes to create the appearance of widespread adoption, market penetration, and growth by providing community-based oncologists, or their patients, with various undisclosed incentives, discounts, or inducements;

(e)     Defendants were overstating the average revenue per clinical test that, in reality, was approximately $1,400-$1,500 per test, substantially below the reported $3,400-$3,600;

(f)     Defendants could not obtain "broad" Medicare reimbursement approval for each of the six clinical indications for which FoundationOne and FoundationOne Heme were designed absent validated clinical utility, which did not exist.  The most the Company could hope to achieve, if at all, was Medicare reimbursement approval for one of the six clinical indications pertaining to non-small cell lung cancer at a market price commensurate with that of competing hotspot tests, which would have indicated to investors the limited commercial viability of FoundationOne and FoundationOne Heme;

(g)     Defendants gave investors the false impression of the widespread adoption of FoundationOne and FoundationOne Heme by ceasing to report the actual number of ordering community-based physicians – maintaining throughout 2014 that it was simply "more than 2,100" – and, in 2015, continuing to lead the market to believe that there was an increasing number of "thousands" of community-based oncologists ordering the tests;

(h)     the Company's 3Q14 10-Q was materially false and misleading because it failed to disclose (in violation of Item 303) materially adverse trends and conditions to investors; and

(i)     the SOX certifications executed by the Defendants included the misleading representation that the 3Q14 10-Q did not contain untrue statements or material omissions, when in reality, Defendants knew but failed to disclose, or recklessly disregarded, that the Company's reported success and future prospects were predicated on artificially inflated clinical test volumes, growth, and associated revenue and a false impression of the adoption of FoundationOne and FoundationOne Heme by an increasing number of community-based oncologists.

E.      **Fourth Quarter 2014 Financial Results**

189.    On January 12, 2015, Foundation issued a press release announcing preliminary 2014 financial results.  The press release announced that Foundation achieved "Revenue of Approximately $61.1 Million and Report[ed] More than 24,500 Clinical Tests in 2014," exceeding its guidance.

190.    Importantly, the press release also announced that Foundation had "[s]ecured first broad payor coverage of FoundationOne and FoundationOne Heme by Priority Health."  The press release quoted Defendant Pellini as stating, "The rapid revenue growth in 2014 was driven by progress across the three key pillars of our business, specifically, the continued adoption of comprehensive genomic profiling by oncologists in both the academic and community setting, an increase in demand from our pharmaceutical partners for clinical trial support, and expanded access to our molecular information platform."  Defendant Pellini continued, "Once again, the team at Foundation Medicine executed well on our business and delivered real value to our clients and their patients, as we exceeded our total revenue guidance for the year."

191.    Then on February 24, 2015, after the market closed, Foundation issued a press release announcing its financial results for 4Q14 and FY14.  The press release reported that the Company had conducted 7,233 clinical tests and reported $10.3 million of clinical revenue in 4Q14.  The press release quoted Defendant Pellini as stating, "Commercial execution and growth rates were strong across both our clinical and pharma customers in the fourth quarter, highlighting the broad adoption of our comprehensive genomic profiling approach."  The press release also provided FY15 guidance, stating that "[t]he company expects to report between 43,000 and 47,000 clinical tests in 2015" and "anticipates 2015 revenue will be in the range of $105 - $115 million assuming completion of the Roche transaction in the second quarter of 2015."

192.    Also on February 24, 2015, after the market closed, Foundation hosted a conference call with analysts and investors to discuss the 4Q14 and FY14 financial results and business

- 73 -

operations.   During the call, Defendant Pellini spoke positively about the Company's operations, commenting on the progress it made in the community setting, advancements on the reimbursement front, including the draft LCD it received from Palmetto, and the increased rate at which physicians were reordering the test.

193.    With regard to the progress the Company made with community practices, Defendant Pellini reported, "we drove significant gains in the community setting, while sustaining growth with our academic customers," reporting that the Company "end[ed] the year with approximately 60% of our clinical volume coming from community-based positions."

194.    Defendant Ryan further commented on the Company's financial performance, stating, "During the fourth quarter of 2014, we continued to make meaningful strides in the commercial front."  Defendant Ryan also provided an update on the status of reimbursement, which centered on the Company's receipt of the draft LCD from Palmetto, which it discussed for the first time: "[W]e were encouraged by signs of forward progress on the reimbursement landscape, headlined by Palmetto's Draft Local Coverage Determination, published in January."  He stated that the "draft LCD was a very important step forward, because it specifically relates to comprehensive genomic profiling in certain patients with non-small cell lung cancer" and "sets a standard for the rigorous analytic validation that's required with this type of testing."

195.    Commenting on the reasons behind an anticipated acceleration in test volume numbers from 4Q14 levels, Defendant Ryan attributed that growth to the investments the Company was making in its operations, including its sales team, client services, and marketing, for example:

> I think one of the keys here, . . . is looking at our investments during the year, and our operating expenses. The investments we're making are not just in the sales team. They're also across client services, across strategic marketing, market analytics, and differentiation programs, as well as our reimbursement team, and of course, internationally.

So there are a lot of different elements where we're investing during the year for commercial growth.

196.    During the call, a Bernstein analyst pointed to "some visibility about genomics testing and comprehensive testing" and Foundation's continued struggle to obtain CMS approval, and asked "Can you help us reconcile that apparent disconnect and when it might be resolved, and how?" Defendant Pellini responded:

> What I can tell you is that we remain encouraged by the progress or the focus that we are seeing from one of the local Medicare administrative contractors, which is Palmetto. As Jason mentioned, they are seen as one of the thought leaders in this space. And they are, in essence, trying to rally the troops within the Medicare organization to focus more on molecular testing, and specifically, comprehensive genomics profiling.

> So while we cannot comment on specific timelines, we are sensing a bit of additional urgency in trying to -- from Palmetto, at least, we are sensing additional urgency in really trying to work through this process. But. . . , it is a process. And just because Palmetto takes a step forward, does not necessarily mean that our MAC or any other MACs will take a step forward.

197.    When directly asked if investors should regard Medicare reimbursement "as a matter of when, or is it a matter of if," Defendant Pellini stated, "we have always believed that it is a matter of when, and we continue to believe it is a matter of when. . . . But we do believe it's a question of when. And we think the question of if -- we passed the question of if, some time ago."

198.    Discussing 2015 initiatives, Defendant Ryan stated, "one of our initial really pushes, commercially, was to get out to as many as physicians and as many clients as we could." He stated, "we feel great about that in terms of the thousands of oncologist who have ordered." Defendant Ryan confirmed the "main initiatives for 2015 isn't only to broaden that client base, but it is to go really deeper into that client base."

199.    During the call, Defendant Pellini discussed academic medical centers and testing volumes, stating "we don't talk about specific clients publicly," but "overall, our business, both in

the community setting, as well as in the academic medical center setting, continues to grow."
Defendant Pellini stated, "We're really pleased with that growth, overall."

200.    Defendant Pellini also commented on competition, evasively responding:

[D]oes it open the door for other companies? No one in the world has the experience
that Foundation Medicine has in comprehensive genomics profiling and molecular
information, and in working with so many pharmaceutical companies. As you know,
we work with a few dozen at this point in time.

201.    When asked if Foundation is still "winning the lion's share of the opportunities,"
Defendant Pellini confidently stated, "I don't know of an opportunity that we have lost to anyone
else -- put it that way."  Defendant Kafka added, "there are certainly companies that are still, just like
we see in the commercial marketplace, choosing to take different kinds of testing approaches that are
more targeted."  He continued, "And so I think where there is an appreciation and a desire to work
with a comprehensive genomics profiling approach, we're doing very well in that marketplace. But
there is still a diversity of approaches that are out there, just like in the commercial side."

202.    Defendant Pellini further commented on competition, stating, "we are the first to
commercialize comprehensive genomics profiling" and "[w]e have a tremendous lead in this space, a
multi-year lead in this space."  Following a discussion of Foundation's operations, Defendant Pellini
stated "when you wrap all those things up in a package . . . that's what keeps us separated and will
continue to keep us separated from anyone else in the marketplace."

203.    Analyst reacted positively to Defendants' statements on February 24, 2015 regarding
2015 outlook.  For example:

(a)    On February 25, 2015, Janney issued an analyst report raising its fair value to
$45 from $28 and reiterating "Neutral" based on "momentum building" and the "significant strides
[made] in 2014."

(b)     Also on February 25, 2015, JMP issued a report commenting that "2015 should be no less exciting" with "the continued momentum in clinical publications" and "our expectation that we hear more positive news flow on the reimbursement front."

204.     On March 13, 2015, the Company filed its annual report for the year ended December 31, 2014 with the SEC on Form 10-K ("2014 10-K"), which was signed by Defendants Pellini and Ryan and reiterated the Company's previously announced financial results.   The 2014 10-K contained materially false and misleading statements about Foundation's tests, their rapid adoption, and competition,  stating:

> We believe we have built the only commercially available molecular information platform that comprehensively assesses cancer simultaneously for all four classes of genomic alterations (*i.e.*, base pair substitutions, copy number alterations, short insertions and deletions, and gene rearrangements and fusions) across all cancer-related genes with the sensitivity and specificity required for routine medical practice. . . .   FoundationOne and FoundationOne Heme deliver this complex molecular information in a concise report that matches detected molecular alterations with potentially relevant treatment options and clinical trials.
>
> *     *     *
>
> Our clinical products have been rapidly adopted in the marketplace, and several thousand physicians from large academic centers and community-based practices have ordered FoundationOne or FoundationOne Heme. We believe this rapid adoption, which has been accomplished in the early stages of our commercial growth, demonstrates the demand for and utility of a single, comprehensive solution that helps oncologists effectively implement the promise of precision medicine.
>
> *     *     *
>
> Based on our actual experience with patient cases since its launch, we believe FoundationOne's ability to identify clinically relevant genomic alterations exceeds that of other commercially available molecular diagnostic tests. We define a clinically relevant alteration as an identified genomic alteration in an analyzed cancer cell associated with an FDA-approved targeted therapy indicated for use in the tumor type, an FDA approved targeted therapy indicated for use in another tumor type, or an open clinical trial for which the alteration confers eligibility. Our comparative quantitative analysis demonstrated that running four commercially available tests that also utilize next-generation sequencing, or NGS, plus two relevant and commonly-used hotspot tests together would collectively identify only a maximum of 31% of the actionable genomic alterations that can be identified by FoundationOne.

\*     \*     \*

We believe FoundationOne and FoundationOne Heme are currently the only commercially available comprehensive molecular information products that provide a fully informative genomic profile in a concise and actionable format designed for use in the clinical setting.

205. The 2014 10-K was signed by Defendants Pellini and Ryan and contained materially similar certifications by Defendants Pellini and Ryan pursuant to the SOX, as stated in ¶128, *supra*.

206. For the reasons stated above in Section IV, and as further detailed herein, Defendants' statements concerning demand, competition, adoption and reimbursement coverage, made in the Company's preliminary fourth quarter 2014 ("4Q14") earnings release, dated January 12, 2015, the 4Q14 and fiscal year 2014 ("FY14") earnings release, dated February 24, 2015, the conference call with analysts held the same day, and the 2014 10-K, filed on March 13, 2015, were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because, for example:

(a) FoundationOne and FoundationOne Heme did not have commercial demand;

(b) FoundationOne and FoundationOne Heme lacked the clinical utility for community-based oncologists that existed with category one (the "gold standard") and/or category two ("hotspot") tests, which were a fraction of the cost and readily reimbursable by non-governmental third party payors and Medicare;

(c) FoundationOne and FoundationOne Heme did not have validated clinical utility thereby providing community-based oncologists with less valuable and informative information for the treatment of their patients;

(d) Defendants were artificially boosting the Company's clinical testing volumes to create the appearance of widespread adoption, market penetration, and growth by providing

community-based oncologists, or their patients, with various undisclosed incentives, discounts, or inducements;

(e)     Defendants were overstating the average revenue per clinical test that, in reality, was approximately $1,400-$1,500 per test, substantially below the reported $3,400-$3,600;

(f)     Defendants could not obtain "broad" Medicare reimbursement approval for each of the six clinical indications for which FoundationOne and FoundationOne Heme were designed absent validated clinical utility, which did not exist. The most the Company could hope to achieve, if at all, was Medicare reimbursement approval for one of the six clinical indications pertaining to non-small cell lung cancer at a market price commensurate with that of competing hotspot tests, which would have indicated to investors the limited commercial viability of FoundationOne and FoundationOne Heme;

(g)     Defendants gave investors the false impression of the widespread adoption of FoundationOne and FoundationOne Heme by ceasing to report the actual number of ordering community-based physicians -  maintaining throughout 2014 that it was simply "more than 2,100" – and, in 2015, continuing to lead the market to believe that there was an increasing number of "thousands" of community-based oncologists ordering the tests;

(h)     as a result of the foregoing, the Company's 2015 revenue and clinical test volume guidance was false and misleading and lacked a reasonable basis;

(i)     the Company's 2014 10-K was materially false and misleading because it failed to disclose (in violation of Item 303) materially adverse trends and conditions to investors; and

(j)     the SOX certifications executed by the Defendants included the misleading representation that the 2014 10-K did not contain untrue statements or material omissions, when in reality, Defendants knew but failed to disclose, or recklessly disregarded, that the Company's

reported success and future prospects were predicated on artificially inflated clinical test volumes, growth, and associated revenue and a false impression of the adoption of FoundationOne and FoundationOne Heme by an increasing number of community-based oncologists.

## VI. THE TRUTH BEGINS TO EMERGE

207. Defendants could only conceal the truth for so long as the Company continued to experience competition from existing and new molecular diagnostic tests and ongoing challenges with obtaining broad Medicare coverage and reimbursement. Foundation's problems were ultimately revealed in a series of partial disclosures causing a series of sharp declines in the Company's common stock prices. The declines would have been swifter and steeper, but Defendants downplayed the negative news and continued to mislead the market with misrepresentations and omissions regarding the state of the Company's financial condition and business prospects. By continuing to mislead the market in this manner, Defendants kept the Company's common stock prices artificially inflated throughout the remainder of the Class Period. This section details the partial revelations of truth regarding Defendants' fraud, the resulting Foundation common stock price declines, and Defendants' continued misrepresentations and omissions that kept the Company's stock prices artificially inflated even as the truth began to leak out.

### A. First Quarter 2015 Financial Results

208. Beginning on May 11, 2015, the truth about the existence of "competitive noise" from other genomic tests on the market, Medicare reimbursement challenges and the resulting negative impact on the Company's current and future financial results, was slowly revealed to investors. On that day, after the market closed, Foundation issued a press release announcing its financial results for 1Q15, reporting lower-than-expected clinical volumes. For the quarter, the Company reported "total revenue of $19.3 million in the first quarter of 2015, compared to $11.5 million in the first

quarter of 2014 and $18.7 million in the fourth quarter of 2014." The release further reported, "Revenue from clinical testing in the 2015 first quarter was $11.1 million, compared to $7.1 million in the first quarter of 2014 and $10.3 million in the fourth quarter of 2014." The Company reported "7,854 clinical tests in the first quarter of 2015, a 67% increase from the same quarter last year and a 9% increase from last year's fourth quarter" which included "6,885 FoundationOne[®] tests and 969 FoundationOne[®] Heme tests." In the press release, Defendant Pellini is quoted as stating, "We're continuing to build a transformational business for the long-term, and we believe we made significant progress in that direction during the first quarter." The press release also reiterated 2015 guidance of between 43,000 and 47,000 clinical tests and revenue in the range of $105-$115 million for fiscal year 2015 ("FY15").

209.    Despite the consensus "miss, which the Company attributed to "competitive noise," Defendants continued to speak positively about 1Q15 results on the earnings call held after the market closed that day. For example, Defendant Pellini falsely and misleadingly stated, "we had a solid first quarter, evidenced by growth across our overall business." Defendant Pellini also commented on community oncologist testing volumes, stating, "While these growth rates are good for many in this industry, we expect to return to a growth rate that reflects our leadership position in molecular information."

210.    Defendant Pellini also emphasized that "the launch of FoundationOne and subsequently FoundationOne Heme were met with unprecedented market adoption when measured against other molecular testing growth rates in the industry." Defendant Pellini attributed the strong growth, in part, to Foundation "satisfying a high unmet need with quality products that are viewed by many as the gold standards for comprehensive genomic profiling."

- 81 -

211.   Despite the revelation that the Company was experiencing "competitive noise," Defendant Pellini continued to boast about Foundation's tests, maintaining, "while tests will come and go, our approach remains unparalleled, both in the robustness of the validity of the science, and its completeness of information."   Defendant Pellini highlighted that "[n]o other Company is offering a comparable end-to-end molecular information solution for oncology."

212.   The existence of "competitive noise" was not the only revelation made that day, however, as Defendant Ryan also revealed that "[t]he average reimbursement per clinical test that was recognized in revenue was $3,400 in the first quarter, a ***slight decrease*** from Q4."   He brushed away the revelation, however, claiming, "Some level of volatility in this number is to be expected before we gain broader reimbursement coverage."   He further stated that Foundation does "not believe this quarterly variance has an impact on our current reimbursement discussions or on the long-term price or margin trajectory."

213.   Defendant Ryan also spoke encouragingly about the reimbursement landscape for 1Q15, stating, "we saw meaningful progress . . . with Palmetto's draft of local coverage determination published in January."   Defendant Ryan confirmed that "[t]he draft LCD is an important step because it specifically relates to comprehensive genomic profiling, and because it sets a high standard for the rigorous analytic validation required for this type of approach."

214.   In response to numerous questions from analysts about "competitive noise" during the call, Defendant Daly discussed the existence of "market confusion" and "noise" in the marketplace with respect to the testing offered.   Defendant Daly confirmed growth in the market for genomic cancer testing was "driven by several key factors, including the shift from single gene to pan-cancer testing, the influx of new entrants into the space and increased marketing efforts on the part of national academic medical centers and national cancer treatment centers."   He continued, "Coupled

with programs like the President's Precision Medicine Initiative, all have contributed to heightened patient and provider awareness and thus overall market growth." Defendant Daly stated that, unfortunately, "The flip side of this growth is market confusion." Contradicting Defendants' prior statements about the lack of competition for FoundationOne and FoundationOne Heme, Defendant Daly revealed that "it is difficult for some oncologists and pathologist to differentiate today between the various tumor profiling assays and to determine which test is most appropriate for a particular patient." He further stated, "This is not surprising." With respect to recent "noise" in the marketplace, Defendant Daly commented:

> One need not look beyond the noise created in the market over the last few weeks. In one instance, we've seen confusing data. In other instances bold and misleading marketing statements from companies in the space claiming either to have comprehensive profiling tests or tests that offer more accurate results than those delivered by FoundationOne.
>
> In short, these tactics are employed by companies attempting to gain share of market by leveraging non-validated comparisons to Foundation Medicine's products that today remain the clinical gold standard. In some respects, this is one reason Foundation Medicine embraces proposed FDA oversight over LDTs, so the physicians can have confidence in the accuracy of the tests they order and patient care is protected.
>
> Thus, we are at an important inflection point. Foundation Medicine's rigorous science and clinical validation has enabled our significant market penetration thus far. But with the increased volume of market noise, now is the time for us to focus on and invest in building a mature customer-centric commercial organization designed to lead for the next decade and beyond.

215.    Defendant Pellini also provided detail on the cause of "confusion," confirming that there were new market entrants trying their hand at similar next-generation sequencing-based and/or liquid biopsy-based diagnostic testing.

216.    As further reassurance, Defendant Pellini fell back to the Company's first mover advantage and "gold standard products": "We have been in this market the longest. We have the

brand name.  And I think that many look to us to provide the gold standard products, which we have been doing and we certainly take that to heart."

217.    In response to clinical testing volumes falling below analyst expectations, Defendants were repeatedly asked for comment.  Defendants instead blamed the weather as a contributing factor to the results.  Analysts additionally asked for "color" on "repeat order rates with . . . existing docs."  Defendant Pellini, however, declined to provide specific numbers of reorder versus new doctors, and instead focused on Foundation's business at a higher level, stating:

> We continue to see new doctors on a consistent basis quarter-over-quarter. We continue to see a slightly higher reorder rate at the academic medical centers versus the community centers.
>
> That is something that we are working on, to be frank. Those reorder rates are really critical to the continued growth of our business, and a fair bit of our investment on the commercial side is heading that direction.
>
> So directionally there really has not been any significant shift in either of those efforts in terms of new docs or a shift in the reorder rate. But those are things that we have to continue to focus on as an organization.

218.    Defendant Daly clarified, "the reorder rate is clearly where the majority of our volume is coming from and the academic medical centers continue to dominate."  He continued, "But as we move more towards the community, in order to enhance that reorder rate, our commercial team is focusing on ensuring the actionability of the results that we provide."

219.    With respect to FoundationOne Heme and the cause of a second quarter of declining numbers, Defendant Daly attributed the decline to "not yet reach[ing] the mainstream, as we have with FoundationOne."

220.    When asked about Defendants' confidence level and for "clarity around what gives you that comfort" around maintaining guidance, Defendant Pellini responded:

> Directionally, we are exactly where we want to be. We see both the pharma and clinical areas growing nicely. Early on pharma led the way, and then we saw the clinical volume emerge. Now we have the emergence of our information business.

221.    During the call Defendant Kafka clarified that "the 43,000 to 47,000 tests [that the Company had projected for 2015] are all clinical market tests. None of those are pharma, either Roche or existing pharma partners. That's all in the clinical space."

222.    Also on May 11, 2015, Foundation filed its Form 10-Q ("1Q15 10-Q") with the SEC, which was signed by Defendants Pellini and Ryan and confirmed the Company's previously announced financial results and financial position.   The 1Q15 10-Q also contained the following materially false and misleading statements:

> Our first clinical products, FoundationOne for solid tumors, and FoundationOne Heme for blood-based cancers, or hematologic malignancies, including leukemia, lymphoma, myeloma, and many sarcomas and pediatric cancers, are, to our knowledge, the only widely available comprehensive genomic profiles designed for use in the routine care of patients with cancer. To accelerate our commercial growth and enhance our competitive advantage, we are continuing to expand our sales force, grow our molecular information knowledgebase, called FoundationCORE, publish scientific and medical advances, foster relationships throughout the oncology community, and develop new clinical and technology products.
>
> *        *        *
>
> Our products provide genomic information about each patient's individual cancer, enabling physicians to optimize treatments in clinical practice and biopharmaceutical companies to develop targeted oncology therapies more effectively. We believe we have a significant first mover advantage in providing comprehensive genomic profiling and molecular information products on a commercial scale.

223.    The 1Q15 10-Q also repeated the revenue and clinical test volume numbers reported in the Company's press release, claiming that "[t]he increase was driven by our growing test volumes and expanding commercialization efforts."

224.    In response to Defendants' statements made on May 11, 2015, analysts expressed concern over "competitive noise" and the slower adoption of FoundationOne Heme.  For example:

(a)    In a report dated May 12, 2015, Janney noted that Foundation "missed consensus" due in part to "competitive noise."   Analysts at Janney believed that the "evolving competitive landscape could temper the Company's adoption curve as clinicians digest the various

commercial NGS providers."  The report also noted that growth in FoundationOne Heme testing "was slower than we estimated" with Foundation "unable to penetrate mainstream clinics."  Even with additional investments in key personnel and clinical utility studies, the report commented that "competitive dynamics will continue to soften overall growth."

(b)      JMP commented in an analyst report dated May 12, 2015 that while Foundation had maintained a "solid first-mover advantage," "the rise of competition has created confusion among community-based physicians, who are being led to believe that all panel-based tests are created equal."  JMP lowered its price target to $57 from $67.

(c)      In a report also dated May 12, 2015, William Blair attributed the 1Q15 miss to "lower clinical volumes" and "slightly lower realized revenue per test."  William Blair lowered its 2015 revenue estimate from $105.4 million to $103.8 million to account in part for "increased conservatism in the clinical business."

(d)      Leerink also issued a report on May 12, 2015 commenting that "we have reduced our clinical volume assumptions until we see evidence that [Foundation's] efforts will reaccelerate growth" and reduced its price target to $46 from $50.

225.     The 1Q15 10-Q was signed by Defendants Pellini and Ryan and contained materially similar certifications by Defendants Pellini and Ryan pursuant to the SOX, as stated in ¶128, *supra*.

226.     On this news the price of Foundation common stock fell $4.33, or 9.84% per share, to close at $39.66 on May 12, 2015, on unusually heavy volume.  However, this stock drop would have been even greater, but for Defendants' materially false and misleading statements and/or omissions of material fact concerning demand, market "confusion," adoption and reimbursement, which led investors to believe and/or gave investors the false impression that despite the "competitive noise,"

the Company was well poised to achieve broad reimbursement coverage and continued financial and operational success.

227.   The price of Foundation stock would have fallen further had the true extent of Defendants' fraud been revealed.   For the reasons stated above in in Section IV, and as further detailed herein, Defendants' statements concerning demand, adoption and reimbursement coverage, made in the Company's 1Q15 earnings release, dated May 11, 2015, the conference call with analysts held the same day, and the 1Q15 10-Q, also filed on May 11, 2015, were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because, for example:

(a)     FoundationOne and FoundationOne Heme did not have commercial demand;

(b)     FoundationOne and FoundationOne Heme lacked the clinical utility for community-based oncologists that existed with category one (the "gold standard") and/or category two ("hotspot") tests, which were a fraction of the cost and readily reimbursable by non-governmental third party payors and Medicare;

(c)     FoundationOne and FoundationOne Heme did not have validated clinical utility thereby providing community-based oncologists with less valuable and informative information for the treatment of their patients;

(d)     Defendants were artificially boosting the Company's clinical testing volumes to create the appearance of widespread adoption, market penetration, and growth by providing community-based oncologists, or their patients, with various undisclosed incentives, discounts, or inducements;

(e)     Defendants were overstating the average revenue per clinical test that, in reality, was approximately $1,413 per test, substantially below the reported $3,400;

(f)     Defendants could not obtain "broad" Medicare reimbursement approval for each of the six clinical indications for which FoundationOne and FoundationOne Heme were designed absent validated clinical utility, which did not exist.  The most the Company could hope to achieve, if at all, was Medicare reimbursement approval for one of the six clinical indications pertaining to non-small cell lung cancer at a market price commensurate with that of competing hotspot tests, which would have indicated to investors the limited commercial viability of FoundationOne and FoundationOne Heme;

(g)     Defendants gave investors the false impression of the widespread adoption of FoundationOne and FoundationOne Heme by ceasing to report the actual number of ordering community-based physicians and reporting only that "thousands" of community-based oncologists were ordering the tests;

(h)     As a result of the foregoing, the Company's 2015 guidance for revenue and clinical test volumes was false and misleading and lacked a reasonable basis;

(i)     the Company's 1Q15 10-Q was materially false and misleading because it failed to disclose (in violation of Item 303) materially adverse trends and conditions to investors; and

(j)     the SOX certifications executed by Defendants included the misleading representation that the 1Q15 10-Q did not contain untrue statements or material omissions, when, in reality, Defendants knew but failed to disclose, or recklessly disregarded, that the Company's reported success and future prospects were predicated on artificially inflated clinical test volumes, growth, and associated revenue, and a false impression of the adoption of FoundationOne and FoundationOne Heme by an increasing number of community-based oncologists.

## B.      Second Quarter 2015 Financial Results

228.    On July 29, 2015, Defendants made another shocking revelation.  In addition to providing additional information concerning "competitive noise," Defendants revealed for  the first

time that it was making slower-than-anticipated progress towards obtaining an LCD from Foundation's MAC, resulting in a downward revision to the Company's revenue and clinical test volume guidance.  On this day, Foundation issued a press release announcing its financial results for 2Q15.  For the quarter, the Company reported total revenue of $22.5 million and 8,846 clinical tests. The press release quoted Defendant Pellini as stating, "Foundation Medicine delivered 16% quarter-over-quarter revenue growth demonstrating that our commercial team continues to leverage a portfolio of differentiated products for both our clinical and biopharmaceutical clients and partners." Defendant Pellini revealed that "clinical volume growth was affected by slower than anticipated progress towards obtaining a local coverage determination from our regional Medicare Administrative Contractor (MAC) and by some competitive noise in the market."  As a result, Defendant Pellini stated, "we are adjusting guidance for clinical volume and annual revenues."  He continued, "We remain focused on building and investing in this business to deliver growth and value creation by integrating our molecular information products into routine patient care."

229.    The press release reported updated FY15 guidance for 2015, lowering revenue guidance to a range of $85 to $95 million, instead of $105-$115 million, and FY15 clinical test volume in the range of 35,000-38,000, instead of 43,000-47,000.

230.    During the conference call held after the market closed, Defendant Pellini discussed 2Q15, which missed consensus estimates, stating, "To begin our business continued with steady growth in the second quarter, with a 16% increase in total revenue over Q1."  With respect to the clinical side of Foundation's business, Defendant Pellini attributed volume growth to "physicians continued support, adoption and integration of our gold standard comprehensive genomic profiling approach to cancer."  Defendant Pellini then disclosed that, unbeknownst to investors, "[o]ur 2015 annual guidance for clinical volume testing was developed based on certain assumptions, including

having a local coverage determination, or LCD, for a portion of Medicare cases in place, starting in the first half of 2015." Defendant Pellini also disclosed that, as a result of "slower than expected progress with Medicare and certain national commercial payers," Foundation did not see "the commonly observed carryover effect from a coverage decision that we would typically expect to see in the field."

231.   Specifically, Defendant Pellini stated:

As guided by Medicare at the local and national levels, we worked closely with Palmetto GBA, even though they are not the specific Medicare Administrative Contractor, or MAC for our region. While there was no direct precedent for this approach, Palmetto was the only MAC with expertise in assessing cutting edge molecular testing, and it was strongly suggested that other MACs, including ours, National Government Services, or NGS, would look to Palmetto for guidance on this important area. The first part of the effort took shape. Palmetto's LCD for comprehensive genomic profiling in a subset of patients with non-small cell lung cancer became final as of July 6th. We expect Palmetto to establish in Q3 a reasonable payment approach that reflects the clear need to maintain very high standards for analytic validation of comprehensive genomic profiling. We anticipated NGS to be more proactive based on the Palmetto decision, but we now realize this next phase is going to take more time to play out.

The payer process in the US is complex, and a lack of clarity at the local MAC level does nothing to simplify the route to coverage. We are being much more proactive at the state and federal levels to bring awareness to this process. And we are working to not only ensure coverage for patients, but to implement change to the system. ***While we continue to push on all fronts we are no longer assuming any Medicare payment for the rest of 2015***. That said, we do expect additional progress at the regional level, and Jason will provide additional commentary. Given what I have just stated, we are updating our outlook for clinical testing volume to 35,000 to 38,000 clinical cases, and revising 2015 full year revenue guidance to a range of $85 million to $95 million.

232.   With respect to competition, Defendant Pellini admitted that Foundation was continuing to "build stronger messaging around the need for comprehensive testing in the appropriate clinical indication" and that the Company was "making progress on that front."

233.   Defendant Ryan stated that "[t]he average reimbursement per clinical test recognized in revenue was approximately $3,400, consistent with the first quarter." With respect to the status of

reimbursements, Defendant Ryan admitted "we still have work to do." He further explained that "[w]e had planned as Mike mentioned for a portion of our Medicare cases to be paid starting in the first half of the year, *and the lack of an LCD in our region began to impact the growth curve of clinical revenue and testing volume*." Defendant Ryan stated that "[o]ur adjusted annual guidance for clinical test volume is 35,000 to 38,000 reported tests, and $85 million to $95 million in annual revenue." The changes to guidance were "driven by a shift in our assumptions around the timing of Medicare payments, the associated affect that an LCD can have on non-Medicare volumes, and some of that competitive noise of the marketplace related to hot spot based testing."

234.   In discussing clinical testing volume growth at academic centers versus the community, Defendant Pellini stated, "What we saw in Q2 is very consistent with what we saw in Q1, and frankly Q4 of last year . . . . That is about 60% of our clinical volume continues to come from the community, whereas about 40% of our volume comes from the academic medical centers." Defendant Pellini confirmed that "both [are] growing" and "growing in a consistent fashion." He also commented on reorder rates stating, "the reorder rate and the number of test order in any given month by a single practitioner in the community is not as high as we see in the academic medical centers" and "[o]verall we saw nice volume growth of 13% from Q2 over Q1, and we saw that growth in both the academic and the community settings."

235.   When asked about the Company's internal assessment of the impact of competitive noise on growth without a, LCD, Defendant Pellini attempted to downplay the impact from competitive noise, stating that, although "there are a number of companies that have emerged with some hot spot type test, claiming in some cases to offer a comprehensive assay," Foundation was "maintaining [its] leadership position" in the market "as we go forward."

236.    In response to a request for clarity on "what is currently baked into" the Company's 2015 updated guidance, Defendant Ryan stated, "We use everything that we know about today to put into that guidance."  He further stated:

> So that is probably how I would address that question. The Medicare cases we had expected or planned to get paid this year is part of the adjustment to revenue, and the other part as Mike had mentioned, is this spillover effect, as you well understand. These LCDs by a MAC, or if it is at the national level can have a spillover effect to the commercial payer marketplace as well. I think it is a combination of the direct Medicare revenue, as well as some of the other volume impact, if that answers your question.

237.    One analyst questioned why Defendants attributed the lowered guidance to the current "LCD situation," as coverage from the LCD was "a pretty small market" and asked Defendants to clarify the magnitude of the guidance reduction and what the reduction was based on. In response, Defendant Ryan explained, "Medicare coverage has an impact, both on those cases that we had planned for payment during the year" and "is one substantive piece of the change in the revenue guidance."  He continued, "The other substantial piece relates to overall volume, so there is that carryover effect . . . .  That a positive LCD would have, more broadly in a physician's office around other testing that is not just Medicare volume."  Defendant Ryan stated, "It really is a combination of those two things. . . .  [T]here is sort of in the background some of this competitive noise too."

238.    In discussing the impact from "competitive noise" and specifically, liquid biopsies, Defendant Pellini admitted that "it does create a little bit of noise" but claimed it was only "in the short-term."

239.    In the wake of Defendants' partial disclosure regarding slower-than-expected progress with reimbursement and increased competition, a number of analysts released negative commentary on the Company.  For example:

(a)     JMP issued a report dated July 30, 2015, downgrading Foundation to "Market Perform" from "Market Outperform" as a result of lower-than-expected 2Q15 results and the reduced guidance for 2015.  The report also noted "sudden lack of visibility on NGS' LCD" as problematic.

(b)     On July 29, 2015, Leerink issued an analyst report reducing its forecasts in response to the lack of reimbursement progress from NGS, "the knock-on effect" from the lack of Medicare reimbursement on its non-Medicare business, and competitive noise.  Leerink reduced its price target from $46 to $36 due to the 2Q15 miss and reduction in guidance.

(c)     On July 30, 2015, Wells Fargo Securities ("Wells Fargo") issued an analyst report commenting that Foundation was "negatively impacted by the twin bogeymen of the diagnostics industry: competition and reimbursement."  Wells Fargo reduced its valuation range to $35-40 from $48-52.

240.    On this news, the price of Foundation common stock plummeted $7.00, or 24% per share, to close at $22.30 on July 30, 2015, on unusually heavy volume.  The price of Foundation common stock continued to fall the following day, with another drop of $2.00, or 9% per share, to close at $20.29 on July 31, 2015.  However, these drops would have been even greater, had Defendants revealed the true impact of competition and reimbursement challenges.

241.    On August 7, 2015, Foundation filed its Form 10-Q ("2Q15 10-Q") with the SEC, which was signed by Defendants Pellini and Ryan and confirmed the Company's previously announced financial results and financial position.  The 2Q15 10-Q also contained the following materially false and misleading statements, stating:

> Our first clinical products, FoundationOne for solid tumors, and FoundationOne Heme for blood-based cancers, or hematologic malignancies, including leukemia, lymphoma, myeloma, and many sarcomas and pediatric cancers, are, to our knowledge, the only widely available comprehensive genomic profiles designed for

use in the routine care of patients with cancer. To accelerate our commercial growth and enhance our competitive advantage, we are continuing to expand our sales force, grow our molecular information knowledgebase, called FoundationCORE, publish scientific and medical advances, foster relationships throughout the oncology community, and develop new clinical and technology products.

\* \* \*

Our products provide genomic information about each patient's individual cancer, enabling physicians to optimize treatments in clinical practice and biopharmaceutical companies to develop targeted oncology therapies more effectively. We believe we have a significant first mover advantage in providing comprehensive genomic profiling and molecular information products on a commercial scale.

242. The 2Q15 10-Q also repeated the revenue and clinical test volume numbers reported in the Company's press release, claiming that "[t]he increase was driven by our growing test volumes and expand[ed] commercialization efforts."

243. The 2Q15 10-Q was signed by Defendants Pellini and Ryan and contained materially similar certifications by Defendants Pellini and Ryan pursuant to the SOX, as stated in ¶128, *supra*.

244. Although the price of Foundation stock plummeted, it would have fallen further had the true extent of Defendants' fraud been revealed. For the reasons stated above in Section IV, and as further detailed herein, Defendants' statements concerning demand and adoption, made in the Company's second quarter 2015 ("2Q15") earnings release, dated July 29, 2015, the conference call with analysts held the same day and the Company's 2Q15 10-Q, were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because, for example:

(a)     FoundationOne and FoundationOne Heme did not have commercial demand;

(b)     FoundationOne and FoundationOne Heme lacked the clinical utility for community-based oncologists that existed with category one (the "gold standard") and/or category two ("hotspot") tests, which were a fraction of the cost and readily reimbursable by non-governmental third party payors and Medicare;

(c)     FoundationOne and FoundationOne Heme did not have validated clinical utility thereby providing community-based oncologists with less valuable and informative information for the treatment of their patients;

(d)     Defendants were artificially boosting the Company's clinical testing volumes to create the appearance of widespread adoption, market penetration, and growth by providing community-based oncologists, or their patients, with various undisclosed incentives, discounts, or inducements;

(e)     Defendants were overstating the average revenue per clinical test that, in reality, was approximately $1,401 per test, substantially below the reported $3,400;

(f)     Defendants could not obtain "broad" Medicare reimbursement approval for each of the six clinical indications for which FoundationOne and FoundationOne Heme were designed absent validated clinical utility, which did not exist.  The most the Company could hope to achieve, if at all, was Medicare reimbursement approval for one of the six clinical indications pertaining to non-small cell lung cancer at a market price commensurate with that of competing hotspot tests, which would have indicated to investors the limited commercial viability of FoundationOne and FoundationOne Heme;

(g)     Defendants gave investors the false impression of the widespread adoption of FoundationOne and FoundationOne Heme by ceasing to report the actual number of ordering community-based physicians and reporting only that "thousands" of community-based oncologists were ordering the tests;

(h)     As a result of the foregoing, the Company's 2015 clinical test volume guidance was false and misleading and lacked a reasonable basis;

(i)     the Company's 2Q15 10-Q was materially false and misleading because it failed to disclose (in violation of Item 303) materially adverse trends and conditions to investors; and

(j)     the SOX certifications executed by Defendants included the misleading representation that the 2Q15 10-Q did not contain untrue statements or material omissions, when in reality, Defendants knew but failed to disclose, or recklessly disregarded, that the Company's reported success and future prospects were predicated on artificially inflated clinical test volumes, growth, and associated revenue, and a false impression of the adoption of FoundationOne and FoundationOne Heme by an increasing number of community-based oncologists.

245.    On October 1, 2015, Foundation's MAC NGS published a draft Local Coverage Determination for Genomic Sequencing Panels in the Treatment of Non-Small Cell Lung Cancer.  In response, analysts reacted with mixed reviews.  For example, Leerink, in a report dated October 2, 2015, commented that the reimbursement movement was "[m]ixed at [b]est."  The report noted that NGS proposes "broader coverage than Palmetto" and does not "limit candidates based on a patient's prior smoking history or previous testing," but its policy "anchors to low priced code."

246.    Similarly, UBS Global Research ("UBS"), in an analyst report dated also dated October 2, 2015, noted that "progress with NGS is clearly a positive step towards broader reimbursement"; however, "the decision does not differentiate tests beyond classification as a 5-50 gene panel."  Meaning, the draft NGS LCD did not differentiate between hotspot testing and Foundation's comprehensive genomic profile.

247.    In a report dated October 2, 2015, William Blair also commented that the LCD appeared to "be written to include assays of lower complexity (genome sequence analysis panels) than the Palmetto and Noridian LCDs."

## C.    Third Quarter 2015 Financial Results

248.    Then, on November 3, 2015, the full truth was finally revealed.  On that day, the Company disclosed that it had experienced lower-than-expected clinical revenues and testing volumes, which it attributed, in part, to low reorder rates from the oncologists ordering Foundation's tests, and admitting that the Company "still [has] work to do."

249.    Specifically, Foundation issued a press release announcing its financial results for the third quarter 2015 ("3Q15").  The press release quoted Defendant Pellini as stating, "Foundation Medicine delivered 54% year-over-year revenue growth driven by particularly strong results from our biopharmaceutical business."  Defendant Pellini also stated, "While our third quarter clinical revenue and volume increased significantly year-over-year, these numbers also reflect that we have work to do in this nascent market."  He continued, "We believe we are well-positioned for continued growth over the near and long term with our fully integrated, diversified business, a growing pipeline of innovative products, a strong balance sheet and a global partner in Roche."  The press release reiterated 2015 revenue guidance of $85-$95 million, but once again *reduced* clinical testing numbers, this time to between 32,000-33,000 for FY15, from July's revised range of 35,000-38,000.

250.    During the conference call with analysts and investors held after the market closed, Defendant Pellini stated, "While our Q3 clinical revenue and volume increased 40% and 25% year-over-year, respectively, the numbers also reflect that we still have work to do."  He continued, "We delivered 8,012 FoundationOne and FoundationOne Heme tests, which certainly fell short of our expectations."  Defendant Pellini further stated, "we do have a strong sense of what's happening in the market."  He continued, "On the one hand, biopharma has come to recognize and appreciate the quality and differentiation of our approach."  However, "the clinical market is still nascent, which requires a longer-term outlook on broader market adoption."

251.    Defendant Pellini explained that while "the number of oncologists ordering our tests in the third quarter did not materially change . . . the reorder rate for our tests slowed, which reflects the complexity of today's oncology landscape."

252.    Defendant Pellini further stated that even though "[t]housands of oncologists are using our products . . . many of those in the community are reserving the use of our tests for their patients with the most difficult medical conditions."   Therefore, Foundation's "challenge is to convert more of our clients to repeat, consistent customers, including the use of our tests earlier in the course of treatment."   Defendant Pellini stated, "This is a battle we are prepared to fight and win."   Defendant Pellini also conceded, "The quarter did not end where we wanted it to from a clinical volume perspective."

253.    Defendant Ryan also discussed the status of reimbursement, stating, "The average reimbursement per clinical test recognized in revenue was approximately $3,200, **down from** $3,400 in the second quarter.  As I have said in the past, we do expect this number to vary from period to period as we work toward contracted coverage, and we don't believe that this change has any impact on long-term pricing."

254.    With respect to Medicare, Defendant Ryan stated that, while the recently proposed draft LCD from NGS is "one step in the right direction . . . there is much work to be done," Warning that "[i]f the final LCD does not reflect these changes, it will mean limited access for Medicare patients to the best clinical care."

255.    Commenting on whether market development impacted the clinical volume shortfall, Defendant Pellini responded, "What we saw in the third quarter is a consistent number of ordering physicians, physicians who were ordering FoundationOne and FoundationOne Heme."  However, he

revealed that "we also saw is a slight decrease of about 7% in terms of the frequency of tests that are being ordered by the oncologists."

256.    During the call, in response to an analyst, Defendant Pellini explained that Foundation has been focusing "over the past several quarters" on "working much more closely in the communities with the physicians who have ordered FoundationOne or FoundationOne Heme" to increase the number of tests per physician.

257.    With respect to the reduction in clinical test volume guidance, Defendant Pellini commented that what "we're expecting is that Q4 volume will be relatively flat compared to Q3" due primarily to issues "on the commercial side" and "a migration into the community setting."

258.    Commenting on reorder rates, Defendant Pellini mentioned that "the community oncologists are faced with challenges that the academic medical center oncologists simply do not face every day."  Defendant Pellini stated that Defendants have "*been aware of that for some time*." Pellini continued,` "[w]e do not believe that pricing is a fundamental issue," however, "there is an impact in the community when the oncologists and pathologists and/or their patients are potentially faced with bills because the tests are not yet covered by the payers . . . .  It comes down to having contracts with payers for the long term to minimize out-of-pocket expenses for the patient."

259.    Commenting on competition and competitive noise, Defendant Pellini reiterated that what Foundation is "focused on is making sure that we drive the continued utility of FoundationOne into the community setting."  He continued, "we want to -- we have to drive this repeat customer base" because "in terms of the growth of our business, the most critical element is really relates to our opportunity to impact volume by way of the reorder rates."  Defendant Pellini explained that "[o]ur clients have to understand why tissue is the gold standard" and "understand why capturing all classes of alteration is critically important to patient care."

- 99 -

260.     Also on November 3, 2015, Foundation filed its Form 10-Q ("3Q15 10-Q") with the SEC, which was signed by Defendants Pellini and Ryan and confirmed the Company's previously announced financial results and financial position.   The 3Q15 10-Q also discussed NGS's recent draft LCD:

> In addition, in March 2015, Palmetto GBA, a Medicare administrative contractor published a final local coverage determination effective July 6, 2015 outlining guidelines for coverage of well-validated comprehensive genomic profiles, which we believe would include FoundationOne, for certain patients diagnosed with non-small cell lung cancer, or NSCLC. However, to date, Palmetto has not issued a formal coverage decision for FoundationOne. In addition, our local MAC, National Government Services, has elected not to follow these guidelines from Palmetto GBA and instead issued their own draft local coverage decision, or LCD, for patients with NSCLC on October 1, 2015. Pending the outcome of the finalized LCD, FoundationOne may or may not be covered by National Government Services for this subset or any other subset of patients with cancer.

261.     On this news, the price of Foundation common stock dropped another $6.62, or 28% per share, to close at $17.31 on November 4, 2015, on unusually heavy volume.

262.     Following Defendants' statements made on November 3, 2015, analysts commented on the continued negative effects of "competitive noise."   For example, in a report dated November 3, 2015, Leerink noted that clinical testing volumes were "meaningfully light and down sequentially."   Leerink reduced its price target from $36 to $27.

263.     In a report dated November 4, 2015, Wells Fargo analysts expressed concerns over the "9% sequential volume decline in the clinical business" and noted that test volumes missed 3Q15 estimates by a "substantial 17%."   The report further stated that the "[r]easons for the volume weakness [were] not comforting" and that management's explanation for low re-order rates did not "alleviate our concerns."   In response, Wells Fargo reduced its earnings per share and valuation range.

264.     Also on November 4, 2015, UBS issued a report commenting that Foundation's "success will depend on its ability to further educate community physicians and leverage its

molecular information database; however, this process will take time leaving FMI more vulnerable to competition." In wake of this news, UBS maintained its Neutral rating but lowered its price target from $32 to $26.

265. As a result of Defendants' wrongful acts and omissions and the precipitous decline in the market value of Foundation stock as the artificial inflation was removed, Plaintiff and other Class members suffered significant losses and damages.

## VII. POST-CLASS PERIOD REVELATIONS

266. On May 3, 2016, Foundation announced that it was expanding its "U.S. laboratory footprint to include a second site at Research Triangle Park in North Carolina." Importantly, Palmetto is also based in North Carolina and under Palmetto's coverage, Foundation tests would be billed under a different CPT code which is not priced nationally but, instead, by the local MAC.

267. Then, almost two years after the end of the Class Period, on March 2, 2017, Foundation announced that it had finally received payment from Palmetto, the Company's MAC in North Carolina, for its FoundationOne comprehensive genomic profiling assay when used in the clinical course for care of individuals in the U.S. with stage IIIB or IV NSCLC who meet the eligibility requirements under Palmetto's LCD.

## VIII. LOSS CAUSATION/ECONOMIC LOSS

268. During the Class Period, as detailed herein, Defendants' fraudulent scheme artificially inflated the prices of Foundation common stock and operated as a fraud or deceit on Class Period purchasers of Foundation common stock. When Defendants' prior misrepresentations and fraudulent conduct were revealed and became apparent to the market, the prices of Foundation common stock fell as the prior artificial inflation came out. The truth was not revealed to the market all at once, but rather, the truth began to emerge, and the risk caused by Defendants' fraud materialized, through partial revelations that cast doubt on the veracity of Defendants' Class Period

statements.    As a result of their purchases of Foundation common stock during the Class Period, Plaintiff and the other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws as the truth was revealed.

### A.    May 11, 2015 Revelations

269.    The truth began to emerge on May 11, 2015, after the market closed, when the Company issued a press release announcing the existence of "competitive noise" from other genomic tests entering the marketplace, creating confusion among community-based physicians.    The Company also revealed slower-than-expected adoption of FoundationOne Heme due to the test's inability to penetrate community clinics resulting in clinical volume falling below analyst expectations.    In response, analysts lowered their 2015 revenues estimates and price targets.

270.    As a result of these revelations to the market, the Company's stock price fell $4.33, or 9.84% per share, to close at $39.66 on May 12, 2015, on unusually heavy volume.[13]

---

[13]    The reference to Nasdaq and Nasdaq Biotech in the graph(s) below refer to the NASDAQ Composite Index (U.S.) and the NASDAQ Biotechnology Index, respectively, as identified in the Company's 2014 10-K and 2015 10-K.    *See*    https://www.sec.gov/ Archives/edgar/data/1488613/000119312514089287/d631649d10k.htm,    at    73,    and https://www.sec.gov/Archives/edgar/data/1488613/000119312515091306/d841153d10k.htm, at 84.



271.    This decline in the Company's stock price was the direct result of the nature and extent of the revelations made to the market regarding "competitive noise" in the marketplace and the slower-than-expected adoption of FoundationOne, both of which negatively impacted the Company's current and future financial results.  The decline would have been more dramatic had Defendants disclosed the true impact of competition on the Company's current and future business operations and revealed the challenges the Company was facing in obtaining broad Medicare coverage and reimbursement.

**B.    July 29, 2015 Revelations**

272.    The truth continued to emerge on July 29, 2015, when Defendants disclosed additional details regarding increased competition and slower-than-anticipated progress towards obtaining a, LCD from Foundation's MAC.  The Company announced that clinical volumes growth was impacted by slower progress towards obtaining Medicare coverage and reimbursement and

continued competitive noise.  In response, Foundation adjusted its 2015 annual guidance for both clinical volumes and revenue.

273.    On this news, the price of Foundation common stock plummeted $7.00, or 24% per share, to close at $22.30 on July 30, 2015, on unusually heavy volume.  The price of Foundation common stock continued to fall the following day, with another drop of $2.00, or 9% per share, to close at $20.29 on July 31, 2015.



274.    The decline would have been more dramatic had Defendants disclosed the true impact of competition and slowed progress on obtaining Medicare coverage and reimbursement on the Company's clinical volumes, revenue and current and future business operations.

**C.    November 3, 2015 Revelations**

275.    Finally, on November 3, 2015, Defendants disclosed lower-than-expected revenue and a third straight quarter of clinical testing volumes that missed analysts' expectations.  The

Company's 3Q15 press release reiterated 2015 revenue guidance of $85-$95 million, but once again reduced clinical testing numbers to a range of between 32,000-33,000.  Defendants attributed the reduction in volume to slowed reorder rates by community physicians and oncologists which they believe "reflects the complexity of today's oncology landscape."

276.    As a result, the price of Foundation common stock dropped another $6.62, or 28% per share, to close at $17.31 on November 4, 2015, on unusually heavy volume.



277.    As a results of Plaintiff's purchases of Foundation common stock during the Class Period, Plaintiff and the other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.   By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Foundation's business, operations, and prospects. Defendants' false and misleading statements and omissions of material fact had the intended effect

and caused Foundation common stock to trade at artificially inflated levels throughout the Class Period.

278.    When the truth about the Company was disclosed to the market through a series of partial disclosures during the Class Period, the price of Foundation common stock declined.  These declines removed the artificial inflation from the price of Foundation common stock, causing real economic loss to investors who had purchased Foundation common stock during the Class Period.

279.    The declines in the price of Foundation common stock after the revelations came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Foundation common stock negate any inference that the losses suffered by Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

280.    The economic losses, *i.e.*, damages, suffered by Plaintiff and the other members of the Class were a direct result of Defendants' fraudulent scheme to artificially inflate the price of Foundation common stock and the subsequent significant declines in the value of Foundation common stock when Defendants' prior misrepresentations and fraudulent conduct were revealed.

## IX.    ADDITIONAL ALLEGATIONS REGARDING SCIENTER

281.    Numerous facts support Defendants' knowledge or reckless disregard of the materially false and misleading nature of their public statements and omissions during the Class Period.  Defendants knew of, or, at a minimum, were severely reckless in disregarding, the problems facing the Company's current and future financials, including declining FoundationOne and FoundationOne Heme testing volume numbers and slower-than-expected progress in obtaining Medicare reimbursement.  This is supported by several indicia of Defendants' knowledge, including Defendants' positions within the Company, the importance of the FoundationOne and

FoundationOne Heme tests to the Company's commercial viability, Defendants' own statements, and Defendants' sales of Foundation common stock.

282.    Plaintiff alleges that the known, but undisclosed, adverse facts alleged herein can be imputed to the Individual Defendants who, as high-level executive Company officers (CEO, CFO, CCO, COO and CMO), knew or recklessly ignored facts related to Foundation's core operations. The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Foundation, its operations, and its business practices, and their control over and/or receipt of the Company's materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning Foundation, were active and culpable participants in the fraudulent scheme alleged herein.

283.    As set forth above, Foundation derived ***nearly 100%*** of its revenue from the sale of its branded (and unbranded) FoundationOne and FoundationOne Heme tests to both clinical and biopharmaceutical customers.   For the year ended December 31, 2014, for example, the Company reported total revenue of $61.1 million, of which $36.6 million was derived from the sale of FoundationOne and FoundationOne Heme to ordering physicians, and $24.4 million was generated by Foundation's biopharmaceutical partners.   The success of the FoundationOne and FoundationOne Heme tests was of utmost importance to the Company's commercial viability and future growth prospects.

284.    In that regard, the Company invested significant resources building a robust sales force of up to 48 professionals by the end of 2014 for its core products.   Foundation's sales force was tasked with interacting and educating physicians and oncologists on the ground level on behalf of the Company.   Through its sales force, the Company not only received real time updates on the number of tests being ordered – whether by first-time testers or by reorder – but it was also able to

receive feedback from physicians and oncologists about the use, utility, and value of the tests, critical data that not only spoke to the Company's actual financial performance and success, but to its future prospects, especially with regard to competition and receiving Medicare coverage and reimbursement.

285. To be sure, the adoption and financial performance of FoundationOne and FoundationOne Heme was key to the Company's overall success and was virtually the only topic on which Defendants made their public statements during the Class Period, as detailed above. The Company, its management, analysts, and the market followed and tracked the adoption and financial performance of FoundationOne and FoundationOne Heme. Defendants knew that analysts and the market considered the adoption and financial performance of FoundationOne and FoundationOne Heme to be an important indicator of the Company's health and current and future prospects because every analyst that reported on Foundation was focused on and commented about the adoption and financial performance of the tests during the Class Period. Given the importance of the tests and the revenue derived therefrom to the Company's overall success and financial performance, it is reasonable to infer that Defendants were well aware of the performance of the Company's *only* revenue driver.

286. Moreover, Defendants Pellini and Ryan, along with the Vice President of Sales, were responsible for setting the Company's 2015 clinical test volumes, which were largely based on market expectations that Foundation should achieve between 20%-30% growth, not an analysis of how many physicians were expected to adopt a new testing methodology like Foundation's.

287. The Company, however, was able to track and monitor the adoption of its tests through a variety of software applications and internal systems that were accessible to Foundation executives, including the Individual Defendants. For example, the FoundationOne and

FoundationOne Heme tests were performed in Foundation's own laboratory located (during the Class Period) in Cambridge, Massachusetts. As described in the Company's public filings, Foundation's laboratory would receive the tissue specimen and completed order form via overnight carrier directly from the physician's office in a kit provided to them by Foundation. There were various types of data available for each test order, including the facility that had ordered it, a hospital identifier, and the ordering physician's National Provider Identification number which would enable Foundation to tell if a particular physician was reordering a test (because Foundation retained this data in its internal system). Once received, the laboratory would log all of the pertinent information into the Company's clinical LIMS which was also available to and monitored by Defendants. By processing this data in house, Defendants had real time access to critical information, including testing volume numbers and growth rates.

288. In addition to the clinical LIMS, the Company also had a variety of other enterprise software systems that were available to and accessed by Defendants and which allowed Defendants to conduct a real time assessment of the Company's financial progress and prospects. According to the Company, these systems tracked "significant elements of [the Company's] operations," including "knowledge management" and "customer reporting," as well as a broad range of business processes and functional areas of the Company such as financial controls, reporting and contract management.

289. Each of the Individual Defendants made numerous public statements in which they discussed FoundationOne and FoundationOne Heme, their personal involvement with all aspects of them, including the revenue and testing volume for the quarter, yearly outlook based on revenue and testing volumes numbers, the adoption rate amongst physicians within the community, competition within the marketplace, and the status of Medicare reimbursement. In fact, Defendants Pellini, Ryan, and Kafka (and Miller and Daly, when in attendance) provided prepared statements on, and

were asked and answered detailed questions, about at least one of those matters during every quarterly earnings call with securities analysts throughout the Class Period and during the Company's first analyst day in September 2015. The Individual Defendants, mainly Defendants Pellini and Ryan, echoed these statements in the Company's numerous press releases and SEC filings throughout the Class Period.

290. More specifically, in response to concerns of "competitive noise," the Individual Defendants repeatedly touted the FoundationOne tests as the "only commercially available comprehensive molecular information products" and further promoted the tests as having a "sustainable competitive advantage." Defendants went to great lengths during earnings call and analyst conferences to differentiate Foundation's tests from the competition, often referring to the single-maker or "hotspot" tests as inferior. For example, during the May 7, 2014 conference call, Defendant Pellini stated "we do not yet see any validated comprehensive approach that is competing with us in the market today." And during the February 24, 2015 conference call, Defendant Pellini commented that "I don't know of an opportunity that we have lost to anyone else – put it that way." These types of statements, which directly address Foundation's tests, further evidence their knowledge of the Company's core product and the existence of competition in the marketplace.

291. The Individual Defendants also repeatedly provided updates and commented on Foundation's progress in obtaining Medicare coverage and reimbursements, giving analysts and investors the false impression that Foundation was on track to receive broad-based Medicare coverage and reimbursements in 2015. Defendant Pellini even stated during the February 25, 2014 conference call that the Company wanted to "maintain as much transparency as possible" about the reimbursement process. Importantly, throughout the Class Period, the Individual Defendants discussed milestones such as approval by the New York States Department of Health, Palmetto's

draft LCD, and Priority Health, in a manner that falsely assured the market that Foundation was making progress and was on its way to obtaining Medicare reimbursement when, in fact, they knew or recklessly disregarded that such coverage was unlikely. Indeed, as discussed in more detail above, the Individual Defendants knew that Foundation would never achieve comprehensive Medicare coverage because that is not how the coverage and reimbursement process actually works in practice. Instead, Medicare looks at "disease-specific" applications when it comes to providing coverage for a particular test, including clinical studies to support the use of the tests, which Foundation was lacking.

292.   Additionally, Foundation's 2013 10-K and the 1Q14, 2Q14, and 3Q14 10-Qs, each of which was filed with the SEC and signed by Defendants Pellini and Ryan, made false and misleading statements and omissions concerning the "rapid adoption" of Foundation's tests at academic centers and community-based practices, which, according to Defendants, demonstrated "the demand for and utility of a single comprehensive product that helps oncologists effectively implement the promise of precision medicine." The Company's 2014 SEC filings also reported that "more than 2,100" physicians had ordered its tests. Tellingly, Foundation's 2014 10-K, filed on March 13, 2015 (two months prior to the first partial disclosure) and signed by Defendants Pellini and Ryan, as well as the Company's 1Q15, 2Q15, and 3Q15 10-Qs, failed to provide the same detail about Foundation's tests. Instead, the 2014 10-K and 1Q15, 2Q15 and 3Q15 10Qs vaguely reported that "several thousand physicians . . . have ordered FoundationOne or FoundationOne Heme." These statements marked another turning point in the tone of the Company's statements about FoundationOne and is further evidence that Defendants knew, or recklessly disregarded, the lack of commercial demand for its tests.

- 111 -

293.    While in possession of non-public adverse information regarding the Company's current and future financial condition and business operations, the Individual Defendants took full advantage of the artificial inflation of Foundation's common stock price caused by their misrepresentations and omissions.   Defendants Pellini, Ryan, Kafka, and Miller were motivated to engage in the fraudulent course of conduct alleged herein to allow them to collectively sell more than 544,000 shares of their personally held Foundation common stock for gross proceeds of approximately $21 million during the Class Period, as follows:

| Name | Title | Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|---|
| Michael J. Pellini, M.D. | CEO | 06/04/14 | 25,000 | $23.53 | $588,250 |
| | | 07/01/14 | 12,500 | $27.30 | $341,250 |
| | | 07/02/14 | 2,500 | $28.00 | $70,000 |
| | | 08/15/14 | 4,500 | $25.61 | $115,245 |
| | | 08/18/14 | 8,000 | $25.10 | $200,800 |
| | | 10/17/14 | 12,500 | $23.00 | $287,500 |
| | | 11/13/14 | 9,500 | $24.93 | $236,835 |
| | | 11/14/14 | 3,000 | $24.84 | $74,520 |
| | | 12/29/14 | 12,500 | $23.91 | $298,875 |
| | | 01/12/15 | 22,500 | $51.07 | $1,149,075 |
| | | 02/11/15 | 17,500 | $48.56 | $849,800 |
| | | 03/04/15 | 66,539 | $47.41 | $3,154,614 |
| | | 03/05/15 | 86,761 | $47.10 | $4,086,443 |
| | | 03/30/15 | 17,500 | $48.48 | $848,400 |
| | | 05/12/15 | 17,500 | $40.24 | $704,200 |
| | | **TOTAL** | **318,300** | | **$13,005,807** |
| | | | | | |
| Jason Ryan | CFO | 04/16/14 | 3,541 | $26.36 | $93,341 |
| | | 05/15/14 | 2,361 | $20.95 | $49,463 |
| | | 06/05/14 | 5,000 | $23.92 | $119,600 |
| | | 06/05/14 | 5,000 | $24.20 | $121,000 |
| | | 06/09/14 | 1,180 | $25.00 | $29,500 |
| | | 06/16/14 | 2,361 | $22.61 | $53,382 |
| | | 06/26/14 | 1,180 | $25.00 | $29,500 |
| | | 07/15/14 | 3,541 | $27.22 | $96,386 |
| | | 08/15/14 | 3,541 | $25.13 | $88,985 |
| | | 09/15/14 | 2,361 | $21.92 | $51,753 |
| | | 10/15/14 | 2,361 | $20.09 | $47,432 |
| | | 10/27/14 | 2,360 | $25.00 | $59,000 |
| | | 11/17/14 | 3,541 | $24.90 | $88,171 |

| Name | Title | Date | Shares Sold | Price | Proceeds |
|------|-------|------|-------------|-------|----------|
| | | 12/15/14 | 2,361 | $21.55 | $50,880 |
| | | 02/27/15 | 25,000 | $47.61 | $1,190,250 |
| | | **TOTAL** | **65,689** | | **$2,168,643** |
| | | | | | |
| Steven Kafka, Ph.D. | | 06/05/14 | 4,500 | $24.19 | $108,855 |
| | | 06/19/14 | 5,000 | $24.46 | $122,300 |
| | | 06/26/14 | 5,000 | $25.19 | $125,950 |
| | | 07/01/14 | 106 | $27.20 | $2,883 |
| | | 07/22/14 | 10,000 | $27.14 | $271,400 |
| | | 10/01/14 | 107 | $18.75 | $2,006 |
| | | 10/27/14 | 10,000 | $25.31 | $253,100 |
| | | 01/02/15 | 107 | $22.25 | $2,381 |
| | | 01/12/15 | 8,000 | $51.83 | $414,640 |
| | | 01/15/15 | 10,000 | $48.38 | $483,800 |
| | | 01/15/15 | 5,000 | $48.38 | $241,900 |
| | | 03/03/15 | 3,124 | $47.69 | $148,984 |
| | | 03/03/15 | 20,656 | $47.68 | $984,878 |
| | | 03/03/15 | 9,344 | $47.57 | $444,494 |
| | | 04/01/15 | 107 | $47.92 | $5,127 |
| | | 07/01/15 | 107 | $33.90 | $3,627 |
| | | 10/01/15 | 107 | $18.28 | $1,956 |
| | | **TOTAL** | **91,265** | | **$3,618,282** |
| | | | | | |
| Vincent Miller, M.D. | | 04/16/14 | 30,000 | $26.86 | $805,800 |
| | | 05/05/14 | 200 | $30.00 | $6,000 |
| | | 05/06/14 | 2,800 | $30.00 | $84,000 |
| | | 07/01/14 | 310 | $27.20 | $8,432 |
| | | 07/15/14 | 595 | $27.75 | $16,511 |
| | | 07/15/14 | 14,405 | $27.23 | $392,248 |
| | | 10/01/14 | 314 | $18.75 | $5,888 |
| | | 01/02/15 | 314 | $22.25 | $6,987 |
| | | 01/12/15 | 2,000 | $53.03 | $106,060 |
| | | 03/03/15 | 17,058 | $47.81 | $815,543 |
| | | 04/01/15 | 356 | $47.92 | $17,060 |
| | | 07/01/15 | 312 | $33.90 | $10,577 |
| | | 10/01/15 | 313 | $18.28 | $5,722 |
| | | **TOTAL** | **68,977** | | **$2,280,826** |
| | | | | | |
| *Total* | | | *544,231* | | *$21,073,558* |

294.     These facts collectively support a strong inference that Defendants knowingly made materially false and misleading statements and omissions, or acted recklessly in doing so, during the Class Period.

## X.     PRESUMPTION OF RELIANCE

295.     Plaintiff is entitled to a presumption of reliance under the fraud-on-the-market doctrine for Defendants' material misrepresentations, because the market for Foundation publicly traded common stock was open, well-developed, and efficient at all times.   As a result of Defendants' materially false and misleading statements, Foundation publicly traded common stock traded at artificially inflated prices during the Class Period.   Plaintiff and the other members of the Class purchased or otherwise acquired Foundation publicly traded common stock relying upon the integrity of the market price of those securities and the market information relating to Foundation, and have been damaged thereby.

296.     At all relevant times, the market for Foundation common stock was an efficient market for the following reasons, among others:

(a)     Foundation common stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient and automated market;

(b)     as a regulated issuer, Foundation regularly made public filings with the SEC, including its Forms 10-K and 10-Q, and related press releases;

(c)     Foundation regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Foundation was followed by securities analysts employed by brokerage firms, such as J.P. Morgan, Leerink, and Wedbush Securities, among others, who wrote research reports

- 114 -

that were distributed to the brokerage firms' sales force and the public at large. Each of these reports was publicly available and entered the public marketplace.

297.    As a result of the foregoing, the market for Foundation common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of Foundation common stock.

298.    Under these circumstances, all purchasers of Foundation publicly traded common stock during the Class Period suffered similar injury through their purchases at artificially inflated prices. As a result, a presumption of reliance applies.

299.    At the times they purchased or otherwise acquired Foundation publicly traded common stock, Plaintiff and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts. As a result, the presumption of reliance applies.

300.    In sum, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations during the Class Period;

(b)    the misrepresentations were material;

(c)    the Company's common stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's publicly traded common stock; and

(e)    Plaintiff and the other members of the Class purchased the Company's common stock between the time Defendants misrepresented material facts and the time the true facts were disclosed, without knowledge that such facts were misrepresented.

- 115 -

301.    Plaintiff is also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated upon omissions of material fact which Defendants had a duty to disclose.  Specifically, Plaintiff is entitled to a presumption of reliance throughout the Class Period because, as more fully alleged above, Defendants failed to disclose material information regarding, *inter alia*, the true nature of Foundation's business operations.

## XI.    NO SAFE HARBOR

302.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged herein.  Many of the statements alleged were not identified as "forward-looking" when made, and, to the extent any statements were forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

303.    Indeed, the risk warnings that were provided by Defendants in their Class Period statements include boilerplate statements,[14] such as:

- We may not be able to generate sufficient revenue from FoundationOne, FoundationOne Heme, or our relationships with our biopharmaceutical partners to achieve and maintain profitability.

- FoundationOne and FoundationOne Heme may never achieve significant commercial market acceptance.

- New product development involves a lengthy and complex process, and we may be unable to successfully commercialize FoundationOne Heme or any other products we may develop on a timely basis, or at all.

- If we cannot compete successfully with our competitors, we may be unable to increase or sustain our revenue or achieve and sustain profitability.

---

[14]    *Compare* 2013 10-K, at 41-42, 44, 46-47 *with* 2014 10-K, at 47-48, 50-51, 53-54.

- If we lose the support of key thought leaders, it may be difficult to establish products enabled by our molecular information platform as a standard of care for patients with cancer, which may limit our revenue growth and ability to achieve profitability.

- We have limited experience in marketing and selling our products, and if we are unable to expand our direct sales and marketing force to adequately address our customers' needs, our business may be adversely affected.

304.    These or other materially identical risks were disseminated throughout the Class Period and did not serve to adequately inform the market of the true risks and actual operational experience of the Company.   Indeed, that these stated warnings were inadequate and provided no new, meaningful, information, is evident from the market's reaction to the revelation of Defendants' untrue and/or misleading statements.  *See, e.g.*, ¶¶268-280, *supra*.

305.    Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements alleged, Defendants are liable for such statements because, at the time they were made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Foundation who knew that those statements were false when made.   Moreover, to the extent that Defendants issued any disclosures designed to warn or caution investors of certain purported risks, those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## XII.   CLASS ACTION ALLEGATIONS

306.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of Federal Rules of Civil Procedure on behalf of a Class consisting of all those who purchased Foundation common stock during the Class Period, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate

families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

307.   The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Foundation common stock was actively traded on the NASDAQ.   While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number at least in the thousands and that they are geographically dispersed.   As of May 6, 2015, Foundation had 34 million common shares outstanding.   Record owners and other members of the Class may be identified from records maintained by Foundation or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

308.   Plaintiff's claims are typical of the claims of the other members of the Class because all Class members are and were similarly affected by Defendants' wrongful conduct in violation of federal law, as alleged herein.

309.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

310.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

311.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)      whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)      whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)      whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e)      whether Defendants acted knowingly or with severe recklessness in omitting and/or misrepresenting material facts;

(f)      whether the market prices of Foundation common stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)      whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## COUNT I

### FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

312.    Plaintiff repeats and realleges each and every allegation set forth in ¶¶1-311 as if fully set forth herein.

313.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary

in order to make the statements made, in light of the circumstances under which they were made, not misleading.

314.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's stock during the Class Period.

315.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Foundation common stock.  Plaintiff and the Class would not have purchased Foundation common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

316.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Foundation common stock during the Class Period.

## COUNT II

### VIOLATION OF SECTION 20(a) OF THE
### EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

317.    Plaintiff repeats and realleges each and every allegation in ¶¶1-311 as if fully set forth herein.

318.    The Individual Defendants acted as controlling persons of Foundation within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions as officers of Foundation, and/or their ownership of Foundation common stock, the Individual Defendants had the power and authority to, and did, cause Foundation to engage in the wrongful conduct alleged.

319.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Foundation common stock during the Class Period.

320.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for relief and judgment, as follows:

A.    Declaring that this action is a proper class action and certifying Plaintiff as Class representative pursuant to Fed. R. Civ. P. 23 and Lead Counsel as Class Counsel for the proposed Class;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  December 22, 2017        HUTCHINGS  BARSAMIAN  MANDELCORN, LLP
                                 THEODORE M. HESS-MAHAN, BBO #557109


                                      *s/Theodore M. Hess-Mahan*
                                 ──────────────────────────────────
                                 THEODORE  M. HESS-MAHAN

                                 110 Cedar Street,  Suite 250
                                 Wellesley Hills,  MA  02481
                                 Telephone:  781/431-2231
                                 781/431-8726 (fax)
                                 thess-mahan@hutchingsbarsamian.com

                                 Local Counsel

                                 ROBBINS  GELLER  RUDMAN
                                    & DOWD LLP
                                 JACK REISE
                                 STEPHEN R. ASTLEY
                                 120 East Palmetto Park Road, Suite 500
                                 Boca Raton, FL 33432
                                 Telephone: 561/750-3000
                                 561/750-3364 (fax)
                                 jreise@rgrdlaw.com
                                 sastley@rgrdlaw.com

                                 ROBBINS  GELLER  RUDMAN
                                        & DOWD LLP
                                 SAMUEL H. RUDMAN
                                 DAVID  A. ROSENFELD (*pro hac vice*)
                                 58 South Service Road, Suite 200
                                 Melville,  NY  11747
                                 Telephone: 631/367-7100
                                 631/367-1173 (fax)
                                 srudman@rgrdlaw.com
                                 drosenfeld@rgrdlaw.com

                                 LEVI & KORSINSKY LLP
                                 EDUARD  KORSINSKY
                                 30 Broad Street, 24th Floor
                                 New York, NY  10004
                                 Telephone:  212/363-7500
                                 212/363-7171 (fax)
                                 ek@zlk.com


                                 - 122 -

LEVI & KORSINSKY LLP
NICHOLAS I. PORRITT
ADAM M. APTON
1101 30th Street NW, Suite 115
Washington, DC 20007
Telephone: 202/524-4290
202/333-2121 (fax)
nporritt@zlk.com
aapton@zlk.com

Lead Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on December 22, 2017.

*s/Theodore M. Hess-Mahan*