UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MARC F. MAHONEY, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil No. 17-11394-LTS |
| FOUNDATION MEDICINE, INC., MICHAEL J. PELLINI, STEVEN KAFKA, JASON RYAN, VINCENT MILLER, and DAVID DALY, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

ORDER ON MOTION TO DISMISS (DOC. NO. 26)

September 20, 2018

SOROKIN, J.

Lead Plaintiff John A. Blair[1] ("Plaintiff"), individually and on behalf of all others similarly situated,[2] filed an Amended Class Action Complaint (the "Amended Complaint") alleging violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, against all above-captioned Defendants (Count I), and violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against Defendants Michael J. Pellini, Steven Kafka, Jason Ryan, Vincent Miller, and David Daly (the "individual Defendants") (Count II). Doc. No. 19. Defendants move to dismiss the Amended Complaint in its entirety and with

---

[1] Blair replaced former lead plaintiff Marc. F. Mahoney by order of this Court on October 20, 2017. Doc. No. 16.
[2] Plaintiff brings this action on behalf of all persons or entities who purchased the publicly traded common stock of Defendant Foundation Medicine, Inc. ("Foundation" or "Company") between February 26, 2014 and November 3, 2015 (the "Class Period"). Doc. No. 19 ¶ 1.

prejudice. Doc. No. 26. After full briefing, a hearing was held on the motion on September 13, 2018. For the reasons that follow, the Court ALLOWS Defendants' motion.

I.      BACKGROUND

The Court recites facts alleged in the Amended Complaint, Doc. No. 19, which the Court accepts as true, making all reasonable inferences in favor of the Plaintiff, for purposes of considering Defendants' motion to dismiss. See Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).

Defendant Foundation Medicine, Inc. ("Foundation") develops, manufactures, and sells diagnostic tests that identify genomic mutations associated with cancer. Doc. No. 19 ¶¶ 2, 15. During the Class Period, Foundation offered two flagship products: FoundationOne, launched in June 2012, which detects genomic alterations in solid tumors, and FoundationOne Heme, launched in December 2013, which detects genomic alterations for patients with hematologic cancers. Id. ¶ 31-32. When the tests, which the company described as "the first commercially available comprehensive molecular information products for analysis of routine cancer specimens in a clinical setting," id. ¶ 2, were launched, government insurance programs such as Medicare did not cover Foundation's tests, and private insurance only covered the tests to a limited extent. Id. ¶ 37.

During the Class Period, individual Defendants, who served as Foundation officers and directors, made various statements about the company's performance in press releases, public filings, and earnings calls. Throughout 2014, Foundation reported steadily increasing revenue and clinical test volumes. Foundation cited "the value that ordering physicians see in our approach" and "strong sales and volume increases." Id. ¶ 43. Defendants explained throughout 2014 that Foundation's sales trajectory involved initial uptake "from the major academic medical centers, the key opinion leaders" and a subsequent "migrat[ion] [of the tests] into the community

setting" after the testing "became a little bit more well known" and "started to leak out into the community, often in a regional way around [the] leading academic medical centers[.]" Id. ¶¶ 49, 142.

However, despite Foundation's positive statements to investors throughout 2014, community-based physicians were not adopting Foundation's tests to the extent anticipated. Foundation suffered from "competitive noise" from single-marker and hotspot diagnostic tests as well as from new entrants to the market. Id. ¶ 55. Physicians were opting for single-market and hotspot tests that were less expensive and covered by both Medicare and private payors. Id. ¶ 81. Additionally, physicians found Foundation's tests to be of limited utility, because few of the genes that the tests identified corresponded to a drug treatment and because the physicians lacked knowledge of how to interpret how to interpret the tests' results. Id. ¶¶ 56-57. In February 2014, Foundation ceased its prior practice of reporting the specific number of physicians that ordered its tests, claiming to analysts on the earnings call that it "elected not to continue to just state … the number of overall physicians ordering the tests" because Foundation continued to "refine the metrics that we will give the investor community." Id. ¶¶ 57, 122.

Despite these issues, in February 2015, reporting a number of tests performed in 2014 that was at the high end of Foundation's forecasted range, id. ¶ 48, Pellini stated in a press release that growth rates for fourth quarter 2014 "highlight[ed] the broad adoption of our comprehensive genomic profiling approach." Id. ¶ 191. The press release announced guidance for 2015, anticipating between 43,000 and 47,000 clinical tests and revenue between $105 and $115 million. Id. On a February 24, 2015, call discussing the 2014 results, Defendant Pellini made positive statements about the likelihood of obtaining Medicare reimbursement, stating that "we continue to believe it is a matter of when." Id. ¶ 197.

3

But beginning in May 2015, Foundation made a series of disclosures that tempered analysts' and investors' outlook. On May 11, 2015, Foundation announced a first quarter of 2015 clinical test volume of 7,854 tests. Id. ¶ 82. On the earnings call, Defendants said the test volume was due to "increased confusion in the marketplace," making it "difficult for some oncologists and pathologists to differentiate today between the various tumor profiling assays and to determine which test is most appropriate for a particular patient." Id. ¶¶ 83. Defendant Daly cited "bold and misleading marketing statements from companies" that claimed to rival Foundation's tests. Id. ¶ 214. Pellini pointed to new market entrants in next-generation sequencing-based testing and liquid biopsy-based testing. Id. ¶ 215. Daly noted the importance of the reorder rate among community-based physicians and Foundation's focus "on ensuring the actionability of the results that we provide." Id. ¶ 218.

On the same call, Foundation also acknowledged a "slight decrease" in the average reimbursement per clinical test to $3,400. Id. ¶ 84. Ryan explained that "[s]ome level of volatility in this number is to be expected before we gain broader reimbursement coverage." Id. ¶ 212. Foundation cited a January 23, 2015, draft local coverage determination issued by Palmetto GBA, LLC ("Palmetto") as grounds for optimism. Id. ¶ 84. Palmetto, a Medicare Administrative Contractor ("MAC") based in South Carolina, had issued a draft determination for "comprehensive genomic profiling" for non-smoker patients with stage IIIB or IV non-small cell lung cancer and who had already tested negative for certain genomic mutations. Id. ¶ 73. Because Palmetto enjoyed a reputation as having a leading role in molecular diagnostics coverage and reimbursement, id. ¶ 74, Foundation called its determination "an important step." Id. ¶ 84. Moreover, Foundation maintained its 2015 guidance of expected revenue of between $105 and $115 million and expected clinical market tests (excluding those ordered by

4

Foundation's biopharmaceutical partners) of between 43,000 and 47,000 tests. Id. ¶ 85. The following day, May 12, 2015, Foundation's stock price fell by 9.8 percent, or $4.33, to $39.66 per share, on unusually heavy volume. Id. ¶¶ 86, 226.

On July 29, 2015, Foundation reported financial results for the second quarter of 2015, including 8,846 clinical tests, short of analysts' forecast of 9,770 tests. Id. ¶ 87. Foundation cited "slower than anticipated progress towards obtaining a local coverage determination from [NGS] and by some competitive noise in the market." Id. Upon this report, Foundation announced a material downward adjustment of its 2015 guidance, to between $85 million and $95 million in revenue and between 35,000 and 38,000 tests. Id. During the earnings call, Defendants told investors that Foundation was not seeing "the commonly observed carryover effect from [the Palmetto draft determination] that we would typically expect to see in the field," while also noting that "there was no direct precedent for this approach." Id. ¶ 88. Pellini informed investors that its prior 2015 guidance for clinical volume testing assumed having a local coverage determination for a portion of Medicare cases in place and that Foundation was "no longer assuming any Medicare payment for the rest of 2015." Id. Ryan noted that the "changes to guidance are driven by a shift in our assumptions around the timing of Medicare payments, the associated effect that a [local coverage determination] can have on non-Medicare volumes, and some of that competitive noise [in] the marketplace related to hotspot-based testing." Id. ¶ 89. Following these announcements, Foundation's stock price fell by 24 percent on June 30, 2015 (by $7.00, to $22.30 per share) and another nine percent on July 31, 2015 (by $2.00, to $20.20 per share), on abnormally high trading volume. Id. ¶¶ 91, 240. Foundation's August 7, 2015 filing of Form 10-Q for the second quarter of 2015 listed the company's previously-announced financial results and clinical test volume numbers. Id. ¶¶ 241-42.

5

On November 3, 2015, the last day of the Class Period, Foundation reported disappointing revenue and a clinical test volume of only 8,102 tests for the third quarter of 2015. Defendants attributed this third straight quarter of missed estimates to a slowdown in reorder rates, sparing use of Foundation's tests by oncologists, and difficulty in harnessing the test results. Id. ¶ 94. As a result, Foundation again downwardly adjusted its 2015 testing volume guidance to between 32,000 and 33,000 tests. Id. On the earnings call, Defendant Ryan reported that the average reimbursement per clinical test recognized in revenue fell from $3,400 to $3,200. Id. ¶ 253. After these announcements, Foundation's share price fell by 28 percent (by $6.62, to $17.31) on unusually heavy volume. Id. ¶¶ 96, 261.

Plaintiff's Amended Complaint enumerates numerous statements and omissions during the Class Period that Plaintiff alleges were materially false and misleading. The alleged misrepresentations generally include positive and encouraging statements about Foundation's tests, statements about Foundation's competitive advantage and growth prospects, and statements about anticipated Medicare coverage and reimbursement. Id. ¶ 105. The alleged omissions generally include the extent of competitive pressures that negatively affected test volumes and the lack of clinical utility of the tests. Id. Separately, Plaintiff alleges omissions in violation of Item 303 of Regulation S-K, 17 C.F.R. § 229.303 ("Item 303"), which requires the disclosure of all "known trends … that have had or that the registrant reasonably expects will have a material … unfavorable impact on … revenues." Plaintiff alleges that Defendants failed to disclose, in Foundation's SEC filings during the Class Period, the rejection by community-based oncologists of Foundation's tests, the competition from academic medical centers and other diagnostic tests, the unwillingness by clinicians to order Foundation's tests without secured reimbursement, and

Foundation's inability to obtain reimbursement for more than just one of the six clinical indications for which it was sought. Doc. No. 19 ¶ 109.

Plaintiff alleges that these various statements or omissions were materially false and misleading because Foundation's tests lacked the reported commercial demand; because the tests lacked the clinical utility that might drive such demand and provide oncologists with valuable treatment information; because Defendants artificially boosted clinical test volumes to create the appearance of widespread adoption by providing oncologists with various undisclosed incentives and discounts; because Defendants overstated the average revenue per clinical test that it expected to receive; because Defendants could not obtain broad Medicare reimbursement for each of the six clinical indications; and because Defendants ceased to report the actual number of test-ordering physicians each quarter. See, e.g., id. ¶ 129.

Plaintiff claims that the alleged statements and omissions constituted a fraudulent scheme to artificially inflate the price of Foundation common stock and operated as a fraud or deceit on investors who purchased Foundation common stock during the Class Period. Id. ¶ 268. The Amended Complaint alleges that Foundation made a series of partial disclosures that avoided a swifter and steeper stock price decline that would have resulted from full disclosure of the facts adverse to Foundation's business prospects. Thus, purchasers of Foundation common stock suffered damages by purchasing stock at artificially high share prices as a result of Defendants' misrepresentations and omissions and sustaining losses upon subsequent market revelations. Id. ¶¶ 275-80. In addition, Plaintiff claims that the individual Defendants, except Defendant Daly, sold, during the Class Period, about $21 million of their personally held Foundation stock at artificially inflated prices that were the result of their conduct during the Class Period. Id. ¶ 293.

7

II.     DISCUSSION

As an initial matter, Plaintiff moved to strike Defendants' Exhibits 1 and 2 to their Motion to Dismiss, asserting the submission of these documents violates an agreement between the parties memorialized in their Joint Motion for Leave of Court to Exceed Page Limit and the Court's order granting that motion. Doc. No. 32 at 2. Exhibit 1 is a table summarizing risk disclosures and cautionary statements made by Foundation in its various SEC filings. Doc. No. 28-1 at 1-18. Exhibit 2 is a reference table cataloguing the misstatements and omissions alleged in the Amended Complaint and explaining why they are not actionable under Rule 10b–5. Doc. No. 28-1 at 19-67. At no point in the motion to strike did Plaintiff seek as alternative relief leave to file a responsive exhibit or additional briefing. The Court does not view the two exhibits as argumentative in nature and, in any event, the exhibits are helpful to the Court, particularly because the Amended Complaint, Doc. No. 19, spans more than 120 pages. Accordingly, the Plaintiff's Motion, Doc. No. 31, is DENIED.

To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The complaint must contain enough factual content to allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Further, "Plaintiffs alleging violations of Section 10(b) must plead (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." In re Biogen Inc. Sec. Litig., 857 F.3d 34, 41 (1st Cir. 2017). The Amended Complaint "must also meet the heightened pleading standards of the [Private Securities Litigation Reform Act], which requires that [it] 'specify each statement alleged to have been misleading' as well as 'the reason or reasons why the statement is misleading.'" Id. (quoting 15

8

U.S.C. § 78u-4(b)(1)). Defendants argue that the Amended Complaint fails to plead scienter, an actionable misstatement or omission, and loss causation. Doc. No. 27 at 17-18.

A. Lack of Scienter

The PSLRA requires that a complaint contain particular facts that give rise to a strong inference of scienter. "For an inference of scienter to be strong, a reasonable person would have to deem it cogent and at least as compelling as any opposing inference one could draw from the facts alleged." In re Biogen, 857 F.3d at 41 (citation omitted). This standard may be met by "clear allegations, internal records, or witnessed discussions suggesting that at the time they made the statements claimed to be misleading, the defendants were aware that they were withholding vital information," or by a combination of "various other facts and circumstances indicating fraudulent intent, including those demonstrating motive and opportunity." Brennan v. Zafgen, Inc., 853 F.3d 606, 614 (1st Cir. 2017) (internal quotations and citations omitted).

1. *Foundation's Growth*

The Amended Complaint alleges that Defendants knew, or were severely reckless in disregarding, the commercial challenges facing Foundation, including declining growth in testing volume and the lack of progress in obtaining reimbursement for its tests. Plaintiff cites several facts that he claims collectively support a strong inference of scienter: Defendants' positions within Foundation, the importance of the tests to the company's commercial viability, Defendants' various statements about the company's performance, and Defendants' sales of Foundation common stock. Doc. No. 19 ¶¶ 281-294. Plaintiff's essential allegation is that Defendants misled them by creating a misleading picture of demand for Foundation's tests and the company's revenue.

9

As to Foundation's revenue during the Class Period, Plaintiff does not allege that any of the financial or operational data Foundation released during the period was inaccurate. Rather, Plaintiffs acknowledge that Foundation disclosed each quarter its revenue, testing volume, revenue per test, and the share of its testing reported to community-based physicians. Id. ¶¶ 45-48. Despite this acknowledgement, Plaintiff claims that the average revenue per test was misleading because Defendants "overstat[ed]" it, id. ¶ 129(e), by stating the number of tests performed in a given quarter alongside revenue received in that quarter, even though the revenue was not generated exclusively by the performance of those tests in particular.

But Foundation's statements and public filings made clear that its average revenue figure included only tests "recognized in revenue during" each quarter, not tests *performed* during that quarter. See, e.g., id. ¶ 132. The company's public filings also provided detailed figures on the number of tests performed, but not reimbursed, in each quarter, breaking those tests down into categories for "tests . . . for patients covered by Medicare and for which claims were not yet submitted or paid," "tests that were reported and not billed," and "tests that were reported and billed to commercial third party payors during the relevant period but not paid during the period." See, e.g., Doc. No. 28-1 at 447. Further, filings also disclosed the number of tests "reported in prior" periods but for which revenue was received in the current period, id., giving investors all of the figures necessary to determine how many tests the company received revenue for in a given period, and, by proxy, the number of tests to which the average revenue figure referred. An investor could also simply divide the total revenue by the average revenue to determine that figure. Because the figures disclosed make clear that the number of tests performed contained a significant number of tests for which revenue was not received in the period, this claim does not give rise to a strong inference that Defendants intended to withhold

10

information or had fraudulent intent. See Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc., 778 F.3d 228, 244 (1st Cir. 2015) (defendants' informative disclosures "undercut any inference of scienter").[3]

Plaintiff also claims that Defendants misled investors by providing figures on the number of tests performed without disclosing that many of those tests were performed at significant discounts. Doc. No. 19 ¶ 53. This claim appears to suggest that the figures Defendants released misleadingly concealed the fact that revenue per test performed would inevitably be lower in future periods because of discounts promised in previous periods. But Plaintiff alleges no specific facts regarding discounting, instead providing only a blanket claim that Foundation was offering significant discounts. He also does not allege that Defendants ever released inaccurate information about company revenue or the number of tests it reported, nor does he specify any time at which revenue per test reported ever actually fell because of Foundation's discounting practices. Without more specific facts showing that Foundation's discounting amounted to fraud, this claim also fails to give rise to a strong inference of scienter.

    2.    *Reimbursement Eligibility*

Similarly, Plaintiff does not allege that Defendants' claims about Foundation's progress toward achieving reimbursement eligibility, particularly from Medicare, were inaccurate. To the contrary, Plaintiff acknowledges that Defendant admitted that "there was no direct precedent for reimbursement of its tests by government and private commercial payors," id. ¶ 67, and reported

---

[3] Plaintiff's arguments about Defendants' statements about physicians' reorder rates for its tests fail for similar reasons. Although Plaintiff claims that Defendants "knew, or recklessly disregarded, that physicians were not reordering" Foundation's tests, Doc. No. 19 ¶ 57, he fails to point to any statement about reorder rates that was false or misleading. Indeed, Defendants acknowledged several times that Foundation's shift to focusing on community physicians was causing lower reorder rates. Id. ¶¶ 181, 217, 218, 234, 258, 275.

11

accurately on the steps Foundation took to secure such reimbursement, id. ¶ 68-73. Plaintiff also acknowledges Defendants' statements highlighting the inherent uncertainty in the Medicare approval process. See, e.g., id. ¶ 196. As a result, investors were not misled into believing that Medicare coverage for Foundation's tests was a certainty, much less that such coverage would begin by a certain date. In the absence of a specific statement that was inaccurate or misleading, Defendants' public conduct with respect to Medicare reimbursement is insufficient to create a strong inference of scienter.

Plaintiff also argues that Defendants must have known at the time they claimed that Foundation would receive Medicare coverage for its tests during 2015 that such coverage was "virtually impossible" because of the Medicare program's internal processes for adopting new coverage standards, which Plaintiffs claim for the first time in their opposition to Defendant's Motion to Dismiss include certain waiting periods before new coverage takes effect. Doc. No. 33 at 25. As a result, Plaintiff argues, Defendant's statements in February and May 2015 projecting Foundation's 2015 revenue were misleading at the time they were made. Id.

However, Plaintiff points to no indication that Defendants were aware of these rules at the time of their statements, and such knowledge would be essential to a strong inference of scienter. Plaintiff also offers facts insufficient to establish that Defendants' July 29, 2015, reduction in revenue guidance was substantially the result of the timing of the possibility of Medicare reimbursements. Rather, Plaintiff acknowledges that Defendants called Medicare reimbursement only "one substantive piece of the change in the revenue guidance," Doc. No. 19 ¶ 237, and that the earlier revenue guidance had included the possibility of only a "local coverage determination . . . for a portion of Medicare cases," id. ¶ 230, not a national determination that could have affected all of Foundation's Medicare cases. These facts undercut

12

Plaintiff's suggestion that Defendants' earlier statements of higher revenue guidance were misleading when made because they were entirely dependent on Medicare reimbursement timing that Defendants knew was impossible.

Finally, even taking Plaintiff's account of the Medicare program rules as true, its conclusion that reimbursements in the first half of 2015 were an absolute impossibility is incorrect. Plaintiff reasons that Foundation would not have received Medicare reimbursement for about five months after its regional MAC adopted a local coverage determination for Foundation's products: first, a 90-day waiting period before the determination would become effective, and then approximately two months before claims would actually be paid under the determination. Doc. No. 33 at 25. But Foundation had been submitting claims for Medicare reimbursement at least as early as February 2014. Id. ¶ 114. As Defendants explain in reply, Foundation could have received payments for tests performed and submitted for reimbursement in earlier periods as soon as coverage became effective, making the actual delay only 90 days, not five months. Doc. No. 37 at 23. As a result, had Foundation's MAC announced a coverage determination in the first quarter of 2015, reimbursement could have begun within the first half of the year. If Defendants' revenue projections did include Medicare reimbursement the first half of 2015, such an optimistic assumption does not, therefore, necessarily support a strong inference of scienter. In any event, Plaintiff has not alleged sufficient facts regarding the significance of Medicare reimbursement to the revenue projections or the related facts regarding possible Medicare reimbursement at the time of the relevant alleged statements to support a strong inference of scienter.

3.  *Defendants' Stock Sales*

Finally, Defendants' sales of stock, as outlined in the Amended Complaint, also fail to support a strong inference of scienter. "[A]llegations of unusual insider trading . . . can support a strong inference of scienter," but "mere pleading of insider trading, without regard to either context or the strength of the inferences to be drawn, is not enough." Greebel v. FTP Software, Inc., 194 F.3d 185, 198 (1st Cir. 1999). Plaintiff fails to allege that the trades that he identifies by certain of the individual Defendants were unusual. In fact, the Amended Complaint only points to the fact that Defendants made the sales during the Class Period. Doc. No. 19 ¶ 293. It does not indicate how the sales were unusual, either on their own or as compared to Defendants' trading outside the Class Period. Nor does it allege that the timing or amounts of Defendants' sales indicate knowledge of artificially inflated prices. See Lenartz v. Am. Superconductor Corp., 879 F.Supp.2d 167, 186 (D. Mass. 2012) (plaintiff has the burden to show that alleged "insider sales were in fact unusual or suspicious in timing or amount"). Further, the Amended Complaint provides no comparison to Defendants' sales before or after the Class Period to suggest that Defendants acted upon artificially-inflated prices caused by materially false and misleading statements and omissions that they knowingly or recklessly made. See id. (plaintiff must "provide information on the defendant's trading both before and after the Class Period, so the court can assess the sales in context"). Accordingly, the bare facts alleged in the Amended Complaint about Defendants' trading do not permit a strong inference of scienter.

Plaintiff's opposition, Doc. No. 33 at 27, points to the Amended Complaint's allegation that a large share of Defendants' sales occurred in the early days of March 2015, Doc. No. 19 ¶ 293, shortly after Palmetto had issued its draft local coverage determination, id. ¶ 73, and after Defendants discussed the draft determination in its February 24, 2015, conference call held in

14

conjunction with Foundation's quarterly results announcement, id. ¶ 192. Plaintiffs argue that "[t]he fact that three separate executives all sold significant positions on or about the same day . . . is highly unusual and suspicious," particularly because of the sales' proximity to the draft determination. Doc. No. 33 at 27.

But allegations about insider trading must "give rise to inferences that are at least as strong as any competing inferences regarding scienter." Mississippi Pub. Employees' Ret. Sys. v. Boston Sci. Corp., 523 F.3d 75, 93 (1st Cir. 2008). At the time of the early March sales, Foundation had just received positive news from Palmetto. Further, on February 2, 2015, shortly before Defendants' stock sales in early March, Roche Holdings, Inc. had commenced a tender offer to purchase 18,758,256 shares of Foundation stock. See Foundation Medicine, Inc., Amendment No. 7 to Schedule TO (Form SC TO-T/A) (Apr. 14, 2015).[4] The tender offer, which was oversubscribed, resulted in Roche's ownership of 57 percent of Foundation. Id. The price of Foundation stock also increased dramatically from late 2014 to the first months of 2015. Doc. No. 19 ¶ 293. These two events make plain "'a substantial incentive for holders to sell' regardless of any material non-public information," rendering Defendants' stock sales "readily explainable." In re Ariad Pharm., Inc. Sec. Litig., 842 F.3d 744, 754 (1st Cir. 2016) (quoting Local No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharm., Inc., 838 F.3d 76, 84–85 (1st Cir. 2016).

---

[4] The Court takes judicial notice of this matter of public record, the accuracy of which cannot reasonably be questioned, and evaluates it as part of the inquiry into scienter. See Boston Sci. Corp., 523 F.3d at 86 ("[S]cienter should be evaluated with respect to 'the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'") (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)); see also Freeman v. Town of Hudson, 714 F.3d 29, 36 (1st Cir. 2013) ("official public records" may be considered at the motion to dismiss stage when they are "subject to judicial notice under Federal Rule of Evidence 201"); Ezra Charitable Tr. v. Tyco Int'l, Ltd., 466 F.3d 1, 10 n.7 (1st Cir. 2006) (taking judicial notice of facts in an SEC filing to evaluate a motion to dismiss for lack of scienter under the PSLRA).

Plaintiff's suggested inference of unusual insider trading is undermined by this clear alternative inference.[5]

Finally, Defendants Pellini, Ryan, and Miller retained significant portions of their Foundation stock through the end of the Class Period, while Defendant Kafka increased his holdings. Doc. No. 27 at 26-27. Taking these factors together, Defendants' trading pattern does not suggest that they were trying to sell their shares during a period in which the stock price was artificially high to an extent sufficient to create a strong inference of scienter.

    4.    *Totality*

Evaluating together all of the various facts and considerations discussed above, the allegations in the Amended Complaint fail to create a strong inference of scienter that is "at least as compelling as any opposing inference of nonfraudulent intent," In re Biogen, 857 F.3d at 41. Accordingly, the Court finds that the Amended Complaint does not clear the hurdle set by the PSLRA.

    B.    <u>Dismissal for Lack of Actionable Omission of Item 303 Information</u>

Plaintiff also alleges that Foundation failed to disclose trends or uncertainties required to be disclosed under Item 303. E.g., Doc. No. 19 ¶ 109. However, Plaintiff's opposition to Defendants' Motion to Dismiss fails to respond to Defendants' arguments that this claim should be dismissed. See Doc. No. 33. Accordingly, Plaintiff has waived his Item 303 claims. See

---

[5] Defendants also suggest that the stock sales were made as part of 10b5–1 trading plans and therefore were not discretionary. Doc. No. 27 at 25-26. Although the Court can take judicial notice of the trading plan's existence, as documented in SEC filings, in light of the discussion above the Court need not go further to determine the significance of the plans to the scienter analysis or to address at this stage questions such as "when the trading plans went into effect, that such trading plans removed entirely from defendants' discretion the question of when sales would occur, or that they were unable to amend these trading plans." Boston Sci. Corp., 523 F.3d at 92.

16

Perkins v. City of Attleboro, 969 F. Supp. 2d. 158, 177 (D. Mass. 2013) (deeming a claim not addressed in an opposition to a motion to dismiss waived).[6]

C. Other Issues

Because of the absence of scienter and Plaintiff's failure to response to Defendants' arguments that the Item 303 claim should be dismissed, the Court need not address the other issues in the Amended Complaint and Plaintiff's opposition to the Motion to Dismiss.[7]

III. CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Strike, Doc. No. 31, is DENIED, and Defendants' Motion to Dismiss, Doc. No. 26, is ALLOWED.

In a footnote, Plaintiff has also requested leave to amend his Amended Complaint again. Doc. No. 33 at 37 n.15. Plaintiff has already had substantial time to revise his allegations, previously amended his Complaint once, and in neither his opposition nor in any other document has Plaintiff asserted he could cure deficiencies identified by Defendant, let alone submitted support to back up such an assertion. Accordingly, this insufficient request to amend is denied, and Plaintiff's claims are DISMISSED WITH PREJUDICE.

SO ORDERED.

/s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

---

[6] Not only did Plaintiff not address Defendants' argument in his briefs, Plaintiff also did not address it at the September 13, 2018, hearing, even though Defendants had pointed out Plaintiff's failure to respond in their reply to Plaintiff's opposition.

[7] Because the Court dismisses the Rule 10b–5 claim, the derivative controlling person claim under Section 20(a) "needs no separate discussion" and is also dismissed. In re Boston Sci. Corp. Sec. Litig., 686 F.3d 21, 26 n.1 (1st Cir. 2012).